**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

KEWAZINGA CORP.,

              Plaintiff,

        v.

GOOGLE LLC,

              Defendant.

Civil Action No. 1:20-cv-1106-LGS

**REDACTED VERSION**

<u>**STATEMENT OF MATERIAL UNDISPUTED FACTS IN SUPPORT OF**</u>
<u>**GOOGLE LLC'S MOTION FOR SUMMARY JUDGMENT OF EQUITABLE**</u>
<u>**ESTOPPEL**</u>

Pursuant to Local Civil Rule 56.1, Defendant Google LLC ("Google") identifies the following material facts to which there is no genuine issue to be tried.

1.      Since 2002, together with developers at Stanford University, Google was developing the concept of using imagery within maps to allow users to virtually explore a location, a concept that was developed into Street View.  (Filip Decl. ¶¶ 4–8, Ex. 1.)

2.      In a November 2002 presentation to Google, developers from Stanford University described the development of a project called "CityBlock" to "obtain a useful representation for viewing an entire commercial city block;" described that the technology could be used in "Web-based map finders" to "[g]et a picture of the place you want to go;" described an additional use as providing "[v]irtual tours;" showed how the CityBlock team chose to focus on "image-based representations" to view city blocks; described several issues that the team was addressing in capturing street-level imagery, including issues displaying imagery in a perspective that would "give the impression that the viewer is standing right in front of the store," whether "fish-eye

1

lenses" could be used, and how to convey the presence of buildings both vertically and horizontally; described the approach the team was taking in 2002 by using "a panning video of street block[s]" to provide glide projections for a viewer; depicted how imagery was already being captured by mounting a Sony camera to the back of a truck on Sunday mornings in Mountain View, California; discusses logistical issues of mapping the "~2.4 million miles of paved road in the US," and estimates that it would require "100 days worth of driving time to capture the entire commercial US."  (Filip Decl. ¶¶ 6–7, Ex. 1.)

3.       No one on the team within Google that was developing Street View in the 2005–2007 time frame was in contact with Kewazinga prior to the launch of Street View, and no one on the team that was developing Street View incorporated any ideas or concepts that originally came from Kewazinga.  (Filip Decl. ¶ 13–14.)

4.       Kewazinga first contacted Google in 2005.  (Sherwood Decl. ¶ 4; Filip Decl. ¶ 13.)

5.       Kewazinga did not provide Google any information in the 2005–2006 time frame under a confidentiality or non-disclosure agreement.  (Worley Dep. 88:9–20.)

6.       Google launched Street View on May 25, 2007.  (Kewazinga's 6/16/2020 Response to Google's Interrogatory No. 4; Filip Decl. ¶ 10.)

7.       Kewazinga did not form a belief that Google infringed Kewazinga's patents until 2012.  (Worley Dep. 116:15–117:6.)

8.       Prior to January 2013, Kewazinga did not explicitly communicate to Google that Google infringed the '226 and '325 patents by making, using, or providing Street View. (Kewazinga's 6/8/2020 Response to Google's RFA No. 24.)

9.      Kewazinga filed a Complaint against Google on May 24, 2013, alleging that Google infringed the '226 patent and the '325 patent (the "2013 Action").  (Kewazinga's 6/4/2020 Response to Google's RFA No. 1.)

10.      Jim Sherwood is senior counsel at Google who was responsible for the Kewazinga matter in 2013.  (Sherwood Decl. ¶¶ 1, 3.)  Before joining Google, Mr. Sherwood practiced patent litigation at Finnegan, Henderson, Farabow, Garrett & Dunner and clerked at the Court of Appeals for the Federal Circuit.  (Sherwood Decl. ¶ 2.)  Since 2012, Mr. Sherwood has been responsible for Google's management of almost every patent litigation filed against the company that involves the Street View feature, of which there have been at least half a dozen.  (*Id*.)

11.      In May 2013, shortly after receiving a copy of Kewazinga's complaint in the 2013 Action, Mr. Sherwood directed members of his team to begin investigating non-infringement and invalidity.  (Sherwood Decl. ¶ 1, 6; *id*. Ex. 5.)  Google formed the belief that Google did not infringe and that the patents-in-suit were likely invalid.  (Sherwood Decl. ¶ 6; *id*. Ex. 5.)

12.      Consistent with his practice in other cases, Mr. Sherwood initiated procedures within the legal department so that Google could defend itself in the 2013 Action against Kewazinga.  (Sherwood Decl. ¶ 7.)

