# Exhibit 1
**(The errata to this deposition is also attached)**

CONFIDENTIAL

Page 1

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    Case No. 1:20-cv-01106
     - - - - - - - - - - - - - - - - - -x
4    KEWAZINGA CORP.,                    :
                                         :
5                          Plaintiff,   :
                                         :
6            - vs -                      :
                                         :
7    GOOGLE LLC,                         :
                                         :
8                          Defendant.   :
     - - - - - - - - - - - - - - - - - -x
9

10

                             June 12, 2020
11                           11:11 a.m.
                             1036 Dorchester Avenue
12                           St. Louis, Missouri
13

14

15

16              ***CONFIDENTIAL***

17

18

19

20           VIDEOTAPED VIRTUAL DEPOSITION UPON
21   ORAL EXAMINATION OF DAVID WORLEY, held at the
22   above-mentioned time and place, before Randi
23   Friedman, a Registered Professional Reporter,
24   within and for the State of New York.
25   Job No. CS4135153

CONFIDENTIAL

```
 1               D. Worley - Confidential
 2      APPEARANCES:
 3
                  STROOCK & STROOCK & LAVAN, LLP
 4                Attorneys for Plaintiff
 5                180 Maiden Lane
                  New York, New York 10038
 6
                  BY:  SAUNAK K. DESAI, ESQ.
 7                     IAN G. DiBERNARDO, ESQ.
 8
 9                DESMARAIS, LLP
                  Attorneys for Defendant
10
                  230 Park Avenue
11                New York, New York 10169
12                BY:  EMILY CHEN, ESQ.
                       JOHN M. DESMARAIS, ESQ.
13                     AMEET MODI, ESQ.
14                       * * *
15
16
17
18
19
20      ALSO PRESENT:
21                Howard Brodsky - Videographer
22
23
24
25
```

CONFIDENTIAL

Page 39

1                    D. Worley - Confidential

2          to parse through that historical question.

3          Again, I don't want to misstate honestly.

4          Probably the best way I can put it is

5          until -- and I'm focusing on being

6          represented.  Until Ian left Morgan &

7          Finnegan and went to Stroock, when I think

8          of represented, I think of represented to

9          the outside world.  I mean, we didn't really

10         have an outside world at that point.  That

11         was all internal.

12                    So probably a better way to say

13         it, was Ian retained to work with Kewazinga

14         on legal matters since Morgan & Finnegan?

15         The answer is yes.  And when he left to

16         Stroock, then he would have been basically

17         the lead, if you will, for Kewazinga with

18         regard to outside, you know, outside

19         entities, including the patent office.

20                    Hopefully, that answers your

21         question.

22     BY MS. CHEN:

23         Q    Mr. DiBernardo and the law firm he was

24     employed at were retained by Kewazinga

25     continuously from 1998 to today; correct?

CONFIDENTIAL

Page 41

1           D. Worley - Confidential

2       Stroock who had put in a conflicts check,

3       and I was very clear with Ian, and my

4       understanding is that Ian was very clear

5       with the attorney, that if -- that Stroock

6       was continuing to represent Kewazinga, we --

7       can you ask the question again?

8    BY MS. CHEN:

9       Q     Have you ever consented to Stroock

10   representing Google?

11              MR. DESAI:  Objection to form.

12              THE WITNESS:  Right.  So -- okay.

13       So the -- my understanding was the Stroock

14       attorney, I believe, is in Florida.  I

15       couldn't -- I believe that.  That's my

16       general recollection.  ██████████████

██   ████████████████████████████████████

██   ██████████████████    ██████████

██   ████████████████████      ████████

██   ██████████████████████████    ████████

██   ██████████████████████████████████

██   ████████████████████████████

██   ████████████████████████████████

██   ██████████████████████████

██   ████████████████████████████

CONFIDENTIAL

```
 1              D. Worley - Confidential
 2        ███████, because Kewazinga continued to have
 3        an intention of proceeding against Google
 4        relative to the patents.  So we weren't
 5        going to -- never give that up, ever.
 6   BY MS. CHEN:
 7        Q     Were the conversations with Ian
 8   telephonic or by email?
 9                  MR. DESAI:  Objection to form.
10                  THE WITNESS:  I'm sure they were
11        all telephone calls.
12                  MR. DESAI:  Emily, I don't want to
13        stop you short or anything, but we've been
14        going a little over an hour.  If there's
15        some time in the next 15 minutes or
16        something we can get a break, let me know.
17                  MS. CHEN:  Sounds great.  Thank
18        you.
19   BY MS. CHEN:
20        Q     So Kewazinga did not authorize Stroock
21   to represent Google in 2018; is that right?
22                  MR. DESAI:  Objection to form.
23                  THE WITNESS:  I didn't say
24        anywhere close to that.  I don't know where
25        that sentence even came from.
```

