# Exhibit 1

CONFIDENTIAL

```
                                                               Page 1

 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    Case No. 1:20-cv-01106
      - - - - - - - - - - - - - - - - - -x
 4    KEWAZINGA CORP.,                    :
                                          :
 5                      Plaintiff,        :
                                          :
 6              - vs -                    :
                                          :
 7    GOOGLE LLC,                         :
                                          :
 8                      Defendant.        :
      - - - - - - - - - - - - - - - - - -x
 9
10
                                 June 12, 2020
11                               11:11 a.m.
                                 1036 Dorchester Avenue
12                               St. Louis, Missouri
13
14
15
16               ***CONFIDENTIAL***
17
18
19
20         VIDEOTAPED VIRTUAL DEPOSITION UPON
21    ORAL EXAMINATION OF DAVID WORLEY, held at the
22    above-mentioned time and place, before Randi
23    Friedman, a Registered Professional Reporter,
24    within and for the State of New York.
25    Job No. CS4135153
```

```
                                                         Page 38
 1              D. Worley - Confidential
 2      DiBernardo left Morgan & Finnegan and went
 3      to Stroock.  That includes the dates that
 4      you identified.  And ever since the --
 5      certainly the filing of the 2013 complaint
 6      and prior to that, we have been in relative
 7      continuous conversations on how to proceed
 8      vis-a-vis Google, among others.
 9  BY MS. CHEN:
10      Q    Between 2013 and now --
11      A    Sorry, was that a question?
12      Q    I'm sorry.  I was just pausing to
13  compose my question.
14           Mr. Ian DiBernardo has been
15  representing Kewazinga since 2013 without
16  interruption; right?
17           MR. DESAI:  Objection to form.
18           THE WITNESS:  Correct.
19  BY MS. CHEN:
20      Q    Mr. Ian DiBernardo has been
21  representing Kewazinga since 1998, when he
22  assisted Kewazinga with its patent applications;
23  correct?
24           MR. DESAI:  Objection to form.
25           THE WITNESS:  Well, sorry, I have
```

```
                                                         Page 39
 1              D. Worley - Confidential
 2      to parse through that historical question.
 3      Again, I don't want to misstate honestly.
 4      Probably the best way I can put it is
 5      until -- and I'm focusing on being
 6      represented.  Until Ian left Morgan &
 7      Finnegan and went to Stroock, when I think
 8      of represented, I think of represented to
 9      the outside world.  I mean, we didn't really
10      have an outside world at that point.  That
11      was all internal.
12           So probably a better way to say
13      it, was Ian retained to work with Kewazinga
14      on legal matters since Morgan & Finnegan?
15      The answer is yes.  And when he left to
16      Stroock, then he would have been basically
17      the lead, if you will, for Kewazinga with
18      regard to outside, you know, outside
19      entities, including the patent office.
20           Hopefully, that answers your
21      question.
22  BY MS. CHEN:
23      Q    Mr. DiBernardo and the law firm he was
24  employed at were retained by Kewazinga
25  continuously from 1998 to today; correct?
```

```
                                                         Page 40
 1              D. Worley - Confidential
 2           MR. DESAI:  Objection to form.
 3           THE WITNESS:  I think I know what
 4      you're asking.  I'm going to phrase it a
 5      little bit differently.
 6           Ian, as between Morgan & Finnegan
 7      and Stroock, there's never been a time when
 8      Ian was not legal counsel to Kewazinga.
 9  BY MS. CHEN:
10      Q    Since 2013, Kewazinga has retained the
11  Stroock law firm to represent Kewazinga adverse
12  to Google; correct?
13           MR. DESAI:  Objection to form.
14           THE WITNESS:  In the sense that we
15      filed a complaint, I believe in May of 2013,
16      yes.  But that's not -- that's not a
17      limitation.  That's just a truism as of that
18      time.
19  BY MS. CHEN:
20      Q    Have you ever consented to Stroock
21  representing Google?
22           MR. DESAI:  Objection to form.
23           THE WITNESS:  So as I recall, I
24      believe it was 2018, Ian and I had several
25      conversations about another lawyer at
```

```
                                                         Page 41
 1              D. Worley - Confidential
 2      Stroock who had put in a conflicts check,
 3      and I was very clear with Ian, and my
 4      understanding is that Ian was very clear
 5      with the attorney, that if -- that Stroock
 6      was continuing to represent Kewazinga, we --
 7      can you ask the question again?
 8  BY MS. CHEN:
 9      Q    Have you ever consented to Stroock
10  representing Google?
11           MR. DESAI:  Objection to form.
12           THE WITNESS:  Right.  So -- okay.
13      So the -- my understanding was the Stroock
14      attorney, I believe, is in Florida.  I
15      couldn't -- I believe that.  That's my
16      general recollection.  [REDACTED]
17      [REDACTED]
18      [REDACTED]
19      [REDACTED]
20      [REDACTED]
21      [REDACTED]
22      [REDACTED]
23      [REDACTED]
24      [REDACTED]
25      [REDACTED]
```

Page 42

1      D. Worley - Confidential
2      ███ because Kewazinga continued to have
3      an intention of proceeding against Google
4      relative to the patents. So we weren't
5      going to -- never give that up, ever.
6   BY MS. CHEN:
7      Q   Were the conversations with Ian
8   telephonic or by email?
9           MR. DESAI: Objection to form.
10          THE WITNESS: I'm sure they were
11     all telephone calls.
12          MR. DESAI: Emily, I don't want to
13     stop you short or anything, but we've been
14     going a little over an hour. If there's
15     some time in the next 15 minutes or
16     something we can get a break, let me know.
17          MS. CHEN: Sounds great. Thank
18     you.
19  BY MS. CHEN:
20     Q   So Kewazinga did not authorize Stroock
21  to represent Google in 2018; is that right?
22          MR. DESAI: Objection to form.
23          THE WITNESS: I didn't say
24     anywhere close to that. I don't know where
25     that sentence even came from.

