**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| KEWAZINGA CORP., <br><br>                       Plaintiff, <br><br>       v. <br><br> GOOGLE LLC, <br><br>                  Defendant. | Civil Action No. 1:20-cv-01106-LGS |

**<u>DEFENDANT GOOGLE LLC'S  RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

**Pages**

TABLE OF AUTHORITIES ............................................................................................. iii

TABLE OF ABBREVIATIONS ......................................................................................... v

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARDS ..................................................................................................... 2

ARGUMENT ..................................................................................................................... 3

I.      The Court Should Afford No Weight To Kewazinga's Expert Testimony. ...................... 3

II.     "Array of Cameras"
        ('226 Patent, claims 55, 119; '325 Patent, claims 1, 5, 6, 10, 14, 15, 29) ......................... 6

        A.      "Fixed In Relation To Each Other" Should Be Included In The
                Construction Of "Array Of Cameras." ................................................................. 7

                1.      The *Microsoft* Court Correctly Concluded That Each Camera In
                        The "Array" Must Be "Fixed In Relation To Each Other." ...................... 7

                2.      Kewazinga's Arguments To Overturn The *Microsoft* Court's
                        Construction Lack Merit And Should Be Rejected. ............................... 9

        B.      Like The *Microsoft* Court, This Court Should Reject Kewazinga's
                Argument That An "Array" Can Be Created Over Time By Moving
                Cameras ............................................................................................................... 14

        C.      If Adopted, Kewazinga's Construction Would Render The Asserted
                Claims Indefinite ................................................................................................. 16

III.    "Mosaicing"
        ('325 Patent, claims 1, 5, 6) .................................................................................................. 18

        A.      In These Patents, "Mosaicing" Requires A Composition Process "To
                Achieve A Seamless Combination Of The Camera Outputs." ............................ 20

        B.      In These Patents, "Mosaicing" Is Performed on "Camera Outputs." ................... 24

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Pages**

### CASES

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
  815 F.3d 1314 (Fed. Cir. 2016)......................................................................... 22

*Goldenberg v. Cytogen, Inc.*,
  373 F.3d 1158 (Fed. Cir. 2004)..................................................................... 15, 25

*GPNE Corp. v. Apple Inc.*,
  830 F.3d 1365 (Fed. Cir. 2016)........................................................................... 9

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
  381 F.3d 1111 (Fed. Cir. 2004)........................................................................... 4

*Intellectual Ventures I LLC v. T-Mobile USA, Inc.*,
  902 F.3d 1372 (Fed. Cir. 2018)......................................................................... 18

*Kewazinga Corp. v. Microsoft Corp.*,
  No. 1:18-cv-4500-GHW, 2019 WL 3423352 (S.D.N.Y. July 29, 2019)................. passim

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005)......................................................................... 16

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996).................................................................................... 2, 3

*Moleculon Research Corp. v. CBS, Inc.*,
  793 F.2d 1261 (Fed. Cir. 1986)......................................................................... 22

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)................................................................................... 17, 18

*Omega Eng'g, Inc, v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003)......................................................................... 18

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005).................................................................... passim

*Secure Web Conference Corp. v. Microsoft Corp.*,
  No. 13-cv-2462-JG, 2014 WL 4954644 (E.D.N.Y. Oct. 2, 2014)............................ 3

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
  550 F.3d 1356 (Fed. Cir. 2008)........................................................................... 5

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015) ............................................................................................... 2

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006) .............................................................................. 25

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ........................................................................ 3, 9, 22

## **RULES**

Fed. R. Evid. 702 ................................................................................................................ 5

\* \* \* All emphasis added unless otherwise noted \* \* \*

**TABLE OF ABBREVIATIONS**

| Abbreviation | Explanation |
|---|---|
| **'234 Patent, xx:yy** | U.S. Patent No. 9,055,234 (filed as Dkt. No. 110-11, Desai Decl. Ex. A), col. xx, line yy |
| **'325 Patent, xx:yy** | U.S. Patent No. 6,522,325 (filed as Dkt. No. 110-12, Desai Decl. Ex. B), col. xx, line yy |
| **'226 Patent, xx:yy** | U.S. Patent No. 6,535,226 (filed as Dkt. No. 110-13, Desai Decl. Ex. C), col. xx, line yy |
| **Chen Decl.** | Declaration of Emily H. Chen in Support of Defendants Google LLC's Responsive Claim Construction Brief filed concurrently. |
| **Stevenson ¶ __** | Declaration of Robert L. Stevenson, Expert for Microsoft, in *Kewazinga Corp. v. Microsoft Corp.*, No. 1:18-cv-4500-GHW, Dkt. No. 46-9 (filed with this brief as Chen Decl. Ex. B) |
| **Hanna ¶ __** | Declaration of Keith Hanna, Expert for Kewazinga, regarding claim construction in *Kewazinga Corp. v. Microsoft Corp.*, No. 1:18-cv-4500-GHW, Dkt. No. 43 (filed with this brief as Chen Decl. Ex. C) |
| **Lubin ¶ __** | Claim Construction Expert Report of Jeffrey Lubin, Expert for Kewazinga in this litigation (filed as Dkt. No. 110-1) |
| **Lubin Dep. __** | Transcript of the November 22, 2020, Deposition of Jeffrey Lubin, Expert for Kewazinga (filed with this brief as Chen Decl. Ex. D) |
| **Stevenson Dep. __** | Transcript of the March 12, 2019, Deposition of Robert L. Stevenson, Expert for Kewazinga, in *Kewazinga Corp. v. Microsoft Corp.*, No. 1:18-cv-4500-GHW, Dkt. No. 52-1 (filed with this brief as Chen Decl. Ex. E) |
| **Burt** | U.S. Patent 5,649,032, issued to Peter J. Burt (filed as Dkt. No. 110-7, Desai Decl. Ex. F) |
| **Microsoft IPR Denial** | Decision Denying Institution of *Inter Partes* Review of U.S. Patent No. 9,055,234, *Microsoft Corp. v. Kewazinga Corp.*, IPR2019-00872, Paper 8 (PTAB September 23, 2019) (filed as Dkt. No. 110-17, Desai Decl. Ex. G) |
| **POSITA** | Person of ordinary skill in the art |

## INTRODUCTION

The Court is already familiar with the interactions between Kewazinga and Google leading up to this lawsuit, which are the subject of Google's pending, case-dispositive summary judgment motion regarding equitable estoppel.  (*See* Dkt. Nos. 59, 97.)  Kewazinga first contacted Google in 2005.  Eight years later, Kewazinga sued Google for patent infringement.  Google explained why it did not infringe:  its Street View service utilizes a camera mounted on a moving vehicle, which is different from Kewazinga's inventions, which stemmed from Kewazinga's development of fixed-rail arrays of cameras for use in concert and sports venues:

 

**Left:**  Chen Decl. Ex. A,
GOOG-KZGA-00000021

**Right:**  '226 Patent, Fig. 7a.

Kewazinga dismissed its own case shortly thereafter and did not contact Google again for seven more years, until filing this lawsuit in 2020.  (*See generally* Dkt. Nos. 59, 97.)

