# Exhibit H

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
Case No. 1:20-cv-01106-LGS
------------------------------------x
KEWAZINGA CORP.,

                Plaintiff,

      -against-

GOOGLE, LLC,

                Defendant.
------------------------------------x

              November 16, 2020

              10:11 a.m.


    Remote Videotaped Deposition
of JEFFREY LUBIN, an Expert Witness in
the above-entitled action, located in
Princeton, New Jersey, taken Via Zoom
before Dawn Matera, a Shorthand Reporter
and Notary Public.

        *    *    *




   Job No. CS4338777

Page 2

A P P E A R A N C E S :

STROOCK STROOCK & LAVAN LLP
   Attorneys for Plaintiff
     180 Maiden Lane
     New York, New York 10038
     (212)806-5400
   By:  SAUNAK DESAI, ESQ.
      sdesai@stroock.com
     IAN DiBERNARDO, ESQ.
      idibernardo@stroock.com

DESMARAIS LLP
   Attorneys for Defendant
     101 California Street
     San Francisco, California 94111
     (415)573-1806

   By:  EMILY CHEN, ESQ.
      echen@desmarais.com
     AMEET MODI, ESQ.
      emodi@desmarais.com
     DAVID FREY, ESQ.
      dfrey@desmarais.com

Also Present:
   JONATHAN POPHAM, Videographer
     ~oOo~

Page 3

       STIPULATIONS

  IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are hereby waived;

  IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form of the question, shall be reserved to the time of the trial;

  IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before any Notary Public with the same force and effect as if signed and sworn to before the Court.

      *  *  *

Page 4

   Lubin
   THE VIDEOGRAPHER: Good morning. We are going on the record at a.m. on November 16th, 2020. Please note the microphones are sensitive and may pick up whispering, private conversations and cellular interference. Audio and video recording will continue until all parties agree to go off the record.

   This is media number 1 of the video deposition of Dr. Jeffrey Lubin taken by counsel for defendant in the matter of Kewazinga Corporation versus Google, LLC filed in the United States District Court for the Southern District of New York, case number 1:20-cv-01106-LGS.

   This deposition is being held at multiple locations via videoconference. My name is Jonathan Popham from Veritext and I am the videographer. The court reporter is Dawn Matera, also from Veritext.

   I am not authorized to

Page 5

   Lubin
administer an oath. I am not related to any party in this action, nor am I financially interested in the outcome.

   Counsel will now please state their appearances and affiliations for the record.

   MR. DESAI: On behalf of plaintiff Kewazinga Corp., this is Stroock Stroock & Lavan. And also on the line on behalf of Kewazinga Corp. is Ian DiBernardo, also of Stroock & Stroock & Lavan.

   MS. CHEN: Good morning. This is Emily Chen representing Google, Inc. with the law firm of Desmarais LLP. With me on the line are my colleagues Ameet Modi and David Frey.

   THE VIDEOGRAPHER: Okay. Anyone else?

   If that's everyone, will the court reporter please swear in the witness.

J E F F R E Y  L U B I N, having been first duly sworn by Dawn Matera, a Notary

Page 46

```
                 Lubin
 1
 2         MR. DESAI:  Objection to the
 3    form.
 4       A.   I arrived at that by reviewing
 5    some of the materials in the patents and
 6    understanding what kinds of techniques
 7    were being used there and relating it
 8    back to my education and my previous
 9    experience.
10       Q.   Did you meet your definition in
11    1998?
12       A.   Yes, I did.
13       Q.   So you still meet your
14    definition today, is that right?
15       A.   I hope so.  Yes.
16       Q.   Do you have a bachelor's degree
17    in computer science?
18       A.   No, I don't.
19       Q.   Do you have a bachelor's degree
20    in computer engineering?
21       A.   I have a bachelor's degree in
22    experimental psychology, which is, you
23    know, in this case pretty highly related
24    to the materials that we're talking
25    about.  So we can go down a list of all
```

Page 47

```
                 Lubin
 1
 2    the computer related fields that I do not
 3    have a bachelor's degree in and I will
 4    respond appropriately to each one of
 5    those.
 6       Q.   Is your bachelor's degree in
 7    experimental psychology equivalent to a
 8    computer science or a computer
 9    engineering degree?
10         MR. DESAI:  Objection to the
11    form.
12       A.   Equivalent in what way?  What
13    do you mean equivalent?
14       Q.   I'll withdraw the question.  Do
15    you have three to five years of
16    experience in the field of computer
17    vision?
18       A.   Yes, at least.
19       Q.   Do you have three to five years
20    of experience in the field of image
21    processing?
22       A.   Yes.
23       Q.   Just for the record, do you
24    have a postgraduate degree in computer
25    science?
```

Page 48

```
                 Lubin
 1
 2       A.   No.
 3       Q.   Do you have a postgraduate
 4    degree in computer engineering?
 5       A.   No.
 6       Q.   Do you have one to two years of
 7    experience in the field of computer
 8    vision?
 9       A.   Yes, at least.
10       Q.   Do you have one to two years of
11    experience in the field of image
12    processing?
13       A.   Yes, at least.
14       Q.   So you don't have a computer
15    engineering degree, true?
16       A.   That's true.
17       Q.   I am going to introduce another
18    exhibit on Exhibit Share.
19         (Exhibit 3, Dr. Keith Hannah's
20    original and supplemental declaration
21    submitted in connection with Microsoft
22    case, was so marked for
23    identification, as of this date.)
24       Q.   I am introducing as Exhibit
25    number 3 Dr. Hannah's declaration in the
```