13.      On May 29, 2013, Google, through Mr. Sherwood, instituted legal holds— instructions to preserve emails, documents, and other records—on individuals believed to have information relevant to Kewazinga's assertions.  (Sherwood Decl. ¶ 7.)  Recipients included Stephen Chau, Gaurav Garg, Kei Kawai, Marc Levoy, Brian McClendon, Augusto Roman, Sebastian Thrun, and Luc Vincent (all of whom were instrumental to the early development of Street View); and others who worked on Street View.  (*Id.*)

14.     In response to Kewazinga's 2013 complaint, consistent with Mr. Sherwood's practice in other cases, he requested initial analyses concerning Kewazinga's allegations and Google's potential defenses from outside law firms.  (Sherwood Decl. ¶ 8; *id*. Exs. 6–7.)

15.     The initial legal analyses received by Google from the Perkins Coie and Akin Gump law firms in 2013 included proposed defenses that Google could pursue in response to Kewazinga's assertions.  (Sherwood Decl. ¶ 9; *id*. Exs. 6–7.)

16.     In the initial legal analyses received by Google in 2013 from the Perkins Coie and Akin Gump law firms, each law firm advised that there were potential alternative designs to Street View that Google could implement in order to avoid the alleged infringement theory or mitigate alleged damages.  (Sherwood Decl. ¶ 18; *id*. Exs. 6–7.)  For example, Perkins Coie discussed how its team would identify potential non-infringing alternatives in order to limit damages in the case and potential invalidity arguments.  (*Id*. Ex. 7.)  As a further example, Akin Gump ███████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████  (*Id*. Ex. 6.)

17.     Google received an initial analysis from the Sterne Kessler law firm in 2013 that outlined a timeline and strategy to file *inter partes* review petitions at the Patent Office to invalidate the asserted claims.  (Sherwood Decl. ¶ 10; *id*. Ex. 8.)

18.     Based on Sterne Kessler's analysis, Google intended to prepare and file *inter partes* review petitions concerning the '226 and '325 Patents if Kewazinga served its 2013 complaint. (Sherwood Decl. ¶ 11.)

19.     In August 2013, representatives from Google met with representatives from Kewazinga to discuss the case.  (Sherwood Decl. ¶ 12; Smalheiser Dep. 25:7–21, 32:4–8; Worley Dep. 141:14–142:4.)

20.     Mr. Sherwood no longer recalls the nature of any damages or settlement demand discussed at the parties' August 2013 meeting.  (Sherwood Decl. ¶ 12.)

21.     At the August 2013 meeting between representatives of Google and Kewazinga, ███████████████████████████████████████████████████████████████████. (Smalheiser Dep. 30:8–25; Worley Dep. 178:4–179:2.)

22.     At the August 2013 meeting between representatives of Google and Kewazinga, Google explained why it did not infringe the '325 and '226 Patents.  (Sherwood Decl. ¶ 12.)

23.     Google contended that it did not infringe the '226 patent in communications between Kewazinga and Google in which the parties discussed, among other things, Kewazinga's patent infringement allegations in the Complaint that Kewazinga filed against Google on May 24, 2013.  (Kewazinga's 6/4/2020 Response to Google's RFA No. 2.)

24.     Google contended that it did not infringe the '325 patent in communications between Kewazinga and Google in which the parties discussed, among other things, Kewazinga's patent infringement allegations in the Complaint that Kewazinga filed against Google on May 24, 2013.  (Kewazinga's 6/4/2020 Response to Google's RFA No. 3.)

25.     On September 11, 2013, Ian DiBernardo, counsel for Kewazinga, sent an email to Jim Sherwood at Google, stating in part: ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████████████████ (Sherwood Decl.

¶ 13; *id*. at Ex. 9.)

26.     Google understood Kewazinga's September 11, 2013 email to be a threat of assertion of its pending patent application, should it mature into a patent.  (Sherwood Decl. ¶ 13; *id*. at Ex. 9.)

27.     Kewazinga put Google on notice of and threatened assertion of a pending continuation application related to the '226 patent and '325 patent in communications between Kewazinga and Google in which the parties discussed, among other things, Kewazinga's patent infringement allegations in the Complaint that Kewazinga filed against Google on May 24, 2013. (Kewazinga's 6/4/2020 Response to Google's RFA No. 4; Worley Dep. 155:4–14.)