CONFIDENTIAL

Page 47

1              D. Worley - Confidential

2          to identify continuous chairman, CEO and

3          general counsel of Kewazinga Corp. beyond

4          that in the LinkedIn.

5     BY MS. CHEN:

6          Q     Why not?

7          A     It's just a decision I made.  This

8     isn't --

9          Q     What is the significance of

10    November 2004 in the date range reflected on

11    Page 2 of Exhibit 5?

12         A     So it's just about that.  I joined

13    Guggenheim Advisors in the beginning of

14    December 2004.

15         Q     So other than you, there has been no

16    change, CEO or general counsel of Kewazinga from

17    November 2004 till today; is that right?

18         A     Correct.  Correct.

19         Q     What does it mean when -- strike that.

20               You co-launched Kewazinga Corporation;

21    is that right?

22         A     Correct.

23         Q     What do you mean by co-launched?

24         A     There were three original co-founders;

25    myself, Andy Weber and Scott Sorokin.

CONFIDENTIAL

Page 48

1              D. Worley - Confidential

2      Q      When did you, Andy Weber and Scott

3   Sorokin launch Kewazinga?

4      A      December of '97 is when we first came

5   together.

6      Q      You orchestrated the strategic

7   direction of Kewazinga; is that right?

8      A      I was definitely one of the

9   participants, yes.

10     Q      In what way did you participate in

11  Kewazinga in 1997?

12              MR. DESAI:  Objection to form.

13              THE WITNESS:  Organization of the

14       company, hiring outside counsel, pursuing

15       patents.

16  BY MS. CHEN:

17     Q      Did you have any other roles besides

18  hiring outside counsel -- strike that.

19          Any other roles?

20     A      Co-inventor on the patents.

21     Q      You were a co-inventor on the

22  Kewazinga patents; is that right?

23     A      Correct.

24     Q      What makes you a co-inventor of the

25  Kewazinga patents?

CONFIDENTIAL

Page 49

1           D. Worley - Confidential

2               MR. DESAI:  Objection to form.

3       Outside the scope of the permitted discovery

4       and 30(b)(6) topics.

5               You can answer the question.

6               THE WITNESS:  Like I said, that's

7       a legal determination, but from a functional

8       standpoint, participation with -- among

9       Scott, Andy, myself, on drafting the claims.

10      I should say formulating the claims.

11      Drafting is done by counsel, outside

12      counsel.

13  BY MS. CHEN:

14      Q    Do you have a technical background?

15      A    What do you mean by technical?

16      Q    Did you study engineering?

17      A    No.

18      Q    Did you study computer science?

19      A    Yes.

20      Q    When did you study computer science?

21      A    In college.

22      Q    Did you major in computer science in

23  college?

24      A    No.

25      Q    You graduated with a Bachelor of Arts

CONFIDENTIAL

Page 70

```
 1                  D. Worley - Confidential

 2                  MR. DESAI:  Objection to form.

 3          Outside the scope of the 30(b)(6).

 4                  THE WITNESS:  After 2004?  Almost

 5          certainly, but I can't -- you know, without

 6          reviewing specific communications to other

 7          third parties, I don't -- I don't recall.

 8     BY MS. CHEN:

 9          Q     Why was Kewazinga reaching out to

10     companies in the 2005 to 2006 time period?

11          A     So we had only been shut down -- we

12     had only closed our doors, you know, at that

13     point, since the end of 2003.  We -- you know, we

14     felt, as we all along had, that our patents were

15     extremely valuable in their scope, very far

16     reaching, and that there were companies in the

17     different types of businesses that we felt that

18     if we showed them and brought it to their

19     attention, the nature of the patents and our

20     ideas, that they would see that it would have --

21     those patents and ideas would have application to

22     the businesses those companies were in.

23          Q     Did Kewazinga develop materials to

24     summarize the value that Kewazinga thought it

25     could bring to other companies?
```