Page 43

1      D. Worley - Confidential
2   BY MS. CHEN:
3      Q   You agree that Kewazinga did not
4   authorize Stroock to represent Google in 2018;
5   right?
6           MR. DESAI: Objection to form.
7           THE WITNESS: Oh, you said
8      Kewazinga. That's why I was confused. I'm
9      sorry. You're going to have to start over
10     because I think you said Kewazinga instead
11     of Google.
12  BY MS. CHEN:
13     Q   You agree that Kewazinga did not
14  authorize Stroock -- strike that.
15          MS. CHEN: I think now is a good
16     time to take a break. We can go off the
17     record.
18          MR. VIDEOGRAPHER: All right. The
19     time is 11:14. We are off the record.
20          (Whereupon there was a brief
21     recess.)
22          MR. VIDEOGRAPHER: The time is
23     11:28. We are on the record.
24  BY MS. CHEN:
25     Q   Mr. Worley, do you have any changes to

Page 44

1      D. Worley - Confidential
2   the testimony that you gave before the break?
3           MR. DESAI: Objection to form.
4           THE WITNESS: No, but I haven't
5      reviewed it.
6   BY MS. CHEN:
7      Q   Mr. Worley, the law firm Stroock has a
8   security interest in Kewazinga's patents; right?
9           MR. DESAI: Objection to form.
10          THE WITNESS: I believe that's
11     right.
12  BY MS. CHEN:
13     Q   What is Stroock's security interest in
14  Kewazinga's patents?
15          MR. DESAI: Same objection.
16          THE WITNESS: What is the security
17     interest? They have -- you know, it's a
18     legal -- it's a legal analysis what a
19     security interest is. It's a security
20     interest. I don't want to get into what the
21     legal analysis of a security interest is.
22     But, yes, they have a security interest.
23  BY MS. CHEN:
24     Q   Stroock's security interest in
25  Kewazinga's patents is still alive now; right?

Page 45

1      D. Worley - Confidential
2           MR. DESAI: Objection to form.
3           THE WITNESS: I believe so.
4   BY MS. CHEN:
5      Q   What was your role at Kewazinga in
6   2005?
7      A   The role hasn't changed since the
8   formation of the company, but it was chairman,
9   CEO and general counsel. Mops the floors.
10  Washes the dishes.
11          (Exhibit 5 was marked.)
12     Q   I'm introducing an exhibit that will
13  be available in the exhibit folder. It's Exhibit
14  No. 5. Please let me know when you see it.
15     A   Okay. Okay.
16     Q   Do you see that Exhibit 5 appears to
17  be your LinkedIn profile?
18     A   It appears to be, yeah.
19     Q   Please turn to Page 2 of Exhibit 5.
20       Do you see the entry that says,
21  "Chairman, CEO and general counsel of Kewazinga
22  Corporation"?
23     A   Yes.
24     Q   You see it gives the time range
25  December 1997 through November 2004 for that

Page 46

1       D. Worley - Confidential
2   entry; correct?
3       A   Yes.
4       Q   This indicates that your role as
5   chairman, CEO and general counsel for Kewazinga
6   Corporation ended in November of 2004; is that
7   right?
8       A   No.
9       Q   Why not?
10      A   It's a date range. It's not a
11  limiting factor.
12      Q   So you have been the chairman, CEO and
13  general counsel of Kewazinga outside of the time
14  range December 1997 to November 2004; right?
15          MR. DESAI: Objection to form.
16          THE WITNESS: Certainly beyond
17      November 2004, yes.
18  BY MS. CHEN:
19      Q   Have you held those positions
20  continuously since November of 2004?
21      A   Yes.
22      Q   Why is that not reflected in your
23  LinkedIn profile here?
24          MR. DESAI: Objection to form.
25          THE WITNESS: There was no reason

Page 47

1       D. Worley - Confidential
2       to identify continuous chairman, CEO and
3       general counsel of Kewazinga Corp. beyond
4       that in the LinkedIn.
5   BY MS. CHEN:
6       Q   Why not?
7       A   It's just a decision I made. This
8   isn't --
9       Q   What is the significance of
10  November 2004 in the date range reflected on
11  Page 2 of Exhibit 5?
12      A   So it's just about that. I joined
13  Guggenheim Advisors in the beginning of
14  December 2004.
15      Q   So other than you, there has been no
16  change, CEO or general counsel of Kewazinga from
17  November 2004 till today; is that right?
18      A   Correct. Correct.
19      Q   What does it mean when -- strike that.
20          You co-launched Kewazinga Corporation;
21  is that right?
22      A   Correct.
23      Q   What do you mean by co-launched?
24      A   There were three original co-founders;
25  myself, Andy Weber and Scott Sorokin.

Page 48

1       D. Worley - Confidential
2       Q   When did you, Andy Weber and Scott
3   Sorokin launch Kewazinga?
4       A   December of '97 is when we first came
5   together.
6       Q   You orchestrated the strategic
7   direction of Kewazinga; is that right?
8       A   I was definitely one of the
9   participants, yes.
10      Q   In what way did you participate in
11  Kewazinga in 1997?
12          MR. DESAI: Objection to form.
13          THE WITNESS: Organization of the
14      company, hiring outside counsel, pursuing
15      patents.
16  BY MS. CHEN:
17      Q   Did you have any other roles besides
18  hiring outside counsel -- strike that.
19          Any other roles?
20      A   Co-inventor on the patents.
21      Q   You were a co-inventor on the
22  Kewazinga patents; is that right?
23      A   Correct.
24      Q   What makes you a co-inventor of the
25  Kewazinga patents?

Page 49

1       D. Worley - Confidential
2           MR. DESAI: Objection to form.
3       Outside the scope of the permitted discovery
4       and 30(b)(6) topics.
5           You can answer the question.
6           THE WITNESS: Like I said, that's
7       a legal determination, but from a functional
8       standpoint, participation with -- among
9       Scott, Andy, myself, on drafting the claims.
10      I should say formulating the claims.
11      Drafting is done by counsel, outside
12      counsel.
13  BY MS. CHEN:
14      Q   Do you have a technical background?
15      A   What do you mean by technical?
16      Q   Did you study engineering?
17      A   No.
18      Q   Did you study computer science?
19      A   Yes.
20      Q   When did you study computer science?
21      A   In college.
22      Q   Did you major in computer science in
23  college?
24      A   No.
25      Q   You graduated with a Bachelor of Arts

Page 70

1         D. Worley - Confidential
2             MR. DESAI:  Objection to form.
3     Outside the scope of the 30(b)(6).
4             THE WITNESS:  After 2004?  Almost
5         certainly, but I can't -- you know, without
6         reviewing specific communications to other
7         third parties, I don't -- I don't recall.
8     BY MS. CHEN:
9         Q    Why was Kewazinga reaching out to
10    companies in the 2005 to 2006 time period?
11        A    So we had only been shut down -- we
12    had only closed our doors, you know, at that
13    point, since the end of 2003.  We -- you know, we
14    felt, as we all along had, that our patents were
15    extremely valuable in their scope, very far
16    reaching, and that there were companies in the
17    different types of businesses that we felt that
18    if we showed them and brought it to their
19    attention, the nature of the patents and our
20    ideas, that they would see that it would have --
21    those patents and ideas would have application to
22    the businesses those companies were in.
23        Q    Did Kewazinga develop materials to
24    summarize the value that Kewazinga thought it
25    could bring to other companies?