In 2018, Kewazinga sued Microsoft for alleged infringement of the same three patents at issue in this case (the '325, '226, and '234 Patents (the "Patents-in-Suit")).  That case remains pending in this District before the Honorable Gregory H. Woods.  No. 1:18-cv-4500-GHW (S.D.N.Y.).  In that *Microsoft* case, Kewazinga sought broad claim constructions, including a construction of the term "array of cameras" as "a configuration of cameras, where such configuration can include ***moveable cameras*** and ***reusing a camera in multiple locations***."  On

July 29, 2019, the *Microsoft* court issued its claim construction order which, among other things, rejected Kewazinga's broad proposed construction.  *Kewazinga Corp. v. Microsoft Corp.*, No. 1:18-cv-4500-GHW, 2019 WL 3423352 (S.D.N.Y. July 29, 2019) ("*Microsoft*").  After thoroughly analyzing the patent claims, the written descriptions, the figures, and expert testimony, the *Microsoft* court concluded that Kewazinga's "moveable cameras" construction "goes too far and lacks intrinsic support."

Kewazinga now seeks a third bite at the apple.  Seeking to salvage any plausible infringement theory against Google, Kewazinga asks this Court to do what the *Microsoft* court correctly declined to do:  construe the claims broadly to cover ***any*** configuration of cameras that can be arranged in ***any*** way and that can be moved at ***any*** time.  But that is not what the patents disclose, because—as the *Microsoft* court explained—that is not what Kewazinga invented.

Google respectfully requests that the Court adopt its constructions, which are supported by the most compelling evidence for claim construction: the words and figures of the patents themselves.  By contrast, as described herein, Kewazinga's constructions rely almost exclusively on paid expert testimony.  Expert testimony is generally disregarded for the purposes of claim construction in most cases, but it is particularly unreliable here because Kewazinga's expert is unqualified under the standard of expertise that Kewazinga itself articulated in the *Microsoft* case and to the Patent Office.

## LEGAL STANDARDS

The *Microsoft* court's claim construction opinion sets forth a comprehensive statement of the relevant legal standards.  *Microsoft*, 2019 WL 3423352, at *2–5.  In pertinent part, "[t]he construction of a patent, including terms of art within its claim,' is not for a jury but 'exclusively' for 'the court to determine.'"  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 835 (2015) (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996)).  "[A] patent must

2

describe the exact scope of an invention and its manufacture to secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them." *Markman*, 517 U.S. at 373. A court considers three primary sources within the intrinsic evidence of record:  (1) the language of the claims; (2) the specification; and (3) the prosecution history. *Secure Web Conference Corp. v. Microsoft Corp*., No. 13-cv-2462-JG, 2014 WL 4954644, at *1 (E.D.N.Y. Oct. 2, 2014) (citing *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  "The specification is always highly relevant to the claim construction analysis;" it "is the single best guide to the meaning of a disputed term," and is "[u]sually . . . dispositive." *Vitronics*, 90 F.3d at 1582.

By contrast, extrinsic evidence—evidence external to the patent and prosecution history, such as expert testimony—"is less significant than the intrinsic record." *Secure Web*, 2014 WL 4954644, at *2 (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005)).  "Expert testimony . . . may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms.  Such instances will rarely, if ever, occur." *Vitronics*, 90 F.3d at 1585.  "[A] court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'" *Phillips*, 415 F.3d at 1318.

## ARGUMENT

## I.   The Court Should Afford No Weight To Kewazinga's Expert Testimony.

Expert testimony is inherently flawed because it is generated during, and for, the purpose of litigation. *Phillips*, 415 F.3d at 1318–19.  To counteract that effect, the court has discretion to decide what weight—if any—to give expert testimony, and is obligated to consider the inherent flaws and assess the evidence accordingly. *Id.* at 1319.  Here, the Court should afford no weight to Kewazinga's expert testimony for at least three reasons.

*First*, Kewazinga's expert is unqualified under the standard that Kewazinga argues is appropriate in the *Microsoft* case and at the Patent Office.  In claim construction, courts seek to "accord a claim the meaning it would have to a person of ordinary skill in the art ["POSITA"] at the time of the invention."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004).  In the *Microsoft* case, Kewazinga's expert (Dr. Keith Hanna) and Microsoft's expert (Dr. Robert L. Stevenson) agreed that a person of ordinary skill in the art in these patents must have either: "[A] *a bachelor's degree in computer science, computer engineering or the equivalent*, and 3-5 years of experience in the field of computer vision or image processing, or [B] a *post-graduate degree in computer science, computer engineering or the equivalent*, and 1–2 years of experience in the field of computer vision or image processing, or equivalent experience."  (*See* Stevenson Decl. ¶ 20; Hanna Decl. ¶ 23.)  Kewazinga agreed to that same definition in 2019, in connection with proceedings at the Patent Office regarding one of the Patents-in-Suit.  (*See* Microsoft IPR Denial at 7–8.)

Perhaps because many of Dr. Hanna's positions were rejected by the *Microsoft* court, Kewazinga hired a new expert for claim construction in this case—Dr. Jeffrey Lubin.  But Dr. Lubin does not meet the definition of "a person of ordinary skill in the art" that Kewazinga still asserts is appropriate in the *Microsoft* case.  Specifically, Dr. Lubin has degrees in psychology; he lacks a "bachelor's degree in computer science, computer engineering or the equivalent (clause "A" of Kewazinga's standard), and he lacks a "post-graduate degree in computer science, computer engineering or the equivalent" (clause "B" of Kewazinga's standard).  (*See* Lubin Decl. ¶ 4; Lubin Dep. 46:16–18, 47:23–48:5.)  Kewazinga does not explain why the level of skill in the art should be different in this case as compared to the *Microsoft* case (which involve the same patents), and none exists.  Because Kewazinga's expert is not a "person of ordinary skill in the

art"—under the standard Kewazinga itself articulated—its expert testimony is inherently unhelpful and should be disregarded. *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008) ("[W]here an issue calls for consideration of evidence from the perspective of one of ordinary skill in the art, it is contradictory to Rule 702 to allow a witness to testify on the issue who is not qualified as a technical expert in that art.").