Page 49

```
                 Lubin
 1
 2    Microsoft litigation.  Please let me know
 3    when you see it.
 4       A.   Okay.
 5       Q.   You reviewed Dr. Hannah's
 6    declaration, which is Exhibit 3, for this
 7    case; is that right?
 8       A.   Yes, I did.
 9       Q.   And you said you generally
10    agree with his opinions in this
11    declaration?
12       A.   Yeah, generally speaking, yes.
13       Q.   Please turn to paragraph 23 of
14    Exhibit 3.
15       A.   Okay.
16       Q.   Do you see it says that a
17    person of ordinary skill in the art would
18    have "a bachelor's degree in computer
19    science, computer engineering or the
20    equivalent, and three to five years of
21    experience in the field of computer
22    vision, image processing or a
23    postgraduate degree in computer science,
24    computer engineering or the equivalent,
25    and one to two years of experience in the
```

Page 50

1  Lubin
2  field of computer vision or image
3  processing or equivalent experience."
4     A.   Yes, I see that.
5     Q.   Your definition of a person of
6  ordinary skill in the art is different
7  from Dr. Hannah's; is that right?
8        MR. DESAI:  Objection to form.
9     A.   No, I don't think it's
10 different.  You know, he's talking about
11 computer science, computer engineering or
12 the equivalent.  And I'm expressing in my
13 definition what some of those
14 equivalences are.
15    Q.   The words of your definition
16 are different from the words of
17 Dr. Hannah's; is that fair?
18    A.   Some of them, yes.  Many of
19 them, yes.
20    Q.   Dr. Hannah's definition
21 requires a degree in computer science,
22 computer engineering or the equivalent,
23 right?
24    A.   Yes.  But what I am referring
25 to here is the equivalent.  So if I can

Page 51

1  Lubin
2  just unpack that for a moment, the work I
3  did in my bachelor's degree involved
4  things that are often taken to be done in
5  computer science or computer engineering.
6  It was about understanding and modeling
7  human visual perceptual processes, which
8  are the same goals of the more related
9  aspects of computer science and computer
10 engineering.
11       In fact, for the materials in
12 this case or at least in the claim
13 construction, most of what's done in
14 computer science and computer engineering
15 is not relevant, and really the only
16 parts that are relevant are the parts
17 that overlap with the things that I have
18 done in the equivalent fields in my
19 undergraduate and graduate career.  So
20 that's why I don't think it's
21 inconsistent.
22    Q.   Did you review Dr. Hannah's
23 definition of a person of ordinary skill
24 in the art before coming up with your
25 own?

Page 52

1  Lubin
2        MR. DESAI:  Objection to form.
3     A.   I looked at it.  I wouldn't say
4  I reviewed it with the purpose of
5  modifying it.  I looked at it and
6  understood it and I understand my own
7  construction which, again, is really
8  just, I think, perhaps a different
9  emphasis and a clarification of what he
10 was talking about.  So I don't see them
11 as inconsistent.
12    Q.   And you reviewed Dr. Hannah's
13 definition of a person of ordinary skill
14 in the art for the purpose of
15 understanding it, is that fair?
16       MR. DESAI:  Objection to the
17    form.
18    A.   For the purpose of
19 understanding what he was saying.  I did
20 not rely on it in any way to formulate my
21 own opinion.
22    Q.   Why did you change the
23 definition of person of ordinary skill in
24 the art from Dr. Hannah's definition?
25       MR. DESAI:  Objection to form.

Page 53

1  Lubin
2     A.   I assessed what I believed
3  would be required to understand and opine
4  on his definition and I used my version
5  of what that meant.
6        THE COURT REPORTER:  Sorry,
7     Dr. Lubin, you broke up a little bit.
8        (Record read.)
9        MS. CHEN:  Ms. Court Reporter,
10    can you read the question back,
11    please.
12       (Record read.)
13       MR. DESAI:  With that question
14    pending, I will object to form.
15    A.   Again, I think it's
16 mischaracterizing to say that I changed
17 it.  I was merely clarifying it.  Again,
18 computer engineering, computer science,
19 from what I have seen of those curricula,
20 involve mostly, you know, architectures,
21 languages, hardware, it really has
22 nothing to do with the matters at hand
23 here.
24       So I was further specifying and
25 clarifying what aspects of computer

14 (Pages 50 - 53)

Page 54

1         Lubin
2   science or computer engineering would be
3   required to be a person of ordinary skill
4   in the art in this case.  And that's what
5   I attempted to do in my definition.
6       Q.   So you reviewed Dr. Hannah's
7   definition and rephrased it in a way that
8   you thought was more appropriate, true?
9           MR. DESAI:  Objection to form.
10      A.   I looked at it.  I understood
11  what he was talking about.  I then went
12  off and decided what I believed was a
13  person of ordinary skill in the art, and
14  I -- and that's what, that's what you see
15  before you.
16      Q.   Okay.  I will move on to the
17  more meaty discussion of the claim
18  construction terms, if that's all right
19  with you.
20      A.   That sounds fine.
21      Q.   In your opinion is the term
22  "array of cameras" unambiguous?
23          MR. DESAI:  Objection to form.
24      A.   Let me look for a moment.
25          (Witness reviews document.)

Page 55

1         Lubin
2       A.   Just to refresh my memory.
3   Maybe you can rephrase it.  What do you
4   mean by ambiguous here?
5       Q.   In your opinion, is the term
6   "array of cameras" unclear?
7           MR. DESAI:  Objection to form.
8       A.   Can you try one other
9   rephrasing perhaps.
10      Q.   Is the meaning of the term
11  "array of cameras" clear after reviewing
12  the patent and the file history?
13      A.   Yes.
14      Q.   In your opinion, is it
15  necessary for the court to construe the
16  term "array of cameras"?
17          MR. DESAI:  Objection to form.
18      A.   Is it my opinion that it's
19  necessary for the court to construe it?
20  I don't have an opinion on that.  That's
21  not -- I am not a lawyer.
22      Q.   And your opinion is that a
23  person of ordinary skill in the art would
24  understand that the term "array of
25  cameras" refers to "a configuration of

Page 56

1         Lubin
2   cameras wherein the configuration can be
3   created over time by moving cameras"; is
4   that right?
5       A.   Yes.
6       Q.   And that opinion is set forth
7   in your declaration at paragraph 47; is
8   that right?
9       A.   Let's look.
10          Yes.
11      Q.   In paragraph 47 you note
12  certain claims of the '226 patent and
13  certain claims of the '325 patent recite
14  array of cameras.  Do you see that?
15      A.   Yes.
16      Q.   Did you also rely on the '234
17  patent or the '234 patent file history in
18  developing your construction of the term
19  "array of cameras"?
20          MR. DESAI:  Objection to form.
21      A.   You know, these patents tend
22  to -- let me take a look at -- which is
23  the '234 patent, which exhibit?
24      Q.   The '234 patent is --
25      A.   I see it, it's Exhibit C.