28.     Following the September 11, 2013 email, Google had at least one further phone conversation with Ian DiBernardo in which Google reiterated its non-infringement arguments. (Sherwood Decl. ¶ 14.)

29.     Google did not receive any further response or communication from Kewazinga, and Kewazinga did not serve its complaint, which led Google to believe that Kewazinga understood its case was weak.  (Sherwood Decl. ¶ 14.)

30.     On September 25, 2013, Google moved to dismiss the complaint in the 2013 Action because Kewazinga had not served the complaint within the requisite 120 days of filing its complaint.  (Sherwood Decl. ¶ 14.)

31.     On October 17, 2013, Kewazinga filed a response and non-opposition to Google's motion to dismiss, in which Kewazinga stated that it "had no intention of serving Google." (Sherwood Decl. ¶¶ 15–16; *id*. Ex. 10; Kewazinga's 6/4/2020 Response to Google's RFA No. 9.)

32.     Google understood Kewazinga's statements as its acknowledgement of the weakness of its case; and that, true to its word, it "had no intention" of continuing its assertion against Google.  (Sherwood Decl. ¶¶ 15–16.)

33.     Although the non-opposition called for dismissal "without prejudice," Kewazinga nowhere suggested that it had any intention of refiling the litigation.  (Sherwood Decl. ¶ 15.)

34.     ███████████████████████████████████████████
████████████████████████████████████████████████ (Worley Dep. 144:19–145:7; Smalheiser Dep., 144:10–25.)

35.     On November 14, 2013, shortly after Kewazinga filed its non-opposition, the District of Delaware court dismissed the 2013 Action and closed the case.  (Sherwood Decl. ¶ 15; Kewazinga's 6/4/2020 Response to Google's RFA No. 10.)

36.     In light of Kewazinga's non-opposition to Google's motion to dismiss—and particularly in view of its statement that it "had no intention of serving Google"—and the subsequent dismissal of the case, Google closed down the internal legal processes it had initiated in defense of Kewazinga's allegations.  (Sherwood Decl. ¶ 16.)

37.     On November 14, 2013, after the dismissal of the 2013 Action, relying on Kewazinga's conduct, Google released litigation holds put in place for the Kewazinga matter. (Sherwood Decl. ¶ 24; *id.* Ex. 13.) ██████████████████████████████████
████████████████████████████████████████████████ (*Id.*) Google knows that certain documents were lost since 2013 because in this case Kewazinga produced communications with Google that Google could not find in its records.  (*Id.*)

38.     After the dismissal of the 2013 Action, relying on Kewazinga's conduct, Google did not move forward with plans to file IPR petitions on Kewazinga's patents.  (Sherwood Decl. ¶ 20.)

39.     After the dismissal of the 2013 Action, relying on Kewazinga's conduct, Google did not retain either the Akin Gump or Perkins Coie law firms, or further investigate the strategies and defenses outlined by each of those law firms.  (Sherwood Decl. ¶ 19.)

40.     After the dismissal of the 2013 Action, relying on Kewazinga's conduct, Google did not believe that there was any active case-or-controversy between the parties that would give Google standing to bring a declaratory judgment action against Kewazinga.  *See, e.g., Google Inc. v. Rockstar Consortium U.S. LP*, No. 4:13-cv-5933-CW (N.D. Cal. filed Dec. 23, 2013). (Sherwood Decl. ¶ 20.)

41.     On December 11, 2013, after the dismissal of the 2013 Action, relying on Kewazinga's conduct, Google represented to its financial auditors at Ernst & Young that the Kewazinga matter was closed.  (Sherwood Decl. ¶¶ 21, 23; *id*. Ex. 11.)

42.     On April 1, 2014, after the dismissal of the 2013 Action, relying on Kewazinga's conduct, Jim Sherwood delivered a presentation internally at Google informing executives within the company that the Kewazinga matter had been resolved.  (Sherwood Decl. ¶¶ 21, 22; *id*. Ex. 12.)

43.     Google informs its internal teams and its auditors of ongoing litigation matters, and Mr. Sherwood would not have told Google's internal teams or auditors that he considered the Kewazinga matter to be fully resolved if he believed that there was a risk of Kewazinga asserting its patents at some point in the future.  (Sherwood Decl. ¶ 23.)