CONFIDENTIAL

Page 88

1             D. Worley - Confidential

2                 MR. DESAI:  Objection to form.

3                 THE WITNESS:  There was never --

4         I'm repeating myself, but there was never a

5         written confidentiality agreement between

6         Kewazinga and Google that I can recall --

7         I'm sorry, during that time frame.

8    BY MS. CHEN:

9         Q     And there was no written

10   non-disclosure agreement during that time frame

11   either; right?

12                MR. DESAI:  Objection to form.

13        Asked and answered.

14                THE WITNESS:  Confidentiality

15        agreements, I think they're same thing as a

16        non-disclosure.  But there was no written

17        agreement called Confidentiality Agreement

18        or an agreement called Non-Disclosure

19        Agreement during that time, 2005 to 2006,

20        between Kewazinga and Google.

21   BY MS. CHEN:

22        Q     There was no verbal non-disclosure

23   agreement either; right?

24                MR. DESAI:  Objection to form.

25                THE WITNESS:  Well, there was

CONFIDENTIAL

Page 89

1              D. Worley - Confidential

2        certainly an understanding as this thing got

3        deeper and deeper in 2006 that as they

4        were -- "they" being -- we would have to

5        parse through the emails.  Much of this was

6        on-the-phone conversations, asking for more

7        information that, as we were digging deeper

8        into our thinking, and applying and showing

9        how that could be applied at Google, it was

10        certainly an appreciation on our part that

11        this was being done at the request of

12        something that they would keep confidential.

13   BY MS. CHEN:

14        Q      Did Google ever state that it would

15   keep these materials confidential?

16              MR. DESAI:  Objection to form.

17              THE WITNESS:  Could there have

18        been a phone conversation?  I don't know.

19        I'm not going to say that I remember

20        specifically.  I remember feeling very

21        comfortable, you know, basically lifting up

22        the kimono and pouring our hearts out in

23        terms of potential applications, that we

24        would never have done had this not been

25        asked for.

CONFIDENTIAL

Page 90

1              D. Worley - Confidential

2    BY MS. CHEN:

3         Q    But you don't recall a specific verbal

4    non-disclosure agreement; right?

5                   MR. DESAI:  Objection to form.

6                   THE WITNESS:  I guess they tricked

7         me.  I don't remember that.

8    BY MS. CHEN:

9         Q    You don't remember there being a

10   verbal non-disclosure agreement; right?

11                  MR. DESAI:  Objection to form.

12                  THE WITNESS:  I can't tell you

13        that I -- that I can quote, you know, a

14        specific "and don't worry, we'll keep this

15        confidential."  It just was applied to me

16        why would a company ask us to -- we're

17        basically doing free work for them at that

18        point, giving them our ideas.  And they

19        were -- it never occurred to me that that

20        wouldn't be kept confidential.

21                  MR. DESAI:  Sorry, I was going to

22        say we're almost at an hour and a half.

23        Again, feel free to finish up anything.  We

24        have to break for lunch pretty soon.  That

25        would be good.  Feel free to finish up.

1              D. Worley - Confidential

2    BY MS. CHEN:

3        Q     So today Kewazinga no longer has

4    access to Mr. Weber's -- strike that.

5              Mr. Weber has passed away; is that

6    right?

7        A     Correct.

8        Q     So today Kewazinga does not have

9    access to emails Mr. Weber would have sent from

10   his personal email address after Kewazinga's

11   email addresses were discontinued; is that right?

12              MR. DESAI:  Objection to form and

13         outside the scope.

14              THE WITNESS:  Right, so -- not

15         right.  Yes, I'm answering the question.  He

16         was -- he was good at a lot of things.

17         Terrific individual.  One of the things he

18         was good at was including others within

19         Kewazinga in terms of what he was doing.  He

20         was not a lone wolf by any means.  Earlier

21         on it would have been Andy and -- you know,

22         Andy and myself as sort of -- as referenced

23         here, like, go off and get a day job.  So he

24         would have, you know, kept others in the

25         loop.  But he was not, you know, he was not

CONFIDENTIAL

Page 95

1                  D. Worley - Confidential

2          a lone wolf.