Page 71

1         D. Worley - Confidential
2             MR. DESAI:  Objection to form.
3             THE WITNESS:  We did.
4     BY MS. CHEN:
5         Q    What materials did you develop?
6         A    Word documents that were converted to
7     Adobe, Acrobat, PowerPoints, emails.  Those would
8     be the three that we used.
9         Q    Who developed those materials?
10            MR. DESAI:  Objection to form.
11            THE WITNESS:  It was collaborative
12        among myself, Andy and Scott.  And then when
13        Leonard Smalheiser came on, Lenny was
14        involved.
15    BY MS. CHEN:
16        Q    What was Mr. Smalheiser's role when he
17    became involved?
18        A    I think we brought him in in a
19    developmental role, product development.  He had
20    been an investor and he was a close friend of
21    Andy's.  And Andy basically recommended him.
22        Q    When did Mr. Smalheiser join the team?
23        A    I'm going to guess a little bit and
24    say 2002.
25        Q    You said Mr. Smalheiser's role was

Page 72

1         D. Worley - Confidential
2     product development; right?
3         A    Yeah, development -- yeah.  It had a
4     formal -- I don't remember whether it had a
5     formal title.  We were pretty informal, other
6     than the corporate structure.  He was not a
7     member -- he was an investor but he wasn't a
8     member of the, you know, corporate officers
9     per se early on.
10        Q    What product did Kewazinga have in
11    2005?
12            MR. DESAI:  Objection to form
13        outside the scope.
14            THE WITNESS:  We had -- we had
15        recorded video.  The camera array -- not the
16        cameras, which I still have, but the camera
17        array itself and the equipment was seized in
18        2004.  Their prototype system.
19    BY MS. CHEN:
20        Q    In 2005, Kewazinga's business pitch
21    was its intellectual property; is that right?
22            MR. DESAI:  Objection to form.
23            THE WITNESS:  Yes, with the
24        explanation that was intellectual property
25        comprising the patents.  We always had a

Page 73

1         D. Worley - Confidential
2     continuation in place as we were constantly
3     working on refining our ideas, as well as
4     applications, potential applications of the
5     technology.
6     BY MS. CHEN:
7         Q    Of the materials that Kewazinga
8     developed in 2005 to 2006 to pitch Kewazinga's
9     business proposition, what information in those
10    materials was confidential?
11            MR. DESAI:  Objection to form.
12            THE WITNESS:  Well, it was -- the
13        overall documents were often, if not always,
14        maybe not always, but often labeled
15        confidential, and those documents included
16        our internal thinking on how our -- I'll
17        call it our technology could be incorporated
18        and adapted and used in certain -- in
19        certain industries and in certain ways.
20            Was everything in every document
21        that we produced labeled as confidential,
22        confidential?  I mean I can think, for
23        example, you know, bios, a corporate --
24        sorry, officer bios were not confidential.
25        The fact that we had patents, obviously not

Page 86

D. Worley - Confidential

1 from how we described ourselves.  It came
2 from how we performed phenomenally with
3 ESPN, I believe, in a particular shoot.
4 There were others, but I think that's what
5 prompted the nomination.
6 BY MS. CHEN:
7     Q    Paragraph 3 of Mr. Weber's email
8 begins, "Combined with existing technologies."
9         Is there anything in that paragraph
10 that is confidential?
11         MR. DESAI:  Objection to form.
12         THE WITNESS:  So I'm going to say,
13     again, this all to me is to how it's
14     phrased.  I'm going to say no because it's
15     not -- it's so -- it's so high level.
16 BY MS. CHEN:
17     Q    Maybe I can short-circuit this.
18         Kewazinga sent materials to Google in
19 the 2005 to 2006 time frame without a
20 non-disclosure agreement; right?
21         MR. DESAI:  Objection to form.
22         THE WITNESS:  That's correct, in
23     the sense there was no written
24     confidentiality agreement between Kewazinga

Page 87

D. Worley - Confidential

1 and Google that I recall.
2 BY MS. CHEN:
3     Q    Did Google solicit the marketing
4 materials from Kewazinga to begin with?
5         MR. DESAI:  Objection to form.
6         THE WITNESS:  Well --
7         MS. CHEN:  I'll strike the
8     question.
9 BY MS. CHEN:
10    Q    Did Kewazinga initiate contact with
11 Google?
12        MR. DESAI:  Objection to form.
13        THE WITNESS:  I believe that this
14    email you're referring to was the initial
15    outreach to Google.  Following this there
16    were -- my recollection is there were
17    referrals within Google and coming back and
18    asking for more information.
19 BY MS. CHEN:
20    Q    For the time period encompassing this
21 email, which is the initial reach-out, through
22 the referrals within Google and coming back and
23 asking for more information, as you said, was
24 there ever a non-disclosure agreement in place?