**Second**, Kewazinga's expert testimony lacks reliability because it was indisputably generated for the specific purpose of attempting to support Kewazinga's claim constructions. Kewazinga's expert, Dr. Lubin, admitted at deposition that he did not have any role in developing Kewazinga's claim constructions.  (Lubin Dep. 23:6–12.)  Nor did Dr. Lubin himself put any words on the page for his expert declaration; it was drafted entirely by Kewazinga's lawyers. (Lubin Dep. 12:18–13:3.)  And Dr. Lubin did not revise a single word of the declaration that the attorneys had already drafted.  (Lubin Dep. 17:8–13.)

**Third**, Kewazinga's expert testimony impermissibly contradicts the disclosures of the patents themselves.  Kewazinga devotes pages and pages of its brief detailing its expert's opinions, in particular with respect to the expert's "analysis" of a single drawing from the patents—the "Figure 11 embodiment"—that allegedly supports its broad constructions.  (*See* Dkt. No. 110, Kewazinga's Opening Claim Construction Brief ("Br.") at 5–9, 20–22.)  And based on that expert testimony, Kewazinga repeatedly (but erroneously) encourages the Court to adopt its constructions because "the only expert testimony offered by either party" allegedly supports Kewazinga's positions.  (*See* Br. at 15, 18.)

But expert testimony is properly discounted when that testimony is "clearly at odds" with the written record of the patent itself.  *Phillips*, 415 F.3d at 1318.  That is the case here.  As explained in further detail below, Kewazinga's expert testimony—particularly with respect to

Figure 11—is directly contradictory to the disclosures of the patents, and is therefore properly disregarded. *See infra* Section II.A.2. Importantly, Dr. Lubin's testimony is also directly at odds with the *Microsoft* court's analysis and conclusions with respect to Figure 11. (*See id*.) For that additional reason, the Court can (and should) disregard the proffered expert testimony.

## II.   "Array of Cameras"
   **('226 Patent, claims 55, 119; '325 Patent, claims 1, 5, 6, 10, 14, 15, 29)**

| Microsoft Court's Construction |
| --- |
| a set of multiple cameras, each fixed in relation to each other |

| Google's Proposed Construction | Kewazinga's Proposed Construction |
| --- | --- |
| a set of multiple cameras, each fixed in relation to each other<br><br>(Same as the *Microsoft* court's construction) | *No construction is necessary. However, if the Court rules that one is necessary, Kewazinga proposes the following construction:*<br>a camera configuration wherein the configuration can be created over time by moving cameras |

The term "array of cameras" is in the claims of the '325 and '226 Patents. It is central to the claimed inventions—indeed, both are titled "Navigable Telepresence Method And System Utilizing An ***Array Of Cameras***." Likewise, the specifications describe the "Background Of The Invention" as "a navigable ***camera array*** telepresence system and method of using the same." ('325 Patent at 1:20–21; '226 Patent at 1:15–16.)

The *Microsoft* court construed this term to mean "a set of multiple cameras, each fixed in relation to each other." In doing so, the court rejected the constructions offered by both parties to that case, including Kewazinga's proposal ("a ***configuration of cameras***, where such configuration can include ***movable cameras*** and ***reusing a camera*** in multiple locations"). *Microsoft*, 2019 WL 3423352, at \*15. The *Microsoft* court extensively analyzed the relevant claim language, the disclosures of the specifications, and the expert testimony proffered by the parties.

6

*Id.* at *15–19.  Google respectfully submits that the *Microsoft* court correctly construed this term and that this Court should adopt the same construction.

By contrast, Kewazinga seeks to re-litigate issues already (and correctly) decided by the *Microsoft* court.  Specifically, Kewazinga seeks to overturn the *Microsoft* court's sound reasoning by re-arguing that (1) the claimed "array" can constitute any "configuration" of cameras, rather than cameras with a fixed relationship to one another; and (2) that an "array" can be created over time by re-using and moving cameras.  This Court should reject those arguments, just as the *Microsoft* court already has.

### A.     "Fixed In Relation To Each Other" Should Be Included In The Construction Of "Array Of Cameras."

#### 1.   The *Microsoft* Court Correctly Concluded That Each Camera In The "Array" Must Be "Fixed In Relation To Each Other."

No dispute exists that the claimed "array of cameras" requires multiple cameras within the array—that is inherent in the phrase itself, which recites "cameras" in the plural.  But the parties dispute whether there must be some relationship between the cameras within the array.  The *Microsoft* court held, and Google proposes, that the claimed "array of cameras" includes "multiple cameras, each fixed in relation to each other."  That is fully consistent with how the claims and specifications of the Patents-in-Suit describe the purpose and benefits of the alleged inventions.

As the *Microsoft* court explained, the specifications of the Patents-in-Suit describe a number of shapes that the array can take—for example, a linear shape, an S-shape, or a ring.  But as the court observed, "[i]n all of the multitude of configurations contemplated in the patents . . . the ***cameras*** in each array ***are always fixed in geometric relation to each other***."  *Microsoft*, 2019 WL 3423352, at *15.  For example, the '325 Patent discloses a preferred embodiment wherein "the cameras [of the array] are on rails with each rail holding a plurality of cameras," and that "***[t]hese cameras [are] each locked into a fixed relation to every adjacent camera on the array***

and dispersed dimensionally in a given environment. . . ."  *Id.* (citing '325 Patent at 3:66–4:4).
Every other embodiment is consistent:  for instance, as the *Microsoft* court explained, Figures 2b,
2c, 2d, 2e, 3, 7a, and 11 all depict that each camera within the "array" is fixed in relation to the
other cameras in the array.  *See Microsoft*, 2019 WL 3423352, at *16; *see also, e.g.*, '325 Patent
at 7:8–15 (describing that each camera in the array of the embodiment depicted in Figures 2a–2d
is fixed in relation to one another by "securing the camera 14 to the rail 12"); *id.* at 8:22–25
(explaining that each camera in the array of the Figure 3 embodiment is "spaced approximately
one inch apart, thereby resulting in a seamless view of the environment").