Page 57

1         Lubin
2           THE COURT REPORTER:  Exhibit?
3           MS. CHEN:  C as in cat.
4       A.   Give me a moment, please.
5       Q.   Sure.
6           (Witness reviews document.)
7       A.   Just repeat the question one
8   more time, please.
9       Q.   The question is, did you also
10  rely on the '234 patent or the '234
11  patent file history in developing your
12  construction of the term "array of
13  cameras"?
14          MR. DESAI:  Objection to form.
15      A.   I certainly looked at it.  I
16  wouldn't say I relied on it.  And, you
17  know, the example in here was just that,
18  an example.  So it's not saying one way
19  or the other whether it was material in
20  the '234 patent that is also applicable.
21      Q.   And what do you mean by the
22  "example in here"?
23      A.   Well, just that claims -- the
24  beginning of that sentence in paragraph
25  47, "Array of cameras," I can't say

Page 174

Lubin

1  
2  you know, be putting different arrays in  
3  place and then you would, you realize  
4  that at some point you need the array,  
5  the next ring to be closer, and you would  
6  put it there.  
7      So, you know, as far as any  
8  individual ring of or cylinder of cameras  
9  in this particular embodiment, how would  
10 you know -- I guess I forgot what your  
11 question is, I'm sorry.  
12    Q.  How would you know that the  
13 cylinder is complete?  
14    A.  How would you know that you  
15 have a single cylinder in place?  
16    Q.  No.  A cylinder could be  
17 composed -- strike that.  
18      A cylinder array, as in claim  
19 Figure 11, could be composed of any  
20 number of cameras, right?  There is no  
21 limitation on how many cameras are  
22 required to form the cylindrical array,  
23 right?  
24      MR. DESAI:  Objection to form.  
25    A.  There is no a priori limit.  

Page 175

Lubin

1  
2  It's, you know, functionally, practically  
3  speaking, you would not want to use more  
4  cameras than you need.  
5    Q.  How do you know when you've  
6  used the right number of cameras?  
7      MR. DESAI:  Objection to form.  
8    A.  There is, you know, various  
9  different ways of determining that.  
10     And again, it depends on the  
11 environment and the application.  The  
12 amount of resolution that you need.  The  
13 fields of views of the camera.  The  
14 number of pixels of each camera.  Whether  
15 you want to increase the resolution by  
16 having more cameras look at a single  
17 point.  
18     There are lots and lots of  
19 reasons that you would want to use more  
20 or fewer cameras.  So I can't really  
21 answer that in general.  
22   Q.  The camera operator decides  
23 when to stop adding cameras to operate  
24 the array, correct?  
25     MR. DESAI:  Objection to form.  

Page 176

Lubin

1  
2    A.  Well, it's not specified.  And  
3  I don't think it has to be specified who  
4  decides.  
5      So can you ask me the question  
6  you're getting at someplace along the  
7  way, because I'm not sure that that one  
8  is -- I am not understanding it.  
9    Q.  Is there any way to know when  
10 an array is complete?  
11     MR. DESAI:  Objection to form.  
12   A.  Well, there is lots of ways to  
13 know.  I think that's my point.  It  
14 depends on why you're constructing the  
15 array in the first place and what the  
16 environment is.  
17     And, you know, one, if  
18 you've -- you know, there is certainly  
19 rules of thumb for particular scenarios,  
20 but it differs a lot from one application  
21 to the next.  
22   Q.  In a situation where a camera  
23 is moved over time, it's up to the camera  
24 operator to determine when to stop and  
25 therefore create the array, right?  

Page 177

Lubin

1  
2      MR. DESAI:  Same objection.  
3    A.  Same answer.  You know, it  
4  depends.  There is no difference, as I've  
5  been testifying in numerous moments  
6  throughout this day, that from the point  
7  of view of constructing the array of  
8  cameras, there is no difference between  
9  how you treat, you know, a single camera  
10 versus a set of different cylinders, for  
11 example.  
12     So, you know, one way to say  
13 that you've gotten enough views is if  
14 you've completely traversed the  
15 environment that you set out to traverse  
16 in creating the virtual or telepresence  
17 environment.  If you traversed that  
18 entire environment and know, because you  
19 know your cameras, what is the overlap of  
20 the fields of view, then, you know, you  
21 can say I do have enough, I do have  
22 enough elements in that array and I am  
23 done.  
24     You can also go back and say,  
25 oh, wow, this one camera didn't work, so

Page 178

1          Lubin
2   let me put another camera in there and
3   even by itself, have it, you know,
4   re-traverse the path that it was supposed
5   to be on.
6         And that would count, too, as
7   an element of that single array of
8   cameras or, you know, of cameras being,
9   of knowing when you had enough.
10        I am just trying to give you
11  different examples that show that it's
12  not a question that you can ask
13  generally -- I mean, that you can answer
14  generally.
15     Q.   From a time perspective,
16  whether you have an array of cameras
17  depends on when the camera operator
18  decides to stop moving the camera to
19  different positions, right?
20        MR. DESAI: Objection to form.
21     Asked and answered.
22     A.   If you're not -- if you're not
23  creating any more positions for that one
24  camera, then you're done.
25     Q.   Is array of cameras one of