44.     Stephen Chau, Gaurav Garg, Kei Kawai, Marc Levoy, Brian McClendon, Augusto Roman, Gaurav Garg, Sebastian Thrun, Marc Levoy, and Luc Vincent are all individuals who

likely have knowledge relevant to Kewazinga's allegations and were instrumental to the early development of Street View.  (Sherwood Decl. ¶ 32.)  All of these former employees left Google since the dismissal of the 2013 Action.  (*Id*.)  In addition, with the passage of time, Google employees Jill Szuchmacher and Vincent Cerf, who Kewazinga claims to have communicated with in the 2005–2006 time frame, have no recollection of Kewazinga.  (*Id.* ¶ 4.)

45.    Andrew Weber was a Vice Chairman of Kewazinga between October 5, 2005 and October 10, 2014.  (Kewazinga's 6/15/2020 Response to Google's RFA No. 27.)

46.    Andrew Weber, who was a named inventor on the patents-in-suit, died on October 10, 2014.  (Kewazinga's 6/15/2020 Response to Google's RFA No. 28.)

47.    Andrew Weber sent emails from his personal email account regarding Kewazinga business.  (Worley Dep., 92:25–93:25.)

48.    ██████████████████████████████████████████████████████ ███████████████████████ (Worley Dep. 92:25–93:25.)

49.    In the late 2013 to early 2014 time frame, Google began development of a complete redesign of its latest generation Street View camera system, which came to be known as the H1 or "Herschel" camera system.  (Marquardt Decl. ¶ 3.)

50.    In the 2015–2016 time frame, Google approved a ████████ investment into Herschel, ████████████████████████████████████████. (Marquardt Decl. ¶¶ 4–5; *id*. Ex. 3. ("████████████████████████████████ ████████████████████████".))

51.    That investment was ████████████████████████████ ████████████████████. (Marquardt Decl. ¶ 5; *id*. Ex. 3 at 2116.) ████████████ ████████████████████████████████████████ (Marquardt Decl. ¶ 5.)

52.      ████████████████████████████████████████████.  (Marquardt

Decl. ¶¶ 7, 9.)  ████████████████████████████████████████████

████████████████████████████████████████████  (*Id.*)

53.      Between December 11, 2014 and February 6, 2020, Google spent at least

████████████  on the Herschel camera system.  (Marquardt Decl. ¶ 12.)

54.      Google regularly makes changes to Street View, including changes to pixel capture,

metadata capture, processing, storage, serving, and user-facing software across Street View's

various platforms.  (Marquardt Decl. ¶ 17.)

55.      Google weighs various factors when deciding whether, how, and when to invest in

its products; whether, how, and when to make changes to its products; and whether, how, and when

to develop, launch, or discontinue its products.  (Marquardt Decl. ¶ 18.)  The factors it weighs in

making those decisions include economic, practical, technical, legal, regulatory considerations,

and user-experience considerations.  (*Id.*)

56.      After the dismissal of the 2013 Action, relying on Kewazinga's conduct, Google

did not further investigate potential design-arounds for Street View that would avoid Kewazinga's

patents and/or mitigate damages.  (Sherwood Decl. ¶ 19.)

57.      It is Google's in-house counsel's standard practice to consider and investigate the

implementation of potential design-arounds to an assertion of patent infringement where

appropriate.  That is particularly true in cases where the plaintiff seeks injunctive relief or an

ongoing royalty.  In several other litigations pending in the 2013 time frame involving Street View,

Google worked with outside counsel to investigate potential design-arounds to Google Maps and

Street View.  (Sherwood Decl. ¶ 17.)

58.     Had Kewazinga pressed forward with its allegations of infringement in and after 2013, Google would have further investigated potential design-arounds for Street View that would avoid Kewazinga's patents and/or mitigate damages, including by further investigating the non-infringing alternatives proposals detailed by the Akin Gump and Perkins Coie law firms. (Sherwood Decl. ¶ 19.)