3      BY MS. CHEN:

4          Q     Kewazinga doesn't have access to

5      emails -- strike that.

6                 Kewazinga does not have access to all

7      of the emails that Andy Weber may have sent from

8      his personal email address on behalf of

9      Kewazinga; is that right?

10                     MR. DESAI:  Objection to form.

11          Outside the scope.

12                     THE WITNESS:  I'm going to have --

13          well, does not have access?  Does not have

14          access?  We certainly have access to

15          everything he would have forwarded or copied

16          others on, and those have been provided.  Is

17          it possible that he might have sent an email

18          that he didn't forward a copy to us on?

19          Unlikely.

20      BY MS. CHEN:

21          Q     Is Exhibit 6 an example of an email

22      that Mr. Weber sent to Google without copying any

23      other Kewazinga employees?

24                     MR. DESAI:  Objection to form.

25                     THE WITNESS:  I can't answer the

CONFIDENTIAL

1                   D. Worley - Confidential

2           We're not recording.

3                   MS. CHEN:   Thanks.

4                   (Whereupon there was a brief

5           recess.)

6                   MR. VIDEOGRAPHER:  We went off at

7           1:47 momentarily.  We are now on the record

8           at 1:53.

9    BY MS. CHEN:

10          Q    Okay.  Mr. Worley, is everything good

11   to go on your set up there?

12          A    Yeah.  I've got quite a delay, but I

13   can hear you fine.

14          Q    Okay.  Just let me know if we need to

15   take a break; okay?

16          A    Okay.

17          Q    Mr. Weber was one of the inventors on

18   Kewazinga's patents; right?

19          A    One of the co-inventors, correct.

20          Q    What was Mr. Weber's role in the

21   invention?

22                   MR. DESAI:  Objection to form.

23          Outside the scope of permitted discovery and

24          the 30(b)(6) topics.

25                   You can answer at a high level.

CONFIDENTIAL

Page 100

```
 1                   D. Worley - Confidential
 2                  THE WITNESS:  Right.  So I think
 3          as I testified earlier, he was the one that
 4          brought Scott and myself and him together
 5          to -- for all of us to collaborate on an
 6          idea regarding remote navigable video.
 7     BY MS. CHEN:
 8          Q     After he brought you all together, did
 9     he contribute to developing the idea?
10                  MR. DESAI:  Objection to form.
11          This is well outside the scope.  This seems
12          to go to the legal issue of inventorship and
13          conception, which is not within the scope of
14          equitable estoppel.
15                  I'll allow a little bit more of
16          this, but to the extent this is going to a
17          separate issue, which the court ordered is
18          not in the scope of discovery right now, it
19          does not seem to be appropriate.  You know,
20          we'll give it a little bit of leeway here.
21          You can answer the question.
22                  THE WITNESS:  Would you repeat the
23          question?
24     BY MS. CHEN:
25          Q     After Mr. Worley brought the three of
```

CONFIDENTIAL

Page 118

1                    D. Worley - Confidential

2       of Google Street View?

3                        MR. DESAI:  Objection to form.

4                        THE WITNESS:  Yeah, Lenny might

5               have -- you know, Lenny was certainly aware

6               of it.  But I don't think it was until like

7               2012 time frame that it -- he started to

8               piece it together that there was

9               infringement.

10      BY MS. CHEN:

11          Q     Are you aware that as early as

12      October 2004, Google publicly funded research at

13      Stanford regarding street level imagery?

14                       MR. DESAI:  Objection to form.

15              Outside the scope.

16                       THE WITNESS:  I'm not aware of

17              that.  And they certainly didn't mention

18              that when we were giving them our

19              information and ideas in 2006.

20      BY MS. CHEN:

21          Q     Before Kewazinga reached out to Google

22      to discuss Kewazinga's business proposition, did

23      Kewazinga research Google's ongoing projects?

24                       MR. DESAI:  Objection to form.

25              Outside the scope.

CONFIDENTIAL

Page 135

1                    D. Worley - Confidential

2    BY MS. CHEN:

3

13                 MS. CHEN:  I think now is a good

14    time to take a break.  Let's go off the

15    record.

16                 MR. VIDEOGRAPHER:  The time is

17    2:51.  We are off the record.