Page 88

D. Worley - Confidential

1         MR. DESAI:  Objection to form.
2         THE WITNESS:  There was never --
3     I'm repeating myself, but there was never a
4     written confidentiality agreement between
5     Kewazinga and Google that I can recall --
6     I'm sorry, during that time frame.
7 BY MS. CHEN:
8     Q    And there was no written
9 non-disclosure agreement during that time frame
10 either; right?
11        MR. DESAI:  Objection to form.
12        Asked and answered.
13        THE WITNESS:  Confidentiality
14    agreements, I think they're same thing as a
15    non-disclosure.  But there was no written
16    agreement called Confidentiality Agreement
17    or an agreement called Non-Disclosure
18    Agreement during that time, 2005 to 2006,
19    between Kewazinga and Google.
20 BY MS. CHEN:
21    Q    There was no verbal non-disclosure
22 agreement either; right?
23        MR. DESAI:  Objection to form.
24        THE WITNESS:  Well, there was

Page 89

D. Worley - Confidential

1 certainly an understanding as this thing got
2 deeper and deeper in 2006 that as they
3 were -- "they" being -- we would have to
4 parse through the emails.  Much of this was
5 on-the-phone conversations, asking for more
6 information that, as we were digging deeper
7 into our thinking, and applying and showing
8 how that could be applied at Google, it was
9 certainly an appreciation on our part that
10 this was being done at the request of
11 something that they would keep confidential.
12 BY MS. CHEN:
13    Q    Did Google ever state that it would
14 keep these materials confidential?
15        MR. DESAI:  Objection to form.
16        THE WITNESS:  Could there have
17    been a phone conversation?  I don't know.
18    I'm not going to say that I remember
19    specifically.  I remember feeling very
20    comfortable, you know, basically lifting up
21    the kimono and pouring our hearts out in
22    terms of potential applications, that we
23    would never have done had this not been
24    asked for.

23 (Pages 86 - 89)

Page 90

1           D. Worley - Confidential
2    BY MS. CHEN:
3        Q    But you don't recall a specific verbal
4    non-disclosure agreement; right?
5            MR. DESAI:  Objection to form.
6            THE WITNESS:  I guess they tricked
7        me.  I don't remember that.
8    BY MS. CHEN:
9        Q    You don't remember there being a
10   verbal non-disclosure agreement; right?
11           MR. DESAI:  Objection to form.
12           THE WITNESS:  I can't tell you
13       that I -- that I can quote, you know, a
14       specific "and don't worry, we'll keep this
15       confidential."  It just was applied to me
16       why would a company ask us to -- we're
17       basically doing free work for them at that
18       point, giving them our ideas.  And they
19       were -- it never occurred to me that that
20       wouldn't be kept confidential.
21           MR. DESAI:  Sorry, I was going to
22       say we're almost at an hour and a half.
23       Again, feel free to finish up anything.  We
24       have to break for lunch pretty soon.  That
25       would be good.  Feel free to finish up.

Page 91

1           D. Worley - Confidential
2            MS. CHEN:  Thank you.  I think we
3        can finish up in just a few moments.
4    BY MS. CHEN:
5        Q    This email that we were just referring
6    to on Exhibit 6 was from Andy Weber; right?
7        A    The October 5, 1:52 version, yes.
8        Q    You mentioned that Mr. Weber was a
9    co-founder of Kewazinga and assisted in business
10   development; right?  Strike that.
11           Mr. Weber was a co-founder of
12   Kewazinga; right?
13       A    Correct.
14       Q    What was Mr. Weber's role in the
15   company?
16           MR. DESAI:  Objection to form.
17           THE WITNESS:  Well, I'm referring
18       back to his "cinch block" is really the best
19       I have at this point.  It certainly consists
20       of, my recollection, vice chairman and
21       director of technologies.
22   BY MS. CHEN:
23       Q    He reached out on behalf of
24   Kewazinga/Visage-HD to other companies; right?
25           MR. DESAI:  Objection to form.

Page 92

1           D. Worley - Confidential
2            THE WITNESS:  I'm sorry.  You said
3        did Andy do that?
4    BY MS. CHEN:
5        Q    Yes.
6            MR. DESAI:  Objection to form and
7        outside the scope.
8            THE WITNESS:  I mean, could he
9        have at any point in time?  Maybe.  That
10       wasn't something he typically did.  He would
11       typically go through myself.
12   BY MS. CHEN:
13       Q    You don't recall Mr. Weber sending
14   this October 5th, 2005 email to you before he
15   sent it to Google; right?
16           MR. DESAI:  Objection to form.
17           THE WITNESS:  No.  I don't know
18       that I got it afterwards.  I might have at
19       some point.
20   BY MS. CHEN:
21       Q    Mr. Weber sent this from his personal
22   email address, ahweber@bellatlantic.net; right?
23       A    I'm scrolling up to the top of his
24   email.  That appears to be correct.
25       Q    Do you have access to all of

Page 93

1           D. Worley - Confidential
2    Mr. Weber's emails from his personal email
3    account?
4            MR. DESAI:  Objection to form.
5        Outside the scope.
6            THE WITNESS:  I mean, no.  His
7        personal emails?  No.
8    BY MS. CHEN:
9        Q    Mr. Weber occasionally sent emails
10   from his personal email account regarding
11   Kewazinga business; is that right?
12           MR. DESAI:  Objection to form.
13       Outside the scope.  To the extent this is
14       about Mr. Weber in his personal capacity,
15       this is foundation.
16           THE WITNESS:  So we had
17       maintained, when we had -- excuse me, when
18       we had the website active, we had also
19       maintained kewazinga.com email addresses.
20       And my recollection is that's sort of
21       reinforced here, that we had at some point,
22       I think from a cost standpoint, stopped
23       paying for that.  So we had to revert to our
24       personal email addresses for Kewazinga
25       business.

Page 94

1        D. Worley - Confidential
2   BY MS. CHEN:
3      Q    So today Kewazinga no longer has
4   access to Mr. Weber's -- strike that.
5           Mr. Weber has passed away; is that
6   right?
7      A    Correct.
8      Q    So today Kewazinga does not have
9   access to emails Mr. Weber would have sent from
10  his personal email address after Kewazinga's
11  email addresses were discontinued; is that right?
12          MR. DESAI:  Objection to form and
13     outside the scope.
14          THE WITNESS:  Right, so -- not
15     right.  Yes, I'm answering the question.  He
16     was -- he was good at a lot of things.
17     Terrific individual.  One of the things he
18     was good at was including others within
19     Kewazinga in terms of what he was doing.  He
20     was not a lone wolf by any means.  Earlier
21     on it would have been Andy and -- you know,
22     Andy and myself as sort of -- as referenced
23     here, like, go off and get a day job.  So he
24     would have, you know, kept others in the
25     loop.  But he was not, you know, he was not