The fixed geometric relationship between the cameras is not just a tangential part of the invention.  Instead, as the *Microsoft* court explained, it is "central" to the use of the array and the goal of the claimed inventions—"to allow one or more users to virtually navigate an environment, preferably in real time." *Microsoft*, 2019 WL 3423352, at *16 (citing Stevenson Dep. ¶ 127:6–11); *see also id*. at *17 (describing the "critical nature of [the] fixed geometric relationship"). Specifically, "[f]ixing the cameras [in] relation to each other allows for the creation of progressively different perspectives, which can be 'mosaiced,' 'tweened' or otherwise mixed or processed to allow a user to navigate images of the environment captured by the array." *Id*. Accordingly, the Court should adopt Google's proposed construction—the same construction entered by the Court in *Microsoft*—because the requirement that each camera within the "array" is fixed in relation to each other adheres to the specification's consistent description of the invention.  *See Vitronics*, 90 F.3d at 1582 (holding that the specification "is the single best guide to the meaning of a disputed term," and is "[u]sually . . . dispositive."); *see also GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016) ("[W]hen a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization[.]").

### 2. Kewazinga's Arguments To Overturn The *Microsoft* Court's Construction Lack Merit And Should Be Rejected.

Kewazinga argues that the *Microsoft* court was wrong, and that this Court's construction should not include "fixed in relation to each other," because such a construction is allegedly imprecise and inconsistent with the intrinsic evidence of the Patents-in-Suit.  (Br. at 22–25.) Kewazinga's arguments should be rejected.

*First*, Kewazinga argues that "fixed in relation to each other" is improper because the relationship between the cameras does not need to be predetermined or known prior to image

capture.  (Br. at 24.)  But that contention contradicts the goals of the claimed inventions.  As the specifications describe, the claimed inventions are designed to allow users to remotely navigate through an environment, and to "better simulate a view's actual presence in a venue, preferably in real time." ('325 Patent at 2:62–63.)  To accomplish that goal, the patents disclose arrangements of cameras, which are "strategically placed through and around the physical environment to be used."  (*Id*. at 6:41–43.)  The specifications explain that precise relationship between the cameras may depend on the application—for instance, on the object being viewed, and the desired speed of movement through the array.  (*See id*. at 7:65–8:1.)  It would defeat the purpose of the inventions if the relationship of the cameras was not determined or known before image capture.  (*See id*. at 6:41–43 ("the user navigates through the array 10, which is ***strategically placed*** through and around the physical environment").)

In support of its assertion that the arrangement of cameras in an "array" does not need to be known or predetermined prior to image capture, Kewazinga relies on its litigation expert, Dr. Lubin, and his complex re-interpretation of Figure 11 of the '325 Patent.  (*See id*., citing Lubin Decl. ¶¶ 29, 54; Lubin Decl. ¶ 29 (purporting to interpret Figure 11); Lubin Decl. ¶ 54 (same).)  According to Dr. Lubin, Figure 11 of the '325 Patent discloses a single array, wherein the concentric rings of Figure 11 (labeled 12-1, 12-2, 12-n) are each "sub-arrays."  (Lubin Decl. ¶ 29.)  Because 12-1, 12-2, and 12-n are allegedly "sub-arrays," according to Dr. Lubin, one "sub-array" (12-1) can capture images, after which the "sub-array" could be moved to another, previously-undetermined position (12-2), where another set of images would be captured by the second "sub-array."  (*Id*.)  According to Dr. Lubin, the single "array" of Figure 11 constitutes the collection of "sub-arrays" 12-1 through 12-n, which do not necessarily have any predetermined relationship between them.  (*See id.*)

10

It is a convoluted theory—one that is wholly unsupported by the actual disclosures of the *patents*, which is the most relevant source for claim construction. As Dr. Lubin admitted at deposition, the phrase "sub-array" does not appear anywhere in the Patents-in-Suit; Kewazinga simply concocted that term for litigation. (*See* Lubin Dep. 148:13–15.) That is because what Figure 11 ***actually*** discloses is a ***plurality*** of "cylindrical arrays," each labeled 12-1 to 12-n, and each array with different circumferences around a central focus point. (*See, e.g.*, '325 Patent at 19:5–11 ("A plurality of cylindrical arrays (121-1-121-n)[1] of differing diameters comprising a series of cameras 14 may be situated around an environment comprising one or more objects 1200, one cylindrical array at a time); *id*. at 19:64–66 (describing "the arrays" (plural) 12-1 through 12-n").) Additionally, Figure 11 is described in the portion of the specification titled "***Multiple*** Arrays," further undermining Kewazinga's attempt to change the disclosure of Figure 11 as a single array with multiple "sub-arrays." (*See id.* at 18:58.)

Indeed, the *Microsoft* court considered—and rejected—the same argument Kewazinga asserts again here regarding Figure 11. *See Microsoft*, 2019 WL 3423352, at *17–18. Specifically, after analyzing the intrinsic evidence, the *Microsoft* court explained:

> Consistent with every instance in which the term 'array of cameras' is used in the Asserted Patents, each array [in Figure 11] contains cameras in [sic] fixed in relation to each other. The supplemental arrays, containing cameras in different geometric relationships with each other than in the initial array, are described as distinct from the first array and each other (i.e. array 12-1, array 12-2, array 12-n+1). From this, a POSITA would understand that the supplemental arrays are distinct and separate arrays because their constituent cameras do not have the same fixed geometric relationship as the cameras in the other arrays.

---

[1] Figure 11 labels the individual cylindrical arrays as "12-1," not the "121-1" that appears in the specification referencing Figure 11. Label "121" is not used in any figure of the patent, nor does it appear anywhere else in the specification and should be understood as a typo.

*Id.* at *17.  The *Microsoft* court further noted that the embodiment of Figure 11 is claimed in claim 22 of the '325 Patent, which (unlike most of the other claims of the '325 Patent) recites a plurality of "arrays" of cameras.  *Id.* at *17.

Thus, the intrinsic evidence supports the construction that Google proposes (and that the *Microsoft* court has already entered).  As described above, expert testimony is generally unhelpful to claim construction, and that is particularly true given that Dr. Lubin does not meet Kewazinga's own previously stated standard for a person of ordinary skill in the art.  (*See supra* Section I.)  And regardless of Dr. Lubin's qualifications, expert testimony is never sufficient to overcome, let alone re-write, the disclosures of the patents themselves.  *See Phillips*, 415 F.3d at 1318 ("[The] court should discount any expert testimony 'that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.'").