Page 179

1          Lubin
2   those things where it depends on the use
3   and other factors, so you know it when
4   you see it?
5         MR. DESAI: Objection to the
6      form. Vague.
7      A.   Well, as I already testified,
8   you know, an array of cameras, you can
9   set up an array of cameras that will be
10  more or less adequate for a particular
11  application. And so I think that's the
12  best that I can answer.
13        If you want to try a more
14  specific question, I can try to answer
15  it.
16     Q.   Is camera one at location A and
17  camera two at location B -- strike that.
18        Is camera one at location A on
19  December 1st and camera two at location B
20  on January 1st an array of cameras?
21     A.   I think I've already answered
22  that. But, you know, it depends on the
23  application. If they meet the
24  requirements that I've laid out in the
25  claim construction, then, yes, if they

Page 180

1          Lubin
2   are, have a known relation to each other,
3   and, you know, that would be it.
4      Q.   In your declaration, can you
5   please turn to paragraph 48.
6      A.   Okay.
7      Q.   You see paragraph 48 goes onto
8   page 23, do you see that you cite the
9   definition of "array" from Random House
10  Webster's College Dictionary, 1991.
11     A.   Yes, I do.
12     Q.   Do you see that it says --
13  strike that.
14     A.   1991.
15     Q.   Yes. 1991. Do you see that
16  you opine your "construction is
17  consistent with the definition of 'array'
18  (i.e. 'regular order or arrangement')"?
19     A.   Yes.
20     Q.   What does it mean to have a
21  regular order or arrangement?
22        MR. DESAI: Objection to form.
23     A.   In this context it means that
24  you can index your way through that array
25  and, you know, find your way to different

Page 181

1          Lubin
2   nodes of the array in a, you know,
3   regular, fully specifiable process.
4         So, you know, just looking at
5   array coordinates is the standard, most
6   typical, way of doing that. When you go
7   to a node that is at a particular array
8   coordinate, that is fully specifying
9   where you are in the array.
10     Q.   And what do you mean -- strike
11  that.
12        What does "regular" mean in
13  this context?
14        MR. DESAI: Objection to form.
15     A.   I believe it means what I just
16  said. It means that it is -- it is an
17  order in which you can find your way
18  around to the different nodes.
19     Q.   Does regular in this context
20  mean uniformed intervals?
21        MR. DESAI: Objection to form.
22     A.   No. There is no requirement,
23  you know, in the way the array is used by
24  the other elements of the patents that
25  would require a uniform distance between

Page 194

    Lubin
1  tools that are used in mosaicing, but I,
2  you know, I didn't -- I never worked on
3  mosaicing myself.
4      Q.   Are you familiar with Dr. Teddy
5  Kumar?
6      A.   Yes, I am.  He's my boss, my
7  boss's boss.
8      Q.   Do you know if Dr. Kumar has
9  worked on mosaicing?
10     A.   I don't know for sure.
11     Q.   Do you know Dr. Burt?
12     A.   Yes, I do.
13     Q.   Do you know if Dr. Burt has
14 worked on mosaicing?
15     A.   Well, I know of his patent in
16 the area, so yes.
17     Q.   Did you discuss Dr. Burt's
18 patent on mosaicing with him?
19     A.   No.
20     Q.   Have you discussed mosaicing
21 with Dr. Burt?
22     A.   No, I am pretty sure I didn't.
23 But I can't absolutely say that over the
24 course of 30 years it didn't ever come up

Page 195

    Lubin
1  in conversation.  But I don't recall any
2  time that it did.
3      Q.   I would like to direct you
4  paragraph 23 of your report.  Please let
5  me know when you see it.
6          THE COURT REPORTER:  Can I take
7      a quick break?
8          (Off the record.)
9          THE VIDEOGRAPHER:  We are back
10     on the record at 4:26 p.m.
11 BY MS. CHEN:
12     Q.   So I think we were just at
13 paragraph 23 of your report, Dr. Lubin.
14         Do you still have that open?
15     A.   Yes, I do.
16     Q.   In this paragraph you describe
17 that "The user interface devices allow
18 each user to navigate through the array
19 and thus through the environment by
20 viewing camera outputs stored at
21 particular locations in memory, also
22 referred to as nodes."
23         Do you see that?
24     A.   Yes.

Page 196

    Lubin
1      Q.   And do you also see about 10
2  lines later in the same paragraph you
3  say, "As of result, navigation through
4  the array is not limited to one physical
5  camera, but rather includes navigation of
6  camera outputs."
7          Do you see that?
8      A.   Yes.
9      Q.   And do you see that the
10 following sentence is a quote from the
11 '226 patent at column 4, lines 26 through
12 29, "The system allows the viewer to
13 float between a multiplicity of
14 microcamera outputs in a way that (via
15 electronic switching processes and thus
16 movement through the array) merges their
17 fields of view into a seamless motion
18 path."
19         Do you see that?
20     A.   Yes, I do.
21     Q.   So do you agree that the claim
22 system allows the user to merge the
23 fields of view of multiple microcamera
24 outputs into a seamless motion path?