59.     For example, had Kewazinga pressed forward with its claims, Google could and would have consulted with Google's engineers and executives about modifying Street View by implementing a single fish-eye lens (thereby avoiding the "array of cameras" limitations of Kewazinga's patents); deactivating the transition animation effects when a user moves from one panorama to another panorama (thereby avoiding the "tweening" limitations of Kewazinga's patents); storing and processing Street View imagery outside the United States (thereby avoiding alleged infringement of method steps covering storage and processing); pre-fetching nearby Street View imagery when a user selects a particular Street View location (avoiding the "sequentially providing" limitations of Kewazinga's patents); changing the interval at which Street View images are captured (avoiding any requirement of the claims that images be captured at fixed intervals); or discontinuing the Street View service altogether.  (Sherwood Decl. ¶ 19.)  To implement design arounds of this kind, Google in-house counsel would work with the Street View Product Manager, and currently that manager is Stafford Marquardt.  (*Id.*)  As outlined in Mr. Marquardt's declaration, the alternatives described above were entirely feasible if there was reason to pursue them.  (*Id.*; Marquardt Decl. ¶¶ 19–23.)  Google did not continue to explore non-infringing alternatives, however, because it believed (based on Kewazinga's statements and actions) that Kewazinga had no intention of continuing its assertion against Google.  (Sherwood Decl. ¶ 19.)

60.     Google has the ability to deactivate the transition animation effect in Street View when a user moves from one panorama to an adjacent panorama and implementing that change would be technically feasible.  (Marquardt Decl. ¶ 19.)  If deactivating the transition animation effect in Street View when a user moves from one panorama to an adjacent panorama made economic and/or practical sense between May 24, 2013 and February 7, 2020, and if asked to do so by legal, Google could have made that change.  (*Id.*)

61.     Google stores and processes Street View imagery outside of the United States and has the ability to store and process all Street View imagery outside of the United States and implementing that change would be technically feasible.  (Marquardt Decl. ¶ 20.)  If storing and processing all Street View imagery outside the United States made economic and/or practical sense between May 24, 2013 and February 7, 2020, and if asked to do so by legal, Google could have made that change.  (*Id.*)

62.     Google has the ability to program its user-facing Street View product to prefetch nearby Street View imagery when a user selects a particular Street View location and implementing that change would be technically feasible.  (Marquardt Decl. ¶ 21.)  If prefetching nearby Street View imagery when a user selects a particular Street View location made economic and/or practical sense between May 24, 2013 and February 7, 2020, and if asked to do so by legal, Google could have made that change.  (*Id.*)

63.     Google has the ability to change the interval at which Street View imagery is captured and implementing that change would be technically feasible.  (Marquardt Decl. ¶ 22.)  If changing the interval at which Street View imagery is captured made economic and/or practical sense between May 24, 2013 and February 7, 2020, and if asked to do so by legal, Google could have made that change.  (*Id.*)

64.     Google has the ability to change the camera system used to capture Street View imagery and implementing that change would be technically feasible.  A previous generation of the Street View imagery capture system used a fisheye lens.  (Marquardt Decl. ¶ 23.)  If changing the camera system used to capture Street View imagery to use another design, such as a sole upward-facing camera with a fisheye lens to capture a single image, which could be converted into an equirectangular panorama, made economic and/or practical sense between May 24, 2013 and February 7, 2020, and if asked to do so by legal, Google could have made that change.  (*Id.*)

65.     If selling or offering a product or service no longer makes practical and/or economic sense for Google or its users, Google will consider discontinuing that product or service. (Marquardt Decl. ¶ 24.)

66.     In 2016, Google retired the Panoramio service.  (Marquardt Decl. ¶ 25.)  Despite being popular with users, Google decided to retire the Panoramio service in light of the annual upkeep expense and Google's plans to invest efforts in other photo-sharing features of Google Maps.  (*Id.*)

67.     Google does not publish Street View imagery in some regions due to legal considerations.  (Marquardt Decl. ¶ 26.)

68.     If providing the current user experience for Street View no longer made practical and/or economic sense or if asked to do so by legal, between May 24, 2013 and February 7, 2020, Google could have discontinued Street View and invested resources in other products or services. (Marquardt Decl. ¶ 27.)

69.     Between 2013 and 2019, ███████████████████████████████████████ ██████████████████████████ (Marquardt Decl. ¶ 13.)

70.     Between 2013 and 2019, ████████████████████████████████████
████████████████████████████    (Marquardt Decl. ¶ 13.)

71.     Between 2013 and 2019, Google increased the amount of resources dedicated to Street View imagery collection in the United States.  (Marquardt Decl. ¶ 14.)  During that time period, ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████    (*Id.*)    ████████████████

████████████████████████████████████████████████████████████

████████████    (*Id.*)

72.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████    (*Id.*)

73.     Kewazinga was aware that Google continued to provide Street View to users and customers after the 2013 Action was dismissed.  (Kewazinga's 6/4/2020 Response to Google's RFA No. 12.)