18                 (Whereupon there was a brief

19    recess.)

20                 MR. VIDEOGRAPHER:  The time is

21    3:04.  We are on the record.

22    BY MS. CHEN:

23         Q

CONFIDENTIAL

Page 136



1          D. Worley - Confidential

8    BY MS. CHEN:

11              MR. DESAI:  Objection to form.

25

CONFIDENTIAL

                                                    Page 137

1                    D. Worley - Confidential

2        BY MS. CHEN:

3              ███   ████████████████████████

   ███   ████████████████████

5                    MR. DESAI:  Objection to form.

6                    ████████   ████████████

   ███   ████████████████████████████

   ███   ████████████████████████████

   ███   ████████████████████████████

   ███   ████████████   ████████████████

   ███   ████████████████████████████████████

   ███   ████████████████████████████

   ███   ████████   ████████████████

   ███   ████████████████████████████

   ███   ████████████████████████████

   ███   ████████████████████

17       BY MS. CHEN:

18             ███   ██████████████████████████

   ███   ████████████████████████████████████

   ███   ██████████████████

   ███   ███   ████████████

22             Q    Were you involved in any of the

23       communications?

24                   MR. DESAI:  Objection to form.

25                   THE WITNESS:  I don't remember --

Veritext Legal Solutions

CONFIDENTIAL

                                        Page 141

 1                  D. Worley - Confidential
 2    our -- the fact that we felt there was
 3    infringement.  And what I remember is he said
 4    something along the lines of, well, you know --
 5    something along the lines of if we've -- it was
 6    encouraging enough that we set up a meeting.  The
 7    meeting, I think, actually ended up happening in
 8    August.
 9              So Lenny and I -- Andy didn't go.
10    Lenny and I and Ian flew out to the West Coast
11    and met with him in Google's offices, I think in
12    August.
13         Q    After the August -- strike that.
14              What happened at the August meeting in
15    California?
16                  MR. DESAI:  Objection to form.
17                  THE WITNESS:  There were -- I
18         mean, the names are in the materials that
19         have been exchanged back and forth.  I don't
20         remember the name of the second person, but
21         there were two individuals from Google.  It
22         was in an office on Google -- I believe on
23         the main campus, I believe.  It was the
24         three of us, myself, Lenny and Ian.  And we
25         mostly -- Ian, you know, basically laid out

CONFIDENTIAL

Page 142

1              D. Worley - Confidential

2         the -- laid out our view on infringement of

3         our patents vis-a-vis the Google product

4         Street View.

5    BY MS. CHEN:

6         Q    What was Google's position at that

7    meeting?

8         A    Google's position was they didn't --

9    they didn't necessarily agree with the

10   infringement contention.

11        Q    Did they say what part of the

12   infringement contention they disagreed with?

13        A    We talked about array of cameras.

14        Q    What about array of cameras?

15        A    From our standpoint, the Street View

16   product using array of cameras.

17        Q    And by "array of cameras," is that the

18   phrase that's from the patents?

19        A    Either camera array or array of

20   cameras.  But "array" is used in the patents,

21   yes.

22        Q    So Google's position was that Google

23   did not infringe that particular array

24   limitation; is that right?

25              MR. DESAI:  Objection to form.

CONFIDENTIAL

Page 143

1                   D. Worley - Confidential

2                      THE WITNESS:  I think that's fair.

3           I think that's fair.

4      BY MS. CHEN:

5           Q     What was Kewazinga's response?

6           A     "You're wrong."  Not correct, wrong.

7      Incorrect, wrong.

CONFIDENTIAL

Page 144

1                D. Worley - Confidential

2

3

4   BY MS. CHEN:

5

6

7

8

9

10

11

12

13

14

15

16   BY MS. CHEN:

17       Q      After that in-person meeting -- strike

18   that.

19              Kewazinga didn't end up serving its

20   complaint on Google; right?

21                  MR. DESAI:  Objection to form.

22                  THE WITNESS:  That is correct.

23   BY MS. CHEN:

24       Q      Why?

25

CONFIDENTIAL

Page 153

1                   D. Worley - Confidential

2        BY MS. CHEN:

3             Q     Kewazinga didn't contact Google

4        between the end of the 2013 litigation and the

5        filing of the 2020 complaint; right?