Page 95

1        D. Worley - Confidential
2   a lone wolf.
3   BY MS. CHEN:
4      Q    Kewazinga doesn't have access to
5   emails -- strike that.
6           Kewazinga does not have access to all
7   of the emails that Andy Weber may have sent from
8   his personal email address on behalf of
9   Kewazinga; is that right?
10          MR. DESAI:  Objection to form.
11     Outside the scope.
12          THE WITNESS:  I'm going to have --
13     well, does not have access?  Does not have
14     access?  We certainly have access to
15     everything he would have forwarded or copied
16     others on, and those have been provided.  Is
17     it possible that he might have sent an email
18     that he didn't forward a copy to us on?
19     Unlikely.
20  BY MS. CHEN:
21     Q    Is Exhibit 6 an example of an email
22  that Mr. Weber sent to Google without copying any
23  other Kewazinga employees?
24          MR. DESAI:  Objection to form.
25          THE WITNESS:  I can't answer the

Page 96

1        D. Worley - Confidential
2      question.  It could have been a blind cc or
3      it could have been a forward.  I don't know.
4   BY MS. CHEN:
5      Q    What was Mr. Weber's role in the
6   inventions that are patented by Kewazinga?
7           MR. DESAI:  Objection to form.
8      Outside the scope of permitted discovery in
9      this case and outside the scope of the
10     30(b)(6) topics.
11          But you can answer the question
12     generally if you have an answer.
13          THE WITNESS:  Right.  So he -- he
14     was sort of the nucleus that brought the
15     three of us, Scott, myself and Andy
16     together.  He had -- he was personal friends
17     with Scott, he was personal he friends with
18     me.  I didn't know Scott.  Scott didn't know
19     me.  And Andy brought us together, you know,
20     as a threesome -- sounds a little trite, but
21     as a threesome to start to work on this in
22     December of '97.
23          MS. CHEN:  This might be a good
24     time to take a break.  I think it's been a
25     little bit.  Let's go off the record.

Page 97

1        D. Worley - Confidential
2           MR. VIDEOGRAPHER:  The time is
3      12:56.  We're off the record.
4           (Whereupon there was a lunch
5      recess.)

Page 118

1     D. Worley - Confidential
2  of Google Street View?
3         MR. DESAI: Objection to form.
4         THE WITNESS: Yeah, Lenny might
5     have -- you know, Lenny was certainly aware
6     of it. But I don't think it was until like
7     2012 time frame that it -- he started to
8     piece it together that there was
9     infringement.
10 BY MS. CHEN:
11    Q   Are you aware that as early as
12 October 2004, Google publicly funded research at
13 Stanford regarding street level imagery?
14        MR. DESAI: Objection to form.
15    Outside the scope.
16        THE WITNESS: I'm not aware of
17    that. And they certainly didn't mention
18    that when we were giving them our
19    information and ideas in 2006.
20 BY MS. CHEN:
21    Q   Before Kewazinga reached out to Google
22 to discuss Kewazinga's business proposition, did
23 Kewazinga research Google's ongoing projects?
24        MR. DESAI: Objection to form.
25    Outside the scope.

Page 119

1     D. Worley - Confidential
2         THE WITNESS: Well, we were aware
3     of the mapping and advertising, obviously.
4     That's the business model. And we felt very
5     strongly that video, navigable video through
6     the use of the phrase plowing the streets
7     and waterways, was really the next step in
8     terms of extension of mapping and Google
9     Earth.
10 BY MS. CHEN:
11    Q   After Mr. Smalheiser mentioned that
12 Google may be infringing in 2012, was it
13 Kewazinga's position that it believed Google
14 infringed Kewazinga's patents?
15        MR. DESAI: Objection to form.
16        THE WITNESS: That was our
17    original take, and then we very quickly --
18    was it hours or days or weeks, I don't
19    recall -- reached out to Ian, our counsel,
20    and started, you know, working with that
21    through him. And, of course, came to the
22    foregone conclusion that there was
23    infringement.
24 BY MS. CHEN:
25    Q   Can you remind me when Mr. Smalheiser

Page 120

1     D. Worley - Confidential
2  joined Kewazinga as an active participant in the
3  business?
4     A   I believe it was 2002.
5     Q   And can you remind me when
6  Mr. Smalheiser began working on the business
7  development for Kewazinga?
8         MR. DESAI: Objection to form.
9         THE WITNESS: It would have been
10    after -- it would have been after --
11    certainly after 2003, and he was definitely
12    involved with Andy and myself in 2006.
13    That's probably the best I can give you.
14 BY MS. CHEN:
15    Q   In 2012, when y'all were discussing
16 the possibility that Google may infringe, were
17 you also discussing whether other companies might
18 also infringe Kewazinga's patents?
19        MR. DESAI: Objection to form.
20        THE WITNESS: Yes.
21 BY MS. CHEN:
22    Q   Why did Kewazinga shift at that time
23 to be interested in patent litigation?
24        MR. DESAI: Objection to form.
25        THE WITNESS: So what do you mean

Page 121

1     D. Worley - Confidential
2  "shift"?
3  BY MS. CHEN:
4     Q   Had Kewazinga always -- excuse me.
5  Strike that.
6         When did Kewazinga first consider
7  enforcing its patents?
8         MR. DESAI: Objection to form and
9     outside the scope of the 30(b)(6).
10        THE WITNESS: I think along the
11    way there were companies from time to time
12    that we felt were -- you know, there could
13    be infringement. You know, we were -- we
14    were -- we were, you know, particularly for
15    example in 2006, you know, in collaboration
16    mode, trying to find partners. And anything
17    in particular, you know, the experiences we
18    had with Microsoft and Google which were --
19    I'll focus on Google -- you know, were
20    repeatedly asking for information. At the
21    time they were telling me they're working on
22    a similar project and not telling us.
23    Asking us for more information on how this
24    could work and be approved. You know, it
25    dawned on us, you know, it is what it is,

31 (Pages 118 - 121)

CONFIDENTIAL

Page 134

1     D. Worley - Confidential
2  Q   Did Wooster Funding fund the 2013
3  Google litigation?
4     MR. DESAI: Objection to form.
5     THE WITNESS: No.
6  BY MS. CHEN:
7  Q   Did any entity other than Kewazinga
8  fund the 2013 Google litigation?
9     MR. DESAI: Objection to form.
10    THE WITNESS: We were searching
11 for funding. We -- and I don't remember
12 when. I mean I will say that my -- sort of
13 my involvement, sort of more direct, too
14 strong to say day-to-day, but started up
15 again late 2012. But we were, you know,
16 beginning sometime around then in 2013, and
17 continuing on, you know for many years, were
18 actively seeking funding. But we had not
19 yet at the point that we filed -- well, in
20 2013, we didn't have any funding. We were
21 seeking funding and in anticipation we felt,
22 you know -- we felt -- we were very hopeful,
23 had reason to think that we could, but we
24 didn't have any funding. Eventually secured
25 funding at that time.