**Second**, Kewazinga argues that the use of the word "fixed" in the construction may lead to juror confusion because the cameras within the array do not need to be "stationary."  (Br. at 24.)  In support of that argument, Kewazinga relies on the specification's disclosure of an embodiment in which the array of cameras "can be secured to a moveable frame that can be wheeled into position."  (*Id*. (citing '325 Patent at 7:43–44).)  But that disclosure simply explains that the ***array*** can be moved; it says nothing about the ***cameras within the array*** being movable.  Once again, the *Microsoft* court rejected the very same argument Kewazinga makes here:

> Plaintiff's contention that the cameras can be moved or reused also goes too far and lacks intrinsic support.  A careful review of the various configurations of "arrays of cameras" contemplated in the Asserted Patents . . . reveals that there is not one single example in the intrinsic evidence of an array of cameras in which the cameras are not fixed relative to each other. . . . Moving a camera, without moving the entire array, would change its geometric relationship with the other cameras within the array, which, as explained above,

> would create a new array.  Accordingly, the Court rejects Plaintiff's contention that a camera within an array can be moved and still constitute the same array as it is divorced from the intrinsic evidence.

*Microsoft*, 2019 WL 3423352, at *18.

Faced with that unequivocal rejection by the *Microsoft* court, Kewazinga switched experts—retaining Dr. Lubin for this case, instead of its expert from the *Microsoft* case (Dr. Hanna).  Here, Kewazinga relies on Dr. Lubin's interpretation of Figure 11 of the '325 Patent to argue that cameras within the "array" can be movable.  Specifically, relying exclusively on Dr. Lubin, Kewazinga argues that Figure 11 discloses "moving sub-arrays with cameras to different locations and different times to capture images."  (Br. at 24 (citing Lubin Decl. ¶¶ 26–28, 55).)

But as described above, Figure 11 does not disclose "sub-arrays;" and the patents never use the phrase "sub-arrays."  (*See* Lubin Dep. 148:13–15.)  Rather, as the *Microsoft* court correctly held, and as explained above, the intrinsic evidence is clear that Figure 11 teaches a system with distinct "cylindrical arrays" (12-1, 12-2, 12-3, and 12-n), each of which has cameras that are fixed with respect to one another.  *See supra* at Section II.A.1; *Microsoft*, 2019 WL 3423352, at *15. The intrinsic evidence trumps Kewazinga's expert testimony.  *See Phillips*, 415 F.3d, at 1318.

***Third***, Kewazinga argues that "fixed in relation to each other" would contradict the intrinsic evidence because the Patents-in-Suit allegedly disclose embodiments in which the relationship between camera distances is reflected "in terms of camera positions relative to one another."  (Br. at 23.)  But the passage that Kewazinga cites merely describes a "conceptualized" naming or addressing convention—a "method[] of ***identifying*** cameras" using unique addresses—not the physical manifestation of the array.  ('325 Patent at 5:1–2 ("In the present embodiment, the camera array **10** is ***conceptualized*** as being in an X, Z coordinate system"); *see also id.* at 5:1–18 (describing Fig. 1, which is an abstract, functional diagram).)

**Fourth**, Kewazinga argues that a Patent Office decision denying institution of *inter partes* review of the '234 Patent somehow "confirms" that an "array of cameras" should not be construed to mean a set of cameras where each camera is "fixed in relation to each other." (Br. at 24–25 (citing Microsoft IPR Denial at 15).) But that argument should be rejected: the Patent Office merely explained that the '234 Patent specification contemplates, in one embodiment, securing an array to a moveable frame, and that therefore the concept of using moving cameras to capture images was not completely foreclosed from the claims. (*See* Microsoft IPR Denial at 15.) But the fact that an **array** can be wheeled into place does not say anything about the arrangement of **cameras within the array**. As the *Microsoft* court explained, "[m]oving a camera, without moving the entire array, would change its geometric relationship with the other cameras within the array, which, as explained above, would create a new array." *Microsoft*, 2019 WL 3423352, at *18.

### B. Like The *Microsoft* Court, This Court Should Reject Kewazinga's Argument That An "Array" Can Be Created Over Time By Moving Cameras.

Kewazinga's proposed construction should be rejected for an additional reason: its proposal that an "array of cameras" can be "created over time by moving cameras" also lacks support in the claims and in the specifications. Instead, Kewazinga attempts to rely on expert testimony to rewrite the actual disclosures of the patents.

Once again, Kewazinga's contention that an array "can be created over time by moving cameras" relies entirely on its expert's interpretation of Figure 11 of the '325 Patent. (*See* Br. at 20–22 (citing Figure 11 and the Lubin Declaration seven times); Lubin Decl. ¶¶ 26–28, 48–50 (identifying Figure 11 as the basis of his opinions at least seventeen times).) As explained above, *see supra* Section II.A.2, that convoluted interpretation posits that Figure 11 describes multiple "sub-arrays" (12-1, 12-2, 12-n), which can purportedly be moved over time to create a single array. Those arguments were rejected by the *Microsoft* court, and this Court should reject them too.

As described above, Dr. Lubin's testimony contradicts the intrinsic record—and expert testimony can never overcome the actual teachings of the written patent record. *See Phillips*, 415 F.3d, at 1318. The Patents-in-Suit never mention the concept of a "sub-array," let alone the notion that Figure 11 discloses sub-arrays. (*See* Lubin Dep. 148:13–15.) Instead, as the specification explains (and as the *Microsoft* court confirmed), Figure 11 is disclosed in the specification section titled "Multiple Arrays," and the figure itself describes a plurality of "cylindrical arrays," not "sub-arrays" that can be moved to ultimately form an "array." *See supra* at Section II.A.2; *Microsoft*, 2019 WL 3423352, at *18. And Kewazinga's argument that Figure 11 supports its construction should be rejected for an additional reason: Figure 11 does not even appear in the '226 patent, and therefore could not support a re-interpretation of "array of cameras" as Kewazinga argues. Figure 11 first appears in the '325 Patent, which is a continuation-in-part of the original '226 Patent. Therefore, Figure 11 is new matter—defined as subject matter not included in the original specification, claims, or drawings of a patent application. *See* MPEP § 608.04(a); 35 U.S.C. § 132(a). Because disclosures constituting new matter should not be used to construe claim terms appearing in the parent patent, Figure 11 cannot be used to construe "array of cameras" in the '226 Patent. *See Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1167–68 (Fed. Cir. 2004).