Page 197

    Lubin
1          MR. DESAI:  Objection to form.
2      A.   I agree that in many cases it
3  is desirable to have -- well, let me say
4  one thing.
5          There is a distinction I think
6  between a seamless motion path and a
7  seamless composition of images.  A
8  seamless -- in all of these cases it is a
9  perceptual thing; seamless with respect
10 to the beholder.  And when you're
11 thinking about a motion path, that's a
12 different -- that's a different kind of
13 seamlessness in my opinion.
14         And by the way, I have a very
15 strong background in perception.  That's
16 actually what my degree is in.  So a
17 seamless motion path is really about
18 having a motion that it's not -- there
19 are no abrupt transitions.  It doesn't
20 refer to seamlessness in the way that I
21 think some embodiments of the patent
22 refer to, if you're getting into that.
23     Q.   Thank you.  I see.
24         So a seamless motion path in

Page 198

1        Lubin
2   your opinion is different from the
3   seamlessness that's described in the Burt
4   patent; is that fair?
5       A.   It's different than some of the
6   descriptions in there, yes.
7       Q.   How so?
8       A.   Well, as I've already said,
9   the -- when you're trying to -- you know,
10  seamlessness is, since it's a perceptual
11  issue, there is no absolute seamlessness,
12  and so it's really a question of, you
13  know, to what extent it is to interfere
14  with the task at end.
15          And if the task at end is
16  navigating through an environment, there
17  is different requirements.  You do not
18  want to have things jump at one moment to
19  the next, perhaps.  But, you know, it's,
20  I would say, a less stringent requirement
21  than seamlessness in images.
22      Q.   So I can't recall the exact
23  term, but is there a way to quantify a
24  person's ability to perceive changes,
25  small changes?

Page 199

1        Lubin
2       A.   Yes, in fact a lot of my early
3   work at Sarnoff was about that.  One unit
4   is called the adjust noticeable
5   difference.
6           And actually I did an analysis,
7   I wrote a paper with another guy named
8   Gerry Alphonse, I don't know if I
9   included it in my CV, but it was about
10  perceptual requirements of seamlessness
11  in tiled large-screen displays.  And it
12  started out from the perspective that
13  there is no such thing as complete
14  seamlessness, because there is a seam
15  between those displays.  The question is
16  how close do they have to be for it to
17  not bother.
18          And it's certainly subjective
19  in a lot of ways, so that if you want to
20  just really not ever be able to see that
21  there is a seam, that is a much more
22  stringent J&D requirement than just
23  having it be not objectionable.
24          And so, you know, that's how
25  I've always viewed the idea of

Page 200

1        Lubin
2   seamlessness.  In anything that's
3   consumed by the human visual system, it,
4   you know, it's a relative thing.
5       Q.   For the record, could you spell
6   the name of your coauthor on that paper?
7       A.   Yeah, it's Gerald, G-E-R-A-L-D,
8   Alfonse, A-L-P-H-O-N-S-E.
9           And maybe just to telegraph a
10  little bit, you know, there is certainly
11  no requirement for seamlessness at all in
12  mosaicing, and in fact, in some
13  applications you specifically do not want
14  any kind of attempt to blur the seam.
15          For example, in the aerial
16  image, you know, analysis example that I
17  gave before the break, where these image
18  analysts are looking at satellite images
19  and they are lined up so that they are
20  more or less matching, they don't want
21  anything to be done to remove any
22  information to obstruct or distort any
23  information at all in these images, even
24  at what's not only on the edges between,
25  between these different plates or what do

Page 201

1        Lubin
2   they call them, these images.
3           So, you know, in that case, and
4   also, you know, it helps you understand
5   where you are in the collection of images
6   for people to see some edges between
7   them.  You know, some see where one
8   starts and the other ends.  And so that
9   is certainly an example of mosaicing and
10  yet there is no requirement for
11  seamlessness.  In fact, there is a
12  requirement for not seamlessness in those
13  applications.
14          And so my opinion of whether or
15  not mosaicing has to include any attempt
16  to make things seamless is really
17  informed by those kinds of applications
18  and in my experience.
19      Q.   In this example of aerial
20  imagery, when the mosaic is being put
21  together, do they also go through what
22  the Burt patent describes as the mosaic
23  composition process?
24          MR. DESAI:  Objection to form.
25      A.   There is the alignment process

51 (Pages 198 - 201)

Page 206

1        Lubin
2  the seams, and to that extent, it's not
3  needed.
4        I not saying that you don't
5  want to do image processing for other
6  reasons, but to answer the question about
7  seamlessness, I opine and firmly believe
8  that it's not required.
9     Q.   In Burt, your opinion is that
10 seam reduction imaging processing is
11 optional and not required; is that fair?
12       MR. DESAI:  Objection to form.
13    A.   Yes.
14    Q.   In Burt, if there is seam
15 reduction image processing, that would
16 take place during the composition
17 process; is that right?
18       MR. DESAI:  Same objection.
19    A.   Let me just check, okay?  Which
20 exhibit is the Burt patent?
21    Q.   It's Exhibit F.
22    A.   F, thank you.
23    Q.   And for the record, I am
24 referring to the Burt patent, which is
25 Exhibit F to Dr. Lubin's declaration, and

Page 207

1        Lubin
2  the patent number is U.S. patent number
3  5,649,032.
4     A.   Yeah, in enclosing the mosaic,
5  looking at column four, starting line 41,
6  "On the aligned images the system may use
7  any one of a number of image fusing,
8  merging, filtering and averaging
9  processes to best produce a seamless
10 mosaic."
11       So if it were being done, it
12 would be done in the composition process.
13    Q.   The process of producing a
14 seamless mosaic, if it is done, is that
15 achieved by any one of these identified
16 processes, image fusing, merging,
17 filtering and averaging?
18       MR. DESAI:  Objection to form.
19    A.   Is it -- is it --
20    Q.   I'll withdraw the question.
21 Let me restate it.
22       Is the purpose of image fusing,
23 merging, filtering and averaging, to try
24 to produce a seamless mosaic; is that
25 fair?

Page 208

1        Lubin
2        MR. DESAI:  Same objection.
3     A.   I would say that certainly it
4  is a way to try to achieve seamlessness.
5        I think there are other reasons
6  to do that kind of processing, perhaps;
7  none that come to mind.  But, you know,
8  at the moment, I believe that's how he
9  intended the meaning of those terms.
10 Can't be absolutely sure.
11    Q.   And the Burt patent was
12 incorporated by reference into the
13 Kewazinga patent, right?
14    A.   Yes.
15    Q.   Earlier I believe you testified
16 that you view there to be a distinction
17 between a seamless motion path and a
18 seamless mosaic, right?
19    A.   Yes, I said in general, from a
20 perceptual perspective, that there are
21 different desiderata in those two cases.
22    Q.   Can you repeat that?
23    A.   I don't know why I always use
24 that word, desiderata, things that are to
25 be -- that are desired.