74.     Kewazinga was aware in 2014 that Google continued to provide Street View to users and customers.  (Kewazinga's 6/4/2020 Response to Google's RFA No. 13.)

75.     Kewazinga was aware in 2015 that Google continued to provide Street View to users and customers.  (Kewazinga's 6/4/2020 Response to Google's RFA No. 14.)

76.     Kewazinga was aware in 2016 that Google continued to provide Street View to users and customers.  (Kewazinga's 6/4/2020 Response to Google's RFA No. 15.)

77.     Kewazinga was aware in 2017 that Google continued to provide Street View to users and customers.  (Kewazinga's 6/4/2020 Response to Google's RFA No. 16.)

78.     Kewazinga was aware in 2018 that Google continued to provide Street View to users and customers.  (Kewazinga's 6/4/2020 Response to Google's RFA No. 17.)

79.     Kewazinga was aware in 2019 that Google continued to provide Street View to users and customers.  (Kewazinga's 6/4/2020 Response to Google's RFA No. 18.)

80.     Kewazinga did not inform Google at any time between 2014 and 2019 that it still believed that Google was infringing its patents.  (Smalheiser Dep. 127:13–129:12.)

81.     ████████████████████████████████████████████████
████████████  Worley Dep. 139:21–140:2.)

82.     ████████████████████████████████████████████████
███████████████████████  Smalheiser Dep., 144:10–25.)

83.     Following the 2013 dismissal, Kewazinga did not again assert its patents against Google—or even communicate directly with Google—for another more than 6 years until this lawsuit was filed in January 2020.  (Sherwood Decl. ¶ 25; Smalheiser Dep. 127:13–129:12; 133:22–134:3; Worley Dep. 154:4–18.)

84.     Kewazinga is seeking monetary damages in this action based on, among other things, Google providing Street View to users and customers between 2014 and 2019. (Kewazinga's 6/4/2020 Response to Google's RFA No. 20.)

85.     ████████████████████████████████████████████████
██████████████████████████████████████  (Sherwood Decl. ¶ 33.)

86.     The '234 patent issued from a patent application that is a continuation of U.S. Patent Application No. 13/949,132, which was pending before the 2013 Action was dismissed. (Kewazinga's 6/4/2020 Response to Google's RFA No. 5.)

87.     The '234 patent issued on June 9, 2015.  (Kewazinga's 6/4/2020 Response to Google's RFA No. 6.)

88.     The document produced in this litigation bearing Bates numbers GOOG-KZGA-00000392 through GOOG-KZGA-00000574 is a copy of the prosecution history of the '234 patent.  (Kewazinga's 6/15/2020 Response to Google's RFA No. 34.)

89.     The document produced in this litigation bearing Bates number GOOG-KZGA-0000509, which is part of the prosecution history of the '234 patent, is a "Terminal Disclaimer To Obviate A Double Patenting Rejection Over A 'Prior' Patent" that Kewazinga filed in order to overcome the patent examiner's rejection of claims as unpatentable over claims 1–30 of U.S. Patent No. 6,522,325 in view of U.S. Patent No. 6,535,226 under the doctrine of non-statutory double patenting.  (Kewazinga's 6/15/2020 Response to Google's RFA No. 36.)

90.     On May 21, 2018, Kewazinga filed suit against Microsoft, but not Google, concerning the '226 Patent, the '325 Patent, and the '234 Patent, the three patents now at suit against Google.  (Sherwood Decl. ¶ 26.)

91.     Because Kewazinga had previously sued Google and Microsoft at the same time in 2013, Google understood the fact that Kewazinga sued only Microsoft as further confirmation that Kewazinga had no intention of suing Google.  (Sherwood Decl. ¶ 26.)

92.     By May 2018, it had been almost five years since there was any contact between anyone at Google and anyone at Kewazinga.  (Sherwood Decl. ¶ 26.)