6                        MR. DESAI:  Objection to form.

7                        THE WITNESS: ███████████████

         ████████████████████████████████████

         ████████████████████████████████████

         ██████████████████████████████████

         ███████████████████████████████████████

         ███████████████████████████████████████

         █████████████████████████████████

         ███████████████████████████████████

15       BY MS. CHEN:

16             Q     So you had instructed your law firm,

17        which is Stroock, to communicate that to Google;

18        is that right?

19                        MR. DESAI:  One second, Dave.

20        Objection to form.

21                        THE WITNESS: █████████████████

         ███████████████████████████████████

         ████████████████████████████████████████

         ██████████████████████████████████

25

CONFIDENTIAL

1                    D. Worley - Confidential

2      View continuously from 2013 until today; right?

3                    MR. DESAI:  Objection to form.

4                    THE WITNESS:  You know, I

5           haven't -- I imagine they haven't missed a

6           day.  I haven't checked, but I imagine they

7           haven't missed a day.

8      BY MS. CHEN:

9           Q     You're not aware of them shutting it

10     down or anything?

11          A     No, I'm not aware of that.

12          Q     Have you used Street View?

13          A     I have.  Recently I have used it,

14     yeah.

15          Q     You know that each year Google offers

16     this Street View service, it maps more and more

17     miles of roads; right?

18                    MR. DESAI:  Objection to form.

19          Outside the scope of a 30(b)(6).

20                    THE WITNESS:  Could be.

21     BY MS. CHEN:

22          Q     You've heard of the Google Street View

23     cars with the cameras on top, driving around?

24                    MR. DESAI:  Same objections.

25                    THE WITNESS:  I've heard of that,

CONFIDENTIAL

Page 173

```
 1              D. Worley - Confidential
 2        yeah.
 3   BY MS. CHEN:
 4        Q     And they drive around collecting
 5   additional imagery to update Google Street View;
 6   right?
 7                  MR. DESAI:  Same objections.
 8                  THE WITNESS:  I mean, that would
 9        be a reasonable conclusion.  Obviously, I'm
10        not party to internal discussions on what
11        they're trying to accomplish.
12   BY MS. CHEN:
13        Q     Have you ever read any public Google
14   posts or blogs or press releases about Street
15   View?
16                  MR. DESAI:  Objection.  Outside
17        the scope.
18                  THE WITNESS:  No.
19   BY MS. CHEN:
20        Q     But it wouldn't surprise you that
21   Google has continued to develop Street View
22   between 2013 and today; right?
23                  MR. DESAI:  Objection to form.
24        Outside the scope.
25                  THE WITNESS:  It wouldn't surprise
```

CONFIDENTIAL

Page 174

1              D. Worley - Confidential

2         me, no.

3     BY MS. CHEN:

4         Q    It wouldn't surprise you that there

5     are more users of Street View now than there were

6     in 2013; right?

7                    MR. DESAI:  Same objections.

8                    THE WITNESS:  I mean, you're

9            getting into specifics.  You're telling me

10            this is true.  I have no idea.

11    BY MS. CHEN:

12        Q    You don't have any reason to believe

13    there are fewer users now than in 2013; right?

14                    MR. DESAI:  Objection to form.

15            Outside the scope of a 30(b)(6).

16                    THE WITNESS:  I don't have any

17            reason to estimate users at any point in

18            time.

19    BY MS. CHEN:

20        Q    What's the goal of the Google

21    litigation?

22                    MR. DESAI:  Objection to form.

23                    THE WITNESS:  To win.

24                    MR. DESAI:  Outside the scope of a

25            30(b)(6).

CONFIDENTIAL

Page 179

1                     D. Worley - Confidential

2       nothing.

3           Q



8                     MR. DESAI:  Objection to form.

9                     THE WITNESS:  Sorry.

10                    MR. DESAI:  Mischaracterizes

11      testimony.

12

CONFIDENTIAL

Page 180

1                  D. Worley - Confidential



17     BY MS. CHEN:

18          Q

21               MR. DESAI:  Objection to form and

22          outside the scope of a 30(b)(6).

23               THE WITNESS:  I don't want to get

24          cute, and my instinct is to say something

25          snarky.