Page 135

1     D. Worley - Confidential
2  BY MS. CHEN:
3  [redacted]
13    MS. CHEN: I think now is a good
14 time to take a break. Let's go off the
15 record.
16    MR. VIDEOGRAPHER: The time is
17 2:51. We are off the record.
18    (Whereupon there was a brief
19 recess.)
20    MR. VIDEOGRAPHER: The time is
21 3:04. We are on the record.
22 BY MS. CHEN:
23 Q [redacted]

Page 136

1     D. Worley - Confidential
[lines 2-25 redacted]
6     MR. DESAI: Objection to form.
8  BY MS. CHEN:
11    MR. DESAI: Objection to form.

Page 137

1     D. Worley - Confidential
2  BY MS. CHEN:
5     MR. DESAI: Objection to form.
17 BY MS. CHEN:
22 Q   Were you involved in any of the
23 communications?
24    MR. DESAI: Objection to form.
25    THE WITNESS: I don't remember --

35 (Pages 134 - 137)

**Page 142**

1  D. Worley - Confidential
2  the -- laid out our view on infringement of
3  our patents vis-a-vis the Google product
4  Street View.
5  BY MS. CHEN:
6  Q  What was Google's position at that
7  meeting?
8  A  Google's position was they didn't --
9  they didn't necessarily agree with the
10  infringement contention.
11  Q  Did they say what part of the
12  infringement contention they disagreed with?
13  A  We talked about array of cameras.
14  Q  What about array of cameras?
15  A  From our standpoint, the Street View
16  product using array of cameras.
17  Q  And by "array of cameras," is that the
18  phrase that's from the patents?
19  A  Either camera array or array of
20  cameras. But "array" is used in the patents,
21  yes.
22  Q  So Google's position was that Google
23  did not infringe that particular array
24  limitation; is that right?
25      MR. DESAI: Objection to form.

**Page 143**

1  D. Worley - Confidential
2      THE WITNESS: I think that's fair.
3  I think that's fair.
4  BY MS. CHEN:
5  Q  What was Kewazinga's response?
6  A  "You're wrong." Not correct, wrong.
7  Incorrect, wrong.
8  [redacted]

**Page 144**

1  D. Worley - Confidential
2  [redacted]
4  BY MS. CHEN:
5  Q  [redacted]
16  BY MS. CHEN:
17  Q  After that in-person meeting -- strike
18  that.
19      Kewazinga didn't end up serving its
20  complaint on Google; right?
21      MR. DESAI: Objection to form.
22      THE WITNESS: That is correct.
23  BY MS. CHEN:
24  Q  Why?
25  A  [redacted]

**Page 145**

1  D. Worley - Confidential
2  had hoped. We knew that the complaint could be
3  withdrawn without prejudice. And we would not
4  have given up or forfeited or waived any rights
5  against Google by having gone through this
6  process and withdrawing the lawsuit without
7  prejudice.
8  Q  Google moved to dismiss the complaint
9  because Kewazinga had not filed -- strike that.
10      Google moved to dismiss Kewazinga's
11  2013 complaint because Kewazinga hadn't served
12  the complaint as required by the federal rules;
13  is that right?
14      MR. DESAI: Objection to form.
15      THE WITNESS: I know they moved to
16  dismiss the complaint. I think the form of
17  the motion speaks for itself.
18  BY MS. CHEN:
19  Q  The court granted Google's motion;
20  right?
21      MR. DESAI: Objection to form.
22      THE WITNESS: That's my
23  understanding.
24  BY MS. CHEN:
25  Q  Before the court granted the motion,

Page 150

D. Worley - Confidential

1  phone call was. I'm going to guess and say
2  May, because I think it happened pretty
3  quickly after we filed.
4      You know, I'm not saying we were
5  misled, but we definitely came off that call
6  thinking they're suggesting we come out and
7  have an in-person meeting. There's -- you
8  know, there's an amicable solution to be
9  had. So I think that was our expectation
10 throughout the summer until we came to the
11 meeting in August. And, you know, up
12 until -- I guess at some point in the
13 meeting, there was certainly back-and-forth
14 that -- but it wasn't clear, I think, until
15 the end of the meeting, where we basically
16 got thrown out, that Google had no intention
17 of settling.
18     So, you know, our primary focus
19 throughout the summer -- primary focus, not
20 exclusive focus, but primary focus was
21 expectation of settlement. You know, we
22 did -- we did continue to look for funding.
23     Again, "has" is -- would have been
24 a better word, if I had been drafting it.

Page 151

D. Worley - Confidential

1  The sentence before that is absolutely true.
2  Settlement negotiations -- and that's borne
3  out by the email where I think it
4  specifically talks about settlement
5  negotiations. I don't remember the exact
6  language, but I know it refers to 408 and it
7  refers to confidentiality. So I know there
8  was an expectation of, you know, some real,
9  reasonable, good-faith negotiation. I
10 honestly don't feel like we got that in
11 August.
12 BY MS. CHEN:
13     Q   Is the sentence starting
14 "Consequently" untrue?
15     MR. DESAI: Objection to form.
16     THE WITNESS: I think "has" -- I
17 think "has" would have been a better choice
18 of words. I think it's misleading to read
19 it that, no, never any intention regardless
20 of -- you know, regardless of anything.
21 That was definitely not the case, and I
22 think if one's trying to read that into
23 this, I think it was a bad choice of words.

Page 152

D. Worley - Confidential

1  BY MS. CHEN:
2      Q   Shortly after this filing, the court
3  dismissed the 2013 Google litigation; right?
4      MR. DESAI: Objection to form.
5      THE WITNESS: I believe that's
6  right.
7  BY MS. CHEN:
8      Q   So let's turn to after the 2013
9  lawsuit is in the rearview mirror and then up
10 through 2020, when Kewazinga filed this
11 litigation, did you ever tell Google that you
12 would come back and assert the patents against
13 Google once you got funding?
14     MR. DESAI: Objection to form.
15     THE WITNESS: No, as to your
16 question, and there was no reason to do so
17 beyond what we had already done.
18 BY MS. CHEN:
19     Q   You didn't contact Google between the
20 end of the 2013 litigation and the filing of the
21 2020 complaint; right?
22     MR. DESAI: Same objection.
23     THE WITNESS: Can you repeat the
24 question?