Indeed, the specification explains that the creation of an array over time by using moving cameras—for example, by a moving vehicle—did not solve the problems sought to be addressed by the claimed inventions:

> In order for the user's view to move through the venue or environment, a moving vehicle carries the cameras. This system, however, has several drawbacks. For example, in order for a viewer's perspective to move through the venue, the moving vehicle must be actuated and controlled. In this regard, operation of the system is complicated.

('325 Patent at 2:12–14.)  Thus, the inventors distinguished their invention from a system that created an array over time by moving cameras.  A claim construction that encompasses concepts that the inventors sought to distinguish is almost never correct, and would not be correct in this case.  *See LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1343–44 (Fed. Cir. 2005).

Significantly, the *Microsoft* court has already rejected a variation of Kewazinga's "moving over time" argument.  In the *Microsoft* case, Kewazinga argued for a construction of "array of cameras" wherein the camera configuration "can include movable cameras and reusing cameras in multiple locations."  *Microsoft*, 2019 WL 3423352, at *15.  The *Microsoft* court explained (correctly) that such a construction lacked intrinsic support in the patents:

> Plaintiff's contention that the cameras can be moved or reused also goes too far and lacks intrinsic support. . . . As discussed above, the cameras are carefully deployed to create the necessary fields of view. . . . Moving a camera, without moving the entire array, would change its geometric relationship with the other cameras within the array, which, as explained above, would create a new array.
> . . .
> Plaintiff's contention that cameras within an array can be reused is also rejected as overbroad. . . . [I]f, in the example represented by Figure 11[], a camera in array 12-1 were reused in array 12-2, array 12-1 and array 12-2 would still constitute separate and distinct arrays.  Accordingly, the contention that a camera can be reused within an array as proposed by Plaintiff [is] rejected as overbroad and likely to cause juror confusion.

*Microsoft*, 2019 WL 3423352, at *18.  Kewazinga's proposal in this case—that an array can be "created over time by moving cameras"—is simply a rehash of its argument in *Microsoft*, and it should be rejected.  After all, using a camera at one location, then moving it for use in a second location at a later time, *is* itself an act of re-using the camera.

### C.    If Adopted, Kewazinga's Construction Would Render The Asserted Claims Indefinite.

Kewazinga's argument that an "array of cameras" can be created over time, by moving cameras, is wrong for the additional reason that such a construction would render the claims invalid

as indefinite.  "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  In other words, if one cannot ascertain with reasonable certainty what is within the scope of a claim (and what is not), it is invalid as indefinite.

If—as Kewazinga argues—an "array of cameras" includes any configuration of cameras, and can be created over an undefined period of time by cameras that can move to any location, the scope of the claims cannot be determined with any reasonable certainty.  Kewazinga's expert admitted as much at deposition.  For instance, does an "array of cameras" exist if a tourist uses a smartphone camera at Times Square and then, a month later, uses a different camera at the Brooklyn Bridge?  According to Kewazinga's expert, "it depends."  (*See* Lubin Dep. 179:18–23 ("Is camera one at location A on December 1st and camera two at location B on January 1st an array of cameras?  A. I think I've already answered that.  But, you know, *it depends on the application*.").)  What if the cameras were operated ten years apart, or twenty, or fifty?  According to Kewazinga's expert, "two cameras at any point in time could be an array of cameras."  (*See* Lubin Dep. 182:4–10 ("Q. So in your opinion, *two cameras at any point in time could be an array of cameras* if they have a known relationship to one another?  A. As long as they are -- known relationship, *yeah*.").)  And because there is no time limit to Kewazinga's construction, one is always left to wonder whether an "array" purportedly created over time exists now, was formed minutes (or days, or hours, or years) ago, or still needs additional development before coming into existence.  (*See* Lubin Dep. 128:15–22 ("Q. So an array of cameras does not exist until you know the relationship between the cameras, is that fair?  A. I mean, that's almost a philosophical question, isn't it.  In order to use it, you have to know the relationship.").)

Additionally, Kewazinga's expert testified that, under Kewazinga's proposed construction, whether a set of cameras constitutes an "array of cameras" depends on the subjective purpose behind the user's deployment of cameras.  (*See* Lubin Dep. 173:13–20 ("Q. In a situation where a camera is moved over time, it's subjectively up to the camera operator to determine when to stop and therefore create the array, right?   A. Subjectively, you know, again, ***it depends on the application***.").)  But a claim term that is "purely subjective and depends on the unpredictable vagaries of any one person's opinion is indefinite."  *See Intellectual Ventures I LLC v. T-Mobile USA, Inc.*, 902 F.3d 1372, 1381 (Fed. Cir. 2018) (internal quotations omitted).

"[A] patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them."  *See Nautilus, Inc.*, 572 U.S. at 899.  As demonstrated above, adoption of Kewazinga's proposed construction would render claims with the "array of cameras" limitation invalid as indefinite.  Because claims are generally construed to preserve their validity, the Court should reject Kewazinga's proposed construction.  *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1335 (Fed. Cir. 2003) ("[C]ourts should attempt to construe claims to preserve their validity[.]").

### III.    "Mosaicing"
####          ('325 Patent, claims 1, 5, 6)

| *Microsoft* **Court's Construction** |
| --- |
| creating imagery assembled from a plurality of images, or portions thereof, including an alignment process and a composition process |

| **Google's Proposed Construction** | **Kewazinga's Proposed Construction** |
| --- | --- |
| creating imagery assembled from a plurality of camera outputs, or portions thereof, including an alignment process and a composition process to achieve a seamless combination of the camera outputs | creating imagery assembled from a plurality of images, or portions thereof, including an alignment process and a composition process |

As described above, the Patents-in-Suit describe remotely navigating through an environment by sequentially viewing images captured from an arrangement of cameras in that environment.  To improve the viewer experience—and avoid the jarring effects of viewing discrete, disjointed images—the '325 Patent claims and specification disclose mixing camera outputs by "mosaicing" them into a combined image, so the user seamlessly moves through the environment.  The term "mosaicing" only appears in the claims of the '325 Patent.   Claim 1 of the '325 Patent recites:

> mix the outputs of cameras in the [first/second] path in accordance
> with the received [first/second] user inputs by sequentially
> ***mosaicing*** the selected outputs of cameras in the [first/second] path

(*See* '325 Patent at 21:14–25.)  The patent figures show the progression of views from each camera of the array, and how they are mixed together—for example, by "mosaicing" the camera outputs—to "achieve the seamless progression of the discrete views of cameras 14-2 through 14-7, which gives the user 22 the look and feel of moving around the viewed object."  (*See* '325 Patent at 15:12–14.)