Page 209

1        Lubin
2  D-E-S-I-D-E-R-A-T-A.  I'm sorry.
3     Q.   No problem.  In the context of
4  the patents in suit, is there a conflict
5  between the meaning of seamless motion
6  path and seamless mosaic as used in the
7  Burt patent?
8        MR. DESAI:  Objection to form.
9     A.   There is no conflict.  There
10 are different applications, different
11 perceptual things you're trying to
12 accomplish in the two cases.
13       So in general when you're
14 trying to have a seamless motion path, as
15 I said earlier, that means, you know,
16 that's, generally speaking, a less
17 stringent requirement than trying to
18 achieve seamlessness on an image when
19 you're looking at it directly.  You know,
20 when you're traversing an environment,
21 mostly things are going by on the sides.
22 And unless there is a big abrupt change
23 in the motion, then you won't even notice
24 it.
25       So from that perspective, it's

Page 210

1        Lubin
2   a less stringent requirement.
3       Q.   In the context of the Kewazinga
4   patent --
5       A.   One other thing that I would
6   like to add to that, is that requirement
7   for seamless motion generally can be
8   accomplished just by the alignment
9   process in my experience.  So there is no
10  need to, there is no reason to do any
11  further processing.  The alignment
12  process and just composing things as is,
13  by itself, reduces or removes any effects
14  of abrupt transitions between images for
15  the purpose of motion.
16      Q.   Is it your understanding that
17  the Kewazinga patent cites the Burt
18  patent to explain how the images are
19  mosaic in order to achieve a seamless
20  motion path?
21          MR. DESAI:  Objection to form.
22      A.   There was a lot of clauses in
23  there.
24      Q.   I'll restate the question.
25          Why does the Kewazinga --

Page 211

1        Lubin
2   strike that.
3           Why does the Kewazinga patent
4   cite Burt?
5           MR. DESAI:  Objection to form.
6       Foundation.
7       A.   I wasn't really asked to delve
8   into that.  You know, I probably could
9   come up with an opinion of why they cited
10  it, but I didn't consider it and I don't
11  feel comfortable trying to consider it
12  right this second.
13      Q.   In the '234 patent, please turn
14  to column 17.
15      A.   What is that?
16      Q.   That is Exhibit C to your
17  declaration.
18      A.   '234 patent, where?
19      Q.   Column 17.  Do you agree that
20  the '234 patent at column 17, line 30,
21  reads, "In another embodiment, mixing may
22  be accomplished by 'mosaicing' the
23  outputs of the intermediate cameras"?
24      A.   Yes.
25      Q.   And do you also see that it

Page 212

1        Lubin
2   reads, "U.S. patent number 5,649,032,
3   which is the Burt patent, discloses a
4   system and method for generating a mosaic
5   from a plurality of images and is hereby
6   incorporated by reference"?
7       A.   Yes, I do.
8       Q.   So the Kewazinga patents,
9   including this '234 patent that we are
10  looking at now, are an improvement over
11  Burt, right?
12          MR. DESAI:  Objection to form.
13      A.   You know, any patent is an
14  improvement over any other patent because
15  it adds more inventions to the world.
16          I think that the fact that, you
17  know, that it cites it incorporates this
18  does not make it an improvement.  It puts
19  it off into a different direction, I
20  guess.  But it's not really my place to,
21  you know, say whether it's an improvement
22  or not, would probably be the best
23  answer.
24      Q.   I'll rephrase it.
25          Would you say the Kewazinga

Page 213

1        Lubin
2   patents build on what is disclosed in
3   Burt?
4           MR. DESAI:  Objection to form.
5       A.   I mean, the Kewazinga patents
6   use something about the Burt patent to
7   solve a particular problem that they are
8   addressing, navigating when you're not
9   going directly from one camera output to
10  the next.
11          So that's how I would -- that's
12  how I would describe what they are doing
13  with the Burt patent and, I guess to
14  answer your previous question, why they
15  are doing it.
16      Q.   So you agree that the Kewazinga
17  patents used the mosaicing that is
18  described in the Burt patent as an
19  example of how mixing is accomplished in
20  the Kewazinga patent; is that fair to
21  say?
22          MR. DESAI:  Objection to form.
23          Mischaracterizes the testimony.
24      A.   I'm sorry, can you ask that
25  again or maybe change it a little bit.

54 (Pages 210 - 213)

Page 254

1          Lubin
2  BY MR. DESAI:
3     Q.   I think you're already looking
4  at your declaration.  Earlier today
5  counsel asked you a number of questions
6  about this declaration and expert report
7  and the analysis that you did in this
8  case; do you remember testifying about
9  that?
10    A.   Yeah.
11    Q.   I would like to ask you just a
12  few more questions about the analysis
13  that you did in this case.
14         If you can take a look at
15  paragraph 1 of your declaration.  You see
16  that?
17    A.   Yes.
18    Q.   You see the second sentence, "I
19  was asked to investigate and provide my
20  opinions regarding the interpretation of
21  certain language in the claims of
22  Kewazinga's United States patents
23  6,535,226, 6,522,325 and 9,055,234"; do
24  you see that?
25    A.   Yes.