93.     In 2018, Google was one of several defendants in a copyright litigation (the "2018 Copyright Litigation").  (Sherwood Decl. ¶ 27.)  One co-defendant, ███████, lined up the Strook law firm to be joint defense counsel for all defendants.  (*Id.*)  In or around June 2018, ███

████████████████████████████████████████████ (*Id.*) ███████████

████████████████████████████████████████████████████

████████████████████ (*Id.*) ██████████████████████████████

████████████████████████████████████████████████████

██████████████████████████ (*Id.*)

94.     Google believed that its retention of Strook in the 2018 Copyright Litigation would be mutually beneficial, as Strook was already representing several other co-defendants in that matter, and Google's defense would be coordinated with those other defendants.  (Sherwood Decl. ¶ 29.)

95.     It is part of Mr. Sherwood's usual practice to ask a law firm seeking to represent Google to investigate conflicts that would prevent them from representing Google.  (Sherwood Decl. ¶ 28.)   This practice protects Google and avoids potential misunderstandings.   (*Id.*)  Consistent with his usual practice, Mr. Sherwood told Mr. Berry to ask Strook about any conflict that would prevent Strook from representing Google in the 2018 Copyright Litigation.  (*Id.*)

████████████████████████████████████████████████████

████████████████████████████████████████ (Sherwood Decl.  ¶ 30.)

96.     Rather than attempting to create a conflict, Google was hopeful that it could avoid any conflicts and reach an agreement with Strook for the purposes of representation in the 2018 Copyright Litigation.  (Sherwood Decl. ¶ 29.)

17

97. 

(Sherwood Decl. ¶ 30; *id*. Ex. 14.)  That confirmed Google's belief that Kewazinga had no "present" intent (*i.e.*, in 2018) to file suit on behalf of Kewazinga against Google.  (Sherwood Decl. ¶ 30.)

Sherwood Decl. ¶ 30; *id*. Ex. 14.) (Sherwood Decl. ¶ 30.)

98.

(Sherwood Decl. ¶ 31; *id*. Ex. 15.)

99. Google relied on Stroock's representation in agreeing to retain Stroock on those terms, and understood Stroock's assertion to be further reaffirmation and confirmation that Kewazinga had no intention of suing Google at any point in the future, as Stroock was actively representing Kewazinga against Microsoft on its patents at the same time.  (Sherwood Decl. ¶ 31.)

100. Had Stroock or Kewazinga communicated that it did intend to sue Google at any point in the future, Google would not have retained Stroock in the 2018 Copyright Litigation.  (Sherwood Decl. ¶ 31.)  In addition, Google would have considered filing IPRs against Kewazinga's patents, initiating a declaratory judgment action, and taken other measures to protect Google and preserve Google's defenses.  (*Id*.)  Google did not take those actions because it continued to believe, based on Stroock's representations and Kewazinga's continued silence, that Kewazinga had no intention of suing Google at any point in the future.  (*Id*.)

101. ███████████████████████████████████████

███████████████████████████████████████ (Worley Dep. 37:24–

38:8 ("█████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████").) ████████████████████████████

███████████████████████████████████████

███████████████ (Smalheiser Dep. 153:3–10).

102. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████ (Smalheiser Dep. 147:18–20, 148:5–10, 153:3–10.)

103. ███████████████████████████████████

██████████████ (Worley Dep. 44:7–45:3; Smalheiser Dep. 149:21–150:19.)

104.   Between the dismissal of the 2013 Action and the filing of this lawsuit, Kewazinga

never told Google that it would assert its patents again against Google ████████████████

█████████. (Worley Dep. 152:9–18.)

105.   Kewazinga's '234, '325, and '226 patents expired on April 1, 2019.  (Kewazinga's

6/4/2020 Response to Google's RFA No. 19.)

Dated: July 15, 2020                    By:     Respectfully submitted,

                                                */s/ John M. Desmarais*
                                                John M. Desmarais

                                                DESMARAIS LLP
                                                John M. Desmarais
                                                jdesmarais@desmaraisllp.com
                                                Ameet A. Modi
                                                amodi@desmaraisllp.com
                                                Steven M. Balcof
                                                sbalcof@desmaraisllp.com
                                                Elizabeth Weyl
                                                eweyl@desmaraisllp.com
                                                David A. Frey
                                                dfrey@desmaraisllp.com
                                                230 Park Avenue
                                                New York, NY 10169
                                                Tel: (212) 351-3400
                                                Fax: (212) 351-3401


                                                Emily Chen (*pro hac vice*)
                                                echen@desmaraisllp.com
                                                101 California Street
                                                San Francisco, CA 94111
                                                Tel: (415) 573-1900
                                                Fax: (415) 573-1901


                                                *Counsel for Defendant Google LLC*