CONFIDENTIAL

Page 189

1              D. Worley - Confidential

2              C E R T I F I C A T I O N

3          I, Randi Friedman, Registered

4    Professional Reporter and Notary Public of the

5    State of New York, do hereby certify:

6          THAT, the witness whose testimony is herein

7    before set forth, was duly sworn by me, and

8    THAT, the within transcript is a true record of

9    the testimony given by said witness.

10          I further certify that I am not related

11    either by blood or marriage to any of the parties

12    to this action; and that I am in no way

13    interested in the outcome of this matter.

14          IN WITNESS WHEREOF, I have hereunto set my

15    hand this day, June 15, 2020.

16

17

18    *Randi C. Friedman*

19    Randi Friedman, RPR

20

21

22

23

24

25    *      *      *      *      *      *      *      *      *

## ERRATA SHEET

**Name of case:**    **KEWAZINGA CORP. v. GOOGLE LLC**
**Deposition of:**    **David Worley**
**Date taken:**    **June 12, 2020**

**Corrections:**

| Page | Line | Change | Reason |
|------|------|--------|--------|
| 13 | 9 | Change "looked" to "looped" | Misheard/Misspoke |
| 24 | 22 | Change "and" to "on" | Misheard/Misspoke |
| 24 | 23-24 | Change "Just general overview of process" to "Just a general overview of the process" | Misheard/Misspoke |
| 27 | 18 | Change "was" to "were" | Misheard/Misspoke |
| 28 | 19 | Change "Morgan Finnegan" to "Morgan & Finnegan" | Clarification |
| 30 | 12 | Change "Morgan Finnegan" to "Morgan & Finnegan" | Clarification |
| 30 | 13-14 | Change "Morgan Finnegan" to "Morgan & Finnegan" | Clarification |
| 30 | 20 | Change "Morgan Finnegan" to "Morgan & Finnegan" | Clarification |
| 42 | 5 | Delete "— never" | Clarification |
| 42 | 24 | Change "anywhere" to "anything" | Misheard/Misspoke |
| 56 | 2 | Change "exceeds" to "exceeding" | Misheard/Misspoke |
| 68 | 7 | Change "if" to "the" | Clarification |
| 77 | 10-11 | Change "Visage-HD was a brand that was another company" to "Visage-HD was a brand – it was not another company" | Clarification |
| 89 | 4 | Change "'they' being –" to "'they' being Google –" | Clarification |
| 89 | 11-12 | Change "at the request of something that" to "at the request of Google and that was something that" | Clarification |
| 90 | 15 | Change "applied" to "implied" | Misheard/Misspoke |
| 91 | 18 | Change "cinch" to "signature" | Misheard/Misspoke |
| 92 | 18 | Change "that" to "whether" | Clarification |
| 94 | 14 | Change "Right so – not right" to "Not right" | Clarification |
| 96 | 17 | Change "personal he friends" to "personal friends" | Misheard/Misspoke |
| 119 | 6 | Change "plowing" to "plying" | Misheard/Misspoke |
| 121 | 21 | Delete "telling me they were" | Clarification |

| 121 | 24 | Change "approved" to "applied" | Misheard/Misspoke |
|-----|-----|-----|-----|
| 121 | 25 | Delete "it is what it is" | Clarification |
| 122 | 10 | Change "2003" to "2013" | Misheard/Misspoke |
| 122 | 22 | Change "we were mapping the products" to "I was using mapping products" | Clarification |
| 134 | 24-25 | Change "Eventually secured funding at that time" to "We eventually secured funding at a later time" | Clarification |
| 138 | 17 | Change "duplicability" to "applicability" | Misheard/Misspoke |
| 138 | 14 | Change "emailed" to "in an email" | Misheard/Misspoke |
| 155 | 14 | Change "patent was at issue" to "patent had issued" | Misheard/Misspoke |
| 161 | 24 | Change "there's" to "there was" | Misheard/Misspoke |
| 162 | 6 | Change "there's" to "there was" | Misheard/Misspoke |
| 166 | 12 | Change "speak to itself" to "speak for itself" | Misheard/Misspoke |
| 181 | 6 | Change "your" to "the" | Misheard/Misspoke |
| 182 | 10 | Change "probable" to "allowable" | Misheard/Misspoke |

July 14 2020
Date

David Worley