Page 153

D. Worley - Confidential

1  BY MS. CHEN:
2      Q   Kewazinga didn't contact Google
3  between the end of the 2013 litigation and the
4  filing of the 2020 complaint; right?
5      MR. DESAI: Objection to form.
6      THE WITNESS: [REDACTED]
7  [REDACTED]
8  [REDACTED]
9  [REDACTED]
10 [REDACTED]
11 [REDACTED]
12 [REDACTED]
13 BY MS. CHEN:
14     Q   So you had instructed your law firm,
15 which is Stroock, to communicate that to Google;
16 is that right?
17     MR. DESAI: One second, Dave.
18 Objection to form.
19     THE WITNESS: [REDACTED]
20 [REDACTED]
21 [REDACTED]

Page 170

1        D. Worley - Confidential
2    BY MS. CHEN:
3        Q    There was never a time after 2012?
4        A    When we did not believe that.
5        Q    So Kewazinga has always believed since
6    2012 that Google infringes its patents?
7        A    Correct.
8        Q    Why did Kewazinga decide to sue Google
9    in 2020?
10           MR. DESAI:  Objection to form.
11           THE WITNESS:  We got the funding.
12   BY MS. CHEN:
13       Q    How long after -- strike that.
14            How long after Kewazinga got the
15   funding did Kewazinga file the complaint against
16   Google?
17       A    Excuse me, I don't recall exactly.
18   I'm going to kind of guess, within a month.  I
19   might be off by a couple of weeks.  Four to six
20   weeks maybe.
21       Q    Did Kewazinga get the funding before
22   Mr. DiBernardo reached out to Google before the
23   litigation?
24           MR. DESAI:  Objection to form.
25           THE WITNESS:  Okay.  All right.  I

Page 171

1        D. Worley - Confidential
2        have to make sure I'm listening to the
3        question.  What time period are we talking
4        about?
5    BY MS. CHEN:
6        Q    In 2020.
7        A    Yeah.
8        Q    Strike that.
9             Did Kewazinga contact Google in 2020,
10   before Kewazinga filed its complaint?
11           MR. DESAI:  Objection to form.
12           THE WITNESS:  I don't know.  I
13       don't recall that we did.  I don't know.
14           MS. CHEN:  I think now is a good
15       time to take a break.  Can we take a
16       five-minute -- sorry, ten-minute break,
17       please.
18           MR. VIDEOGRAPHER:  The time is
19       4:01.  We are off the record.
20           (Whereupon there was a brief
21       recess.)
22           MR. VIDEOGRAPHER:  The time is
23       4:14.  We're on the record.
24   BY MS. CHEN:
25       Q    Mr. Worley, Google has offered Street

Page 172

1        D. Worley - Confidential
2    View continuously from 2013 until today; right?
3           MR. DESAI:  Objection to form.
4           THE WITNESS:  You know, I
5       haven't -- I imagine they haven't missed a
6       day.  I haven't checked, but I imagine they
7       haven't missed a day.
8    BY MS. CHEN:
9        Q    You're not aware of them shutting it
10   down or anything?
11       A    No, I'm not aware of that.
12       Q    Have you used Street View?
13       A    I have.  Recently I have used it,
14   yeah.
15       Q    You know that each year Google offers
16   this Street View service, it maps more and more
17   miles of roads; right?
18           MR. DESAI:  Objection to form.
19           Outside the scope of a 30(b)(6).
20           THE WITNESS:  Could be.
21   BY MS. CHEN:
22       Q    You've heard of the Google Street View
23   cars with the cameras on top, driving around?
24           MR. DESAI:  Same objections.
25           THE WITNESS:  I've heard of that,

Page 173

1        D. Worley - Confidential
2        yeah.
3    BY MS. CHEN:
4        Q    And they drive around collecting
5    additional imagery to update Google Street View;
6    right?
7           MR. DESAI:  Same objections.
8           THE WITNESS:  I mean, that would
9       be a reasonable conclusion.  Obviously, I'm
10      not party to internal discussions on what
11      they're trying to accomplish.
12   BY MS. CHEN:
13       Q    Have you ever read any public Google
14   posts or blogs or press releases about Street
15   View?
16           MR. DESAI:  Objection.  Outside
17      the scope.
18           THE WITNESS:  No.
19   BY MS. CHEN:
20       Q    But it wouldn't surprise you that
21   Google has continued to develop Street View
22   between 2013 and today; right?
23           MR. DESAI:  Objection to form.
24      Outside the scope.
25           THE WITNESS:  It wouldn't surprise

Page 174

1     D. Worley - Confidential
2     me, no.
3  BY MS. CHEN:
4     Q   It wouldn't surprise you that there
5  are more users of Street View now than there were
6  in 2013; right?
7         MR. DESAI:  Same objections.
8         THE WITNESS:  I mean, you're
9     getting into specifics.  You're telling me
10    this is true.  I have no idea.
11 BY MS. CHEN:
12    Q   You don't have any reason to believe
13 there are fewer users now than in 2013; right?
14        MR. DESAI:  Objection to form.
15    Outside the scope of a 30(b)(6).
16        THE WITNESS:  I don't have any
17    reason to estimate users at any point in
18    time.
19 BY MS. CHEN:
20    Q   What's the goal of the Google
21 litigation?
22        MR. DESAI:  Objection to form.
23        THE WITNESS:  To win.
24        MR. DESAI:  Outside the scope of a
25    30(b)(6).

Page 175

1     D. Worley - Confidential
2         Sorry.  Sorry to cut you off.
3         THE WITNESS:  I don't know if you
4     heard my answer, Randi, but to win.
5  BY MS. CHEN:
6     Q   How do you win the litigation?
7         MR. DESAI:  Same objections.
8         THE WITNESS:  I think there are
9     different ways one can win.  You know, in
10    terms of what our expectation is, it's
11    proving willful infringement at trial, which
12    I don't think will be very hard.
13 BY MS. CHEN:
14    Q   Would you be satisfied with a jury
15 verdict of willful infringement at trial, but no
16 damages?
17        MR. DESAI:  Objection to form.
18    Outside the scope of a 30(b)(6).
19        THE WITNESS:  I can't even
20    comprehend that question.  Could that
21    happen?  Has that ever happened?
22 BY MS. CHEN:
23    Q   I'm not sure.
24    A   Well, okay.  I mean -- okay.  Sorry.
25 I'll keep my mouth shut.