**'325 Patent Figs. 7a, 7b-7g (modified and annotated)
(showing the views from exemplar cameras).**

19

The parties agree that "mosaicing" includes an "alignment process" and a "composition process."  But the parties dispute whether "mosaicing" requires at least an effort to achieve seamlessness of the camera outputs.  In *Microsoft*, the court expressly withheld addressing that issue.  *Microsoft*, 2019 WL 3423352, at *9 n.8.  As detailed below, that additional clarification is warranted based on the intrinsic record.

### A.    In These Patents, "Mosaicing" Requires A Composition Process "To Achieve A Seamless Combination Of The Camera Outputs."

Google's proposed construction should be adopted because it will best help the jury understand the claim term and resolve questions of infringement and validity.  Consistent with Google's proposal, the '325 Patent specification consistently describes that "mosaicing" involves processes in order to achieve seamlessness between images.  (*See, e.g.*, '325 Patent, Abstract (describing "mosaicing and tweening [images], for effectuating seamless motion"); *id.* at 4:41–43 ("image output mixing, such as mosaicing and tweening, effectuates seamless motion.").)

The meaning of "mosaicing" is described most comprehensively in column 13 of the '325 Patent, with reference to (and incorporation of) the teachings of U.S. Patent 5,649,032, issued to Peter J. Burt ("Burt" (Dkt. No. 110-7)).  (*See* '325 Patent at 13:15–21.)  According to that part of the '325 Patent specification:

> [T]he present embodiment utilizes a mosaic composition process to construct (or update) a mosaic.  The mosaic composition comprises a selection process and a combination process. . . . The combination process applies various output processing techniques, such as merging, fusing, filtering, output enhancement, and the like, ***to achieve a seamless combination of the outputs***.

('325 Patent at 13:26–39.)  The patents further describe mosaicing as a form of "mixing" camera outputs, which creates a "***seamless progression*** of the discrete views of cameras 14-2 through 14-7, which gives the user 22 the look and feel of moving around the viewed object." ('325 Patent at 15:13–15 (emphasis added); '325 Patent, Abstract (describing the result of viewing mixed images

as "effectuating *seamless* motion along such paths" (emphasis added)).)  Indeed, the '325 Patent explicitly states that there are two steps to the "mosaicing" process: First, "[t]he server 18 automatically aligns one *camera output* to another *camera output*, a *camera output* to another mosaic (generated from previously occurring camera *output*) such that the output can be added to the mosaic, or an existing mosaic to a *camera output*."  ('325 Patent at 13:21–25 (emphases added).)  Second, after the mosaic is aligned, a composition process is used to construct (or update) a mosaic:

> ***The mosaic composition comprises a selection process and a combination process****. . . .* Once the selection process selects which output(s) are to be included in the mosaic, the combination process combines the various outputs to form the mosaic. ***The combination process applies various output processing techniques, such as merging, fusing, filtering, output enhancement, and the like, to achieve a seamless combination of the outputs. The resulting mosaic is a smooth view that combines the constituent outputs such that temporal and spatial information redundancy are minimized in the mosaic.***

('325 Patent at 13:29–42.)

The '325 Patent's description of "mosaicing," explained above, incorporates and builds on the teachings of the Burt patent, which explains that mixing may be accomplished by "mosaicing" the outputs of intermediate cameras.  Indeed, the Burt patent explains that "the system sequentially executes an image alignment process, an editing process, and a combining process such that, from a sequence of images, the system automatically produces a *seamless* mosaic for various applications."  (Burt at Abstract.)  Specifically, the "combining process" described in Burt is used to "*seamlessly* combine the input image with the mosaic."  (Burt at 6:20–21.)

Thus, the intrinsic evidence clearly and consistently describes that "mosaicing" includes a process attempting to achieve seamlessness between images that are assembled together.  In contrast, the Patents-in-Suit have no discussion of "mosaicing" that does not involve attempting

to smooth, or make seamless, sequential camera outputs.  Google's proposal should be adopted because it provides meaning to the terms in the context of the claimed inventions.  *See, e.g.*, *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016) (holding that the ordinary meaning is not the meaning of the term in the abstract, but rather its meaning to the ordinary artisan after reading the entire patent).

Kewazinga argues that Google's construction is improper because "seamless mosaic" is "redundant."  (*See* Br. at 17.)  But Kewazinga's example merely highlights the fact that the mosaic composition step should use whatever process is best to reduce seams and try to achieve seamlessness.  The phrase "seamless mosaic" is not redundant, but rather an important emphasis on the essential character of the mosaic—that it has undergone an ***effort*** to achieve seamlessness.

Kewazinga also argues that Burt describes additional image processing for seamlessness after the mosaic has been created.  (*See* Br. at 17 (citing Lubin Decl. ¶ 44)).  But Kewazinga mischaracterizes Burt's teachings.  In Burt, the mosaic composition step ("mosaicing") seeks to achieve a seamless combination of the camera outputs—consistent with Google's proposed construction—and notes that additional processing to reduce seams after creating a mosaic may be performed.  Nor should the Court consider Dr. Lubin's testimony, because as discussed above, the patent documents, taken as a whole, are sufficient to enable the court to construe the disputed term. *See Vitronics*, 90 F.3d at 1582.  Indeed, the Court should also reject Kewazinga's implication that its construction should be adopted because Kewazinga hired an expert and Google did not.  The intrinsic evidence—instead of disfavored expert testimony—is the most relevant source for claim construction.  *See Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1270 (Fed. Cir. 1986) ("We have never *required* a party to proffer expert testimony on claim interpretation."); *Vitronics*, 90 F.3d at 1582 ("The specification . . . is the [] best guide to the meaning of a disputed term").

Kewazinga argues that no statements in the specifications of the Patents-in-Suit disavow or disclaim the scope of the claim.  (*See* Br. at 18.)   But in discussing the disadvantages of certain prior art, the specifications explain that the prior art "has several drawbacks," including that "changing camera views results in a discontinuous image."  (*See* '325 Patent at 2:14–20.)   The specification further explains that the resulting mosaic "is a smooth view that combines the constituent outputs such that temporal and spatial information redundancy are minimized."  ('325 Patent at 13:29–42.)   Thus, the patents distinguish the prior art as lacking continuous image transitions when changing camera views and point out the advantages of a smooth, seamless combination.  *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1342–43, 1341–45 (Fed. Cir. 2001).   Here, the specification explicitly discloses that the entire purpose of "mosaicing" is to "achieve a seamless combination," and the claim language should be construed consistent with that disclosure.  (*See* '325 Patent at 13:38; *see also* Burt at 6:20–21 (disclosure incorporated by reference explaining the goal of "seamlessly combin[ing] the input image with the mosaic."));  *ERBE Elektromedizin GmbH v. Int'l Trade Comm'n*, 566 F.3d 1028, 1034 (Fed. Cir. 2009) ("We generally do not construe claim language to be inconsistent with the clear language of the specification; '[u]sually, it is dispositive.'" (citing *Phillips*, 415 F.3d at 1315)).   Kewazinga's allegation that the **Burt patent** does not disavow the full scope of mosaicing is inapposite because, as discussed above, the specification of **Kewazinga's patents** do.