Page 255

1          Lubin
2     Q.   Were you asked to investigate,
3  analyze and provide opinions on claim
4  construction at this point in the case?
5     A.   Just the meaning of those two
6  terms, "array of cameras" and
7  "mosaicing."
8     Q.   Can you explain a little about
9  the analysis you did to come to your
10  opinions on what you believe is the
11  proper claim construction for mosaicing
12  and array of cameras?
13         MS. CHEN:  Objection to form.
14    A.   In both cases I started with
15  the common usage of those terms and
16  formed it from what I understood from my
17  work in the field, and then went into the
18  patents themselves and decided whether or
19  not those were consistent with what I
20  found in the patents.
21    Q.   You said based on your review
22  of the patents, I believe that you stated
23  was part of your analysis; what did you
24  find and how did that factor into your
25  claim construction opinions in this case?

Page 256

1          Lubin
2          MS. CHEN:  Objection to form.
3     A.   It showed me that my -- that my
4  claim constructions that I came up with
5  were consistent with what I was reading
6  in the patents.
7     Q.   Had you finalized your claim
8  construction analysis before you reviewed
9  the Kewazinga patents?
10    A.   No.
11    Q.   Had you finalized your claim
12  construction opinions before reviewing
13  the Kewazinga patents?
14         MS. CHEN:  Objection, form.
15    Q.   I think your answer got cut
16  off.  I will ask the question again.
17         Had you finalized your claim
18  construction opinions in this case before
19  reviewing the Kewazinga patents?
20    A.   No.
21         MS. CHEN:  Objection, form.
22    Q.   Can you turn to paragraph 10 of
23  your declaration.
24    A.   Okay.
25    Q.   You see that the first sentence

Page 257

1          Lubin
2  says, "I considered the following
3  materials, facts and data in forming my
4  opinions in this action," and then there
5  is four bullet points underneath that.
6  Do you see that in paragraph 10?
7     A.   Yes.
8     Q.   Had you finalized your claim
9  construction analysis prior to reviewing
10  the materials you considered in forming
11  your opinions?
12         MS. CHEN:  Objection, form.
13    A.   No, I did not.
14    Q.   And was reviewing the materials
15  that you identified here in paragraph 10
16  part of your analysis to provide the
17  opinions on claim construction that you
18  provided in this case?
19    A.   Yes.
20    Q.   And you have provided those
21  claim construction opinions in this case
22  in this expert report and declaration
23  that is Exhibit 1 at your deposition,
24  correct?
25         MS. CHEN:  Objection.  Leading.

Page 258

```
1            Lubin
2    A.   Correct.
3    Q.   Do you still agree with the
4  statements that you made in the expert
5  report and declaration that is Exhibit 1
6  to your deposition?
7        MS. CHEN:  Objection.  Form.
8    A.   The statement in paragraph 1
9  you said?
10   Q.   Let me clarify.
11       I am asking you, do you agree
12 with the statements that you made in this
13 entirety of your expert report and
14 declaration, which I am identifying as
15 Exhibit 1 to your deposition?
16   A.   Oh, yes.
17       MS. CHEN:  Objection, form.
18   Q.   Do you believe that your review
19 of the relevant intrinsic and extrinsic
20 evidence that you reviewed in forming
21 your opinions continue to support the
22 opinions that you provided in your expert
23 report and declaration that is Exhibit 1
24 to your deposition?
25       MS. CHEN:  Objection, form.
```

Page 259

```
1            Lubin
2    A.   Yes, I do.
3        MR. DESAI:  I pass the witness,
4    I have no further questions of the
5    witness.
6  BY MS. CHEN:
7    Q.   Dr. Lubin, I just have a couple
8  more questions for you.
9        Earlier I asked you questions
10 about your process in forming your
11 opinions.  Do you recall those questions?
12   A.   Yes, I do.
13   Q.   When were you first asked --
14 strike that.
15       When you were first asked to
16 provide opinions in this case, were you
17 provided Kewazinga's proposed
18 construction?
19       MR. DESAI:  Objection to form
20   and outside the scope of the redirect.
21       You can answer the question at a
22   high level, but don't reveal the
23   substance of any communications that
24   you had with attorneys.
25   A.   Can you repeat the question?
```

Page 260

```
1            Lubin
2    Q.   Kewazinga's counsel asked you
3  questions about your process in forming
4  opinions in this case, right?
5    A.   Yes.
6    Q.   When you were first asked to
7  provide your opinions in this case, were
8  you provided Kewazinga's proposed
9  construction?
10       MR. DESAI:  Objection to form.
11       Again, you can answer the
12   question at a high level, but the
13   question appears to be about
14   conversations with counsel.  So I
15   advise you not to reveal the substance
16   of any conversations with counsel.
17   A.   Well, I'm not sure how to
18 answer it then.
19       I was -- they presented me with
20 the, I believe the Microsoft claim
21 construction opinions.  The Microsoft
22 claim constructions.  I don't recall
23 whether or not they presented me with any
24 draft claim constructions in this case
25 before they -- before I started looking
```

Page 261

```
1            Lubin
2  into it.
3    Q.   You considered Kewazinga's
4  proposed constructions of the claim terms
5  in this case before you finalized
6  opinions, right?
7        MR. DESAI:  Objection to form.
8    A.   I believe I did.  I believe
9  there was -- I saw something along those
10 lines.
11       Whether or not I saw those
12 before I started reviewing other
13 documents, I'm not sure.
14   Q.   You considered -- as you
15 indicated in paragraph 10 of your
16 declaration, you considered the joint
17 claim construction and prehearing
18 statement, which is attached as Exhibit E
19 to your declaration, which includes
20 Kewazinga's proposed construction, in
21 forming your opinions; is that right?
22   A.   Yes.  Yes.  That's right.
23   Q.   And then you finalized your
24 opinions after reviewing that document,
25 right?
```

66 (Pages 258 - 261)