Page 176

1     D. Worley - Confidential
2     Q   Allow me to take a step back.
3         Does Kewazinga seek damages in this
4  litigation?
5     A   You know, I think it's whatever is
6  spelled out in the complaint.  I'm not going to
7  try to repeat what's in the complaint.  We can
8  pull it out and look at it.  That would be the
9  best.
10    Q   In your exhibits folder, I think
11 Exhibit 1 is the complaint.  On page -- please
12 turn to Page 21 of Exhibit 1.
13    A   Okay.  I'm a little slow here.  I'm on
14 Page 7.  Starts with E at the top?  Letter E?
15    Q   Yes.
16        So Page 21 of Exhibit 1 is a partial
17 list of the remedies that Kewazinga is seeking in
18 this litigation; right?
19        MR. DESAI:  Objection to form.
20        THE WITNESS:  The complaint speaks
21    for itself.  I can't -- the only thing I can
22    say -- you can't change what's in the
23    complaint or modify what's in the complaint.
24    I don't mean to be coy, but the complaint is
25    the complaint.

Page 177

1     D. Worley - Confidential
2  BY MS. CHEN:
3     Q   And in the complaint, your
4  understanding is that Kewazinga is seeking
5  damages for Google's alleged infringement; right?
6         MR. DESAI:  Objection to form.
7         THE WITNESS:  Correct.
8  BY MS. CHEN:
9     Q   Kewazinga is seeking damages for
10 Google's alleged infringement of the '325 patent;
11 right?
12        MR. DESAI:  Same objection.
13        THE WITNESS:  Paragraph E at the
14    top.
15 BY MS. CHEN:
16    Q   Yes.
17    A   That paragraph, yes.
18        Look, I'm happy to answer questions.
19 There's nothing I can do that's going to modify
20 this complaint, but -- anyhow, sorry, go ahead.
21    Q   We can just take a step back away from
22 the complaint.  I just want to understand,
23 Kewazinga is seeking damages, monetary damages in
24 this case; right?
25    A   Yes, of course.  Is that unusual?

CONFIDENTIAL

Page 186

1  D. Worley - Confidential
2       MS. CHEN: Okay. I think now is a
3  good time to take a break. Let's take ten
4  minutes, please.
5       MR. VIDEOGRAPHER: The time is
6  4:36. We are off the record.
7       (Whereupon there was a brief
8  recess.)
9       MR. VIDEOGRAPHER: The time is
10 4:45. We're on the record.
11      MS. CHEN: Mr. Worley, thank you
12 so much for your time today. I do not have
13 any further questions at this time.
14      MR. DESAI: Can we go off the
15 record? I know we just took a break, but it
16 will just be a very --
17      MR. VIDEOGRAPHER: The time is
18 4:45. We are off the record.
19      (Whereupon there was a brief
20 recess.)
21      MR. VIDEOGRAPHER: The time is
22 4:51. We're on the record.
23      MR. DESAI: Counsel for Kewazinga
24 has no questions for the witness.
25      While I'm on the record, I will go

Page 187

1  D. Worley - Confidential
2  ahead and designate the transcript in its
3  entirety as confidential pursuant to the
4  Protective Order and we will redesignate or
5  dedesignate the transcript as appropriate in
6  the time period allotted by the Protective
7  Order.
8       We have no questions for the
9  witness.
10      MR. VIDEOGRAPHER: All right.
11 This concludes the video-recorded virtual
12 remote deposition of David Clark Worley
13 taken by the defendant on Friday, June 12,
14 2020. The time is 4:51 Central Daylight
15 Time and we are going off the record.
16              * * *
17
18
19 ----------------------
20    DAVID WORLEY
21 SUBSCRIBED AND SWORN TO
   BEFORE ME THIS ____ DAY
   OF _____, 2020.
22
23 ----------------------
   NOTARY PUBLIC
24 MY COMMISSION EXPIRES_____
25

Page 188

1  D. Worley - Confidential
2        INDEX TO TESTIMONY
3        EXAMINATION OF
4  DAVID WORLEY                    PAGE
5  BY: Ms. Chen                      6
6              * * *
7        EXHIBITS
8  Defendant
   Number   Description              Page
9  Exhibit 1  Complaint                14
10 Exhibit 2  30(b)(6)Notice of Deposition   31
11 Exhibit 3  30(b)(1)Notice of Deposition   33
12 Exhibit 4  Rule 26(a) Initial Disclosures 34
13 Exhibit 5  LinkedIn Profile of Mr. Worley 45
14 Exhibit 6  Email Exchange           69
              (GOOG-KZGA 2374-2375)
15
   Exhibit 7  Email Exchange          110
16            (GOOG-KZGA 2961-2962)
17 Exhibit 8  Plaintiffs' Response and 146
              Non-Opposition to Google's
18            Motions to Dismiss
19 Exhibit 9  U.S. Patent '234        160
              (KEWAZINGA-G 57-87)
20
   Exhibit 10 Utility Patent Application 163
21            Transmittal
              (KEWAZINGA-G 1448-2194)
22
   (Exhibits were retained on Exhibit Share.)
23              * * *
24
25

Page 189

1  D. Worley - Confidential
2        C E R T I F I C A T I O N
3       I, Randi Friedman, Registered
4  Professional Reporter and Notary Public of the
5  State of New York, do hereby certify:
6       THAT, the witness whose testimony is herein
7  before set forth, was duly sworn by me, and
8  THAT, the within transcript is a true record of
9  the testimony given by said witness.
10      I further certify that I am not related
11 either by blood or marriage to any of the parties
12 to this action; and that I am in no way
13 interested in the outcome of this matter.
14      IN WITNESS WHEREOF, I have hereunto set my
15 hand this day, June 15, 2020.
16
17
18      *Randi C. Friedman* (signature)
19      Randi Friedman, RPR
20
21
22
23
24
25 * * * * * * * * *

Veritext Legal Solutions
800-567-8658                                973-410-4098