Kewazinga's proposal—that "mosaicing" does not even need to include an **effort** to achieve a seamless combination of images—leads to nonsensical results:  under that interpretation, any collection of images could be considered a result of "mosaicing," no matter how disparate or disjointed.   Indeed, attempting to defend that position at deposition, Dr. Lubin testified that there is **no** requirement that images be contiguous or overlap in order to be mosaiced—or even that they

be in any particular relationship to each other.  (*See* Lubin Dep. 231:4–24.)  Likewise, Dr. Lubin testified that taking two completely unrelated photographs and taping them together could be considered "mosaicing" as claimed in the Patents-in-Suit.  (*See* Lubin Dep. 238:10–239:21.)  As that testimony shows, Kewazinga's construction completely jettisons the purpose of mosaicing in the patents—to create better transitions between camera outputs.  (*See* '325 Patent at 15:9–16; Lubin Dep. 217:18–218:2.)  The Court should disregard Dr. Lubin's testimony as contrary to the intrinsic evidence.  *Phillips*, 415 F.3d at 1318 ("a court should discount any expert testimony that is clearly at odds with the . . . written record of the patent").

**B.  In These Patents, "Mosaicing" Is Performed on "Camera Outputs."**

The claims, drafted by Kewazinga and approved by the Patent Office, establish that the mosaics of these claims must be of ***camera outputs***.  For example, claim 1 of the '325 Patent requires "sequentially mosaicing ***the selected outputs of cameras*** in the first path."  Claim 5 of the '325 Patent requires a sequence of cameras and "mosaicing the image of a current camera in the sequence to the image of a next camera in the sequence," indicating that "mosaicing" is performed on what is delivered from the camera.   Likewise, the "Summary of the Invention" of the '325 Patent describes mosaicing only in the context of taking "outputs of cameras in [a] path" in the "array of cameras" and "mix[ing] the ***output*** by mosaicing or tweening the output images."  (*See* '325 Patent at 2:65–3:16.)  Then, when describing the only embodiment of mosaicing, the '325 Patent characterizes it as "'mosaicing' ***the outputs*** of the intermediate cameras 14."  (*See* '325 Patent at 13:16.)  Therefore, the claims and specification consistently describe that "mosaicing" is performed on "camera outputs," and the term "mosaicing" should be construed consistent with that description.

The Court should reject Kewazinga's proposed construction, which leads to results that are contrary the claim language.  Kewazinga argues that mosaicing need not be performed on camera

outputs.  (*See* Br. at 16 (citing Lubin Decl. ¶ 46)).  For support, Kewazinga cites the '234 Patent, which it asserts provides examples of non-camera output mosaicing, and its expert's citation to that same portion of the '234 Patent.  (*See id.* (citing '234 Patent at 12:39–13:2; Lubin Decl. ¶ 46).)  But unlike the '325 Patent claims, the '234 Patent claims do not recite "mosaicing."  Indeed, the portion of the '234 Patent specification that Kewazinga cites does not even appear in the '325 Patent, and is directed to the meaning of the claim term "additional source output," not the meaning of the term "mosaicing."  (*Compare* '234 Patent at 12:39–13:2, *with* '325 Patent at 12:20–35); *see Goldenberg*, 373 F.3d at 1167–68 (holding that disclosures constituting new matter should not be used to construe claim terms appearing in the parent patent).  And, because the only claims that recite "mosaicing" (claims 1, 5, and 6 of the '325 Patent) do not have the term "additional source output," the passage Kewazinga identifies is not relevant to the construction of "mosaicing."  *See Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1184 (Fed. Cir. 2006).  Kewazinga also cites the Burt patent's discussion of mosaicing.  (*See* Br. at 16.)  But Kewazinga's patents allegedly improved on the Burt patent—and, as described above, the claims and specification of the '325 Patent consistently describe "mosaicing" as being performed on the outputs of cameras.

## CONCLUSION

For the reasons above, the Court should adopt Google's proposed constructions in their entirety and reject Kewazinga's proposed constructions.

Dated: January 22, 2021               By:     */s/ Ameet A. Modi*
                                              DESMARAIS LLP
                                              John M. Desmarais
                                              jdesmarais@desmaraisllp.com
                                              Steven M. Balcof
                                              sbalcof@desmaraisllp.com
                                              Elizabeth Weyl
                                              eweyl@desmaraisllp.com
                                              David A. Frey
                                              dfrey@desmaraisllp.com
                                              230 Park Avenue
                                              New York, NY 10169
                                              Tel: (212) 351-3400
                                              Fax: (212) 351-3401


                                              Ameet A. Modi
                                              amodi@desmaraisllp.com
                                              Emily H. Chen (*pro hac vice*)
                                              echen@desmaraisllp.com
                                              101 California Street
                                              San Francisco, CA 94111
                                              Tel: (415) 573-1900
                                              Fax: (415) 573-1901


                                              *Attorneys for Defendant Google LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2021, I caused a true and correct copy of the foregoing

**DEFENDANT GOOGLE LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** to be

filed and served electronically by means of the Court's CM/ECF system in accordance with

Federal Rules of Civil Procedure and/or the Local Rules of this Court, upon the following counsel

of record:

    Ian G. DiBernardo
    Timothy K. Gilman
    Kenneth L. Stein
    Saunak K. Desai
    Gregory R. Springsted
    **STROOCK & STROOCK & LAVAN LLP**
    180 Maiden Lane
    New York, NY 10038
    Tel: (212) 806-5400
    Fax: (212) 806-6006
    Email: idibernardo@stroock.com
    Email: tgilman@stroock.com
    Email: kstein@stroock.com
    Email: sdesai@stroock.com
    Email: gspringsted@stroock.com

    *Attorneys for Plaintiff Kewazinga Corp.*

                                       */s/ Ameet A. Modi*

                                          Ameet A. Modi