Page 262

```
1           Lubin
2       MR. DESAI:  Object to the form.
3   A.   Yes.  Yes, I did.
4       MS. CHEN:  Thank you, I pass the
5   witness.
6       MR. DESAI:  A few questions.
7   BY MR. DESAI:
8   Q.   There seems to be a lot of
9   confusion here about the timing of your
10  opinion.  Let's just make this simple.
11      Can you turn to paragraph 41 of
12  your declaration -- 38 of your
13  declaration.  Do you see it states there,
14  "A POSITA understands that this term" --
15  strike that.
16      Just read that paragraph to
17  yourself.
18  A.   Okay.
19      (Witness reviews document.)
20  Q.   What is your opinion on the
21  proper construction for the claim term
22  "mosaicing"?
23      MS. CHEN:  Objection, form.
24  A.   My opinion is, as I state here,
25  that the term refers to "creating imagery
```

Page 263

```
1           Lubin
2   assembled from a plurality of images, or
3   portions thereof, including an alignment
4   process and a composition process."
5   Q.   Did you perform an analysis or
6   view any materials in coming to that
7   opinion?
8       MS. CHEN:  Objection to form.
9   A.   Yes.
10  Q.   Did that include reviewing the
11  Kewazinga patents?
12  A.   Yes.
13  Q.   Do you still agree -- do you
14  still believe that, in your expert
15  opinion, that is the proper construction
16  of mosaicing as used in the Kewazinga
17  patents?
18      MS. CHEN:  Objection, form.
19  A.   Yes.
20  Q.   Can you turn now to paragraph
21  47 of your declaration.  Take a moment to
22  read that paragraph to yourself.
23  A.   Okay.
24  Q.   In your expert opinion, what is
25  the proper construction of "array of
```

Page 264

```
1           Lubin
2   cameras" as used in the Kewazinga
3   patents?
4       MS. CHEN:  Objection to form.
5   A.   As I state in paragraph 47, it
6   is a configuration of cameras wherein the
7   configuration can be created over time by
8   moving cameras.
9   Q.   Did you do an analysis
10  including reviewing the Kewazinga patents
11  in coming to that opinion?
12  A.   Yes.
13      MS. CHEN:  Objection, form.
14  Q.   And do you still believe that,
15  in your expert opinion, that that is the
16  appropriate construction of "array of
17  cameras" in this case?
18      MS. CHEN:  Objection, form.
19  A.   Yes.
20      MR. DESAI:  I pass the witness.
21      MS. CHEN:  Dr. Lubin, thank you
22  again for your time.  I have no
23  further questions.
24      THE WITNESS:  Thank you.
25      THE VIDEOGRAPHER:  This
```

Page 265

```
1           Lubin
2   concludes today's testimony of
3   Dr. Jeffrey Lubin.  We are going off
4   the record at 6:33 p.m.  This also
5   concludes media 6.
6       (Time noted:  6:33 p.m.)
7       _____
8
9   Subscribed and sworn to
10  before me this____day of_____, 2020.
11  _____
```

67 (Pages 262 - 265)

Page 266

1
2      CERTIFICATION
3
4      I, DAWN MATERA, a Notary Public
5  for and within the State of New York, do
6  hereby certify:
7      That the witness whose testimony
8  as herein set forth, was duly sworn by
9  me; and that the within transcript is a
10 true record of the testimony given by
11 said witness.
12     I further certify that I am not
13 related to any of the parties to this
14 action by blood or marriage, and that I
15 am in no way interested in the outcome of
16 this matter.
17     IN WITNESS WHEREOF, I have
18 hereunto set my hand this 19th day of
19 November, 2020.
20
21       *[signature: Dawn Matera]*
22            DAWN MATERA
23
24
25

Page 267

1
2           I N D E X
3  Witness                    Page
4  JEFFREY LUBIN               5
5
6         E X H I B I T S
7  No.                        Page
8  Exhibit 1 Claim construction expert  8
         report and declaration
9
   Exhibit 2 Notice of deposition to     9
10       Kewazinga pursuant to Rule
         30(b)(1)
11
   Exhibit 3 Dr. Keith Hannah's         48
12       original and supplemental
         declaration submitted in
13       connection with Microsoft
         case
14
15         ~oOo~
16
17
18
19
20
21
22
23
24
25

Page 268

1                Veritext Legal Solutions
              290 W. Mt. Pleasant Ave. - Suite 3200
2                Livingston, New Jersey 07039
            Toll Free: 800-227-8440  Fax: 973-629-1287
3                 erratas-cs@veritext.com
4  November 20, 2020
5  Jeffrey Lubin
   jxlubin@gmail.com
6
   Case Name: Kewazinga Corp. v. Google, LLC
7
   Veritext Reference Number: 4338777
8
   Witness:  Jeffrey Lubin    Deposition Date:  11/16/2020
9
   Dear Sir/Madam:
10
   Enclosed you will find a transcript of your deposition.
11
   As the reading and signing have not been expressly
12
   waived, please review the transcript and note any
13
   changes or corrections on the jurat/errata sheet
14
   included, indicating the page, line number, change and
15
   reason for the change. Sign at the bottom of the sheet
16
   in the presence of a notary except in California where
17
   you are signing under penalty of perjury and email
18
   the errata sheet back to us at the address shown above.
19
   If the jurat is not received within thirty days of your receipt of
20
   this letter, the reading and signing will be deemed waived.
21
   Sincerely,
22
   Production Department
23
   Encl.
24 Cc:  Emily Chen, Esq.
25      Saunak Desai, Esq.

Page 269

1       Kewazinga Corp. v. Google, LLC
2              Jeffrey Lubin
3            E R R A T A
4            - - - - -
5  PAGE   LINE   CHANGE
6  ___ ___ _____
7  Reason:_____
8  ___ ___ _____
9  Reason:_____
10 ___ ___ _____
11 Reason:_____
12 ___ ___ _____
13 Reason:_____
14 ___ ___ _____
15 Reason:_____
16 ___ ___ _____
17 Reason:_____
18 ___ ___ _____
19 Reason:_____
20 ___ ___ _____
21 Reason:_____
22 ___ ___ _____
23 Reason:_____
24 ___ ___ _____
25 4338777

68 (Pages 266 - 269)