L2GHKEWO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   KEWAZINGA CORP.,

4                   Plaintiff,

5             v.                              20 Civ. 1106 (LGS)

6   GOOGLE LLC,
                                             Remote Oral Argument
7
                 Defendants.
8   ------------------------------x
9                                            New York, N.Y.
                                             February 16, 2021
10                                           10:40 a.m.

11  Before:

12                      HON. LORNA G. SCHOFIELD,

13                                           District Judge

14                          APPEARANCES

15  STROOCK & STROOCK & LAVAN LLP
         Attorneys for Plaintiff
16  BY:  IAN G. DiBERNARDO
         SAUNAK KIRTI DESAI
17       KENNETH L. STEIN

18  DESMARAIS LLP
         Attorneys for Defendant
19  BY:  AMEET A. MODI
         JOHN MICHAEL DESMARAIS
20       EMILY CHEN
         KENNETH L. STEIN
21
    Also Present:
22
    Jim Sherwood, Google representative
23  Michael Skrzypek, defense trial tech

24

25

L2GHKEWO

1              THE COURT:  Good morning.

2              MR. MODI:  Good morning, your Honor.

3              MR. DiBERNARDO:  Good morning, your Honor.

4              THE DEPUTY CLERK:  Good morning.  We're here in 20

5     Civ. 1106, Kewazinga v. Google LLC.  The parties' appearances

6     have been noted for the record.

7              Before we begin, I'd like to remind the parties and

8     anyone else listening that recording or rebroadcasting of this

9     is prohibited.  Violation of this prohibition may result in

10    sanctions.

11             We're here before the Honorable Lorna G. Schofield.

12             THE COURT:  So welcome, everybody.  It's strange to be

13    here in this remote way, but I trust we can proceed and we

14    won't have anything funny or strange.  I'm glad we can start a

15    little bit later.  I noticed that at least some people were in

16    California.

17             So I guess have you all talked to Mr. Street about how

18    much time you want to reserve?

19             MR. MODI:  Your Honor, I believe what the parties have

20    discussed that each side would present for an hour.  Certainly,

21    with the Court's permission, perhaps the parties could reserve

22    some period of time for rebuttal, although I don't think

23    counsel discussed specifically what amount of time.

24             THE COURT:  As I understood it, Mr. DiBernardo was

25    going to go first.  Is that right?  I guess my question is do

L2GHKEWO

1   you want to reserve some time?  Do you want Mr. Street to

2   prompt you or you just watch the clock?  How do you want to

3   proceed?

4          MR. DiBERNARDO:  Appreciate that, your Honor.  I think

5   we can watch the clock on our end, if that's OK.

6          THE COURT:  All right.  So Mr. Street will keep track

7   as well, and you may begin.

8          MR. DiBERNARDO:  Thank you, your Honor.  I will

9   apologize for the mask.  We're actually in a conference room

10  with colleagues.  If you're having difficulty hearing me,

11  please say so, and we may rearrange and I'll try to remove the

12  mask.

13         THE COURT:  OK.  I can hear you fine.  I obviously

14  can't read your lips, but we'll see how it goes.

15         MR. DiBERNARDO:  Thank you.

16         With that, your Honor, I will share my screen to walk

17  through the presentation.

18         THE COURT:  OK.

19         MR. DiBERNARDO:  Are you able to see that, your Honor?

20         THE COURT:  I can see it, yes.

21         MR. DiBERNARDO:  We'll begin today, your Honor, with

22  the array of cameras limitation, as an overview why should the

23  Court adopt Kewazinga's proposed constructions?  On the

24  Kewazinga side, the proposed constructions are supported by the

25  intrinsic evidence, supported by competent expert testimony,

L2GHKEWO

1    and absolutely consistent with the *Microsoft* Court's rationale.

2              Google responds with mischaracterizations of the

3    patents and the intrinsic record with no expert testimony, and

4    in fact mischaracterizes Kewazinga's expert Dr. Lubin's

5    credentials and mischaracterizes the *Microsoft* Court's

6    rationale.

7              Just first a word on the law that's applicable here.

8    As a baseline, courts give the terms their ordinary and

9    customary meaning in the particular field.  That is the

10   baseline, an objective baseline.  Patentees are free and should

11   get the full scope of the proposed term's ordinary meaning

12   unless one of two things:  (1) The patentee explicitly

13   redefines the term or (2) disavows the full scope.  Neither of

14   which is the case here with the terms at issue.  In fact, mere

15   criticism of a particular embodiment or an alternative is not a

16   disavowal or an explicit redefinition of a term, and any

17   disavowal has to be clear and unmistakable.  And, again, there

18   is none here.

19             Also important to note, your Honor, claims are not

20   limited to described embodiments.  The federal circuit has

21   repeatedly cautioned against that.  The specification need not

22   describe every embodiment, and claims should not be confined to

23   disclosed embodiments even when there's only a single

24   embodiment that's disclosed.

25             THE COURT:  I had a question about that.  In

L2GHKEWO

construing array of cameras, Judge Woods relied on the various

embodiments in the patent and noted that they all consistently

depicted multiple cameras in fixed locations relative to each

other, and that seemed to be very much at the center of his

analysis.  And I'm genuinely asking for clarification here.

It's not a Socratic question.  But there seems to be some

tension between, on the one hand, saying the claims must be

read in light of the specifications, but on the other hand, the

claims are not to be limited by an embodiment or features shown

in an embodiment absent the patentee's clear intention.  Could

you speak to that.

          MR. DiBERNARDO:  Yes, your Honor.  The tension, if one

exists, is resolved I think in this case by the nature of the

disclosure in the Kewazinga patents where, in the context of

the array, it is given a broad description.  Throughout the

specification, it is emphasized that there's a breadth to what

constitutes an array, and that emphasizes that no one

embodiment should be limiting to the term.

          Again, starting with the ordinary meaning, there has

to be either a redefinition of the term or a clear disavowal.

Neither of which is present here.  And, again, the whole spec

in discussing the array emphasizes the breadth of the

disclosure and the flexibility and the different forms that the

array can take.  And I will get into those disclosures in the

presentation, your Honor.

L2GHKEWO

1          THE COURT:  OK.

2          MR. DiBERNARDO:  So just some background on the

3     asserted patents.  They're directed to not a specific array,

4     not any particular structure.  They're directed to telepresence

5     systems and methods that enable multiple users to smoothly

6     navigate imagery along a path through a remote environment

7     simultaneously and independently of one another.  In the

8     disclosed environment, there are at least three aspects that

9     allow this to happen: image capture, storage, and user

10    navigation.  I'll briefly go through that by way of background

11    and go into some of the specifications as I mentioned.

12          Let's start with the image capture and storage, your

13    Honor.  At the top of the picture, and this is Figure 1 which

14    is in all of the patents, array 10 shown in red is comprised of

15    multiple sub-arrays, as Dr. Lubin calls them, rail arrays 12,

16    and each rail array includes multiple cameras 14.  The images

17    are captured and sent via local area hubs shown in blue to the

18    server, and the server causes the images to be stored in an

19    electronic storage device shown in purple.  So the function

20    here is the array is there to capture the images so that they

21    can be stored for later retrieval and navigation.  I will say

22    the implication of the local area hubs and why we included them

23    there is that the arrays, the cameras, the rail arrays, don't

24    have to be connected to one another.  They can be wire --

25          THE COURT:  What do you mean?

L2GHKEWO

1          MR. DiBERNARDO:  They can comprise -- the array of

2     cameras 10 can comprise discrete sections, each section of

3     which is fed into a local area hub for the images to be stored.

4     The camera array 10 does not have to be a unitary structure.

5          THE COURT:  OK.

6          MR. DiBERNARDO:  That's generally the image capture

7     and storage.

8          Now, on the user navigation side, having stored the

9     imagery in the electronic storage device, users using a various

10     type of computing device can send navigation commands, user

11     inputs, to the server, and based on those user inputs, the

12     server in turn provides the imagery from those storage nodes to

13     the user.  And in providing those, that imagery, the server

14     and/or the user interface devices can process the imagery, for

15     example, to smooth the navigation.

16          A bit more on the navigation, your Honor.  Navigation

17     here is not physical, it's in a sense virtual.  It's as the

18     patents describe, floating between a multiplicity of camera

19     outputs, through electronic switches.  That's movement through

20     the array.  It's selecting which images from storage are to be

21     retrieved and viewed.

22          THE COURT:  Just so we're clear -- and I heard you

23     just now say it -- what we're talking about are captured images

24     or stored images, not live camera images?

25          MR. DiBERNARDO:  Relevant here, although the patents

L2GHKEWO

1    describe alternate embodiments where it could be live, here

2    we're talking, yes, primarily about the stored imagery.

3         THE COURT:  OK.

4         MR. DiBERNARDO:  So that's the navigation of the

5    patents.  It is not providing a user with remote control to

6    physically move a robotic camera.  It's not giving a user that

7    remote control.  And the patents discuss that and say if you

8    were to do that, that immediately limits the number of viewers

9    that could simultaneously control their own course.  Only one

10   person is controlling that robotic camera.  That's not the

11   invention.  That's the type of moving, physically moving of

12   cameras, that was criticized in the patents.

13        Another note on the navigation.  Navigation also is

14   not based on knowing the precise location of the cameras, where

15   the images were taken, but based on relative ordering of where

16   the images were to -- and that's emphasized in Figure 5, which

17   again is in each of the patents, although we cite only to the

18   '325 patent here, your Honor.  You can see users can choose to

19   move, for example, to the right in the environment.  In which

20   case, in response to receiving that input, the server, the

21   system, would increment the camera node along the x-axis.  So

22   moving from the first camera, say, X0, receiving an input to

23   move to the right, moving to X1, the next camera.  There's no

24   requirement that the user or the system know the precise

25   location of the cameras.  It's that relative ordering, moving

L2GHKEWO

to the right, increment the address along the X axis; moving to

the left, decrement the node address.  So that is navigation.

Now, with that background, why should the Court adopt

Kewazinga's construction?  Again, it's consistent with the

intrinsic evidence, it's supported by expert testimony, and

it's consistent with the *Microsoft* Court's ruling.  Google's

proposed construction has ambiguities that were not addressed

in the *Microsoft* case or in the Court's opinion, and those

ambiguities are actually highlighted by Google's attempts to

read in narrowing limitations that are not required by that

specific language.  We'll get into that.

So, again, array of cameras, they're there to capture

the images that are stored for the purposes of navigation.

What do we know about the array?  It has full breadth.  It can

take many different forms to achieve that purpose.  It's not

limited to a specific structure or a single structure.  The

array of cameras is not limited to fixed or stationary cameras.

Cameras can be moved.  An array of cameras can comprise

multiple other array of cameras.

THE COURT:  So let's talk about that a little bit

because Judge Woods -- and I should just tell you.  I'm not

necessarily wedded to what he has concluded -- but Judge Woods'

conclusion and Google's position is that the cameras are fixed

relative to each other.  The array isn't fixed, but that the

cameras relative to each other are fixed.  I guess it wasn't

L2GHKEWO

1      entirely clear to me that you really disputed that.

2                MR. DiBERNARDO:  Kewazinga's proposed construction

3      that the camera configuration can be created over time by

4      moving cameras is consistent with that.  Kewazinga's not

5      putting forth a proposed construction where the images and the

6      positions are not fixed.  We do believe there are serious

7      ambiguities with that language.  Again, that was language that

8      the *Microsoft* Court adopted without it being proposed by either

9      party.

10               THE COURT:  I understand that.  I guess what I'm

11     trying to understand is what your position is relative to that

12     because I just heard you say that it wasn't necessarily

13     inconsistent.  So I think what you're saying, but correct me if

14     I'm wrong, I think you're saying that the cameras are situated

15     in a way that is fixed relative to the other cameras, and

16     therefore the images are fixed in a particular configuration,

17     but you're suggesting that you can move the cameras.  For

18     example, if you only have two cameras, you can use the camera

19     in -- one camera in position one and position two and then take

20     that first camera and move it to position three but maintaining

21     a configuration that will allow you to have overlapping images

22     so it seems as though you are walking through the environment

23     or moving through the environment.

24               MR. DiBERNARDO:  Your Honor, we largely agree with

25     that, that, yes, Figure 11 and 12, that embodiment really

L2GHKEWO

1   highlights this, that cameras can be moved to capture the

2   images and perform the array.  And once the images are captured

3   and the array is formed, those relationships between the

4   captured images do not change.  There is a known relationship.

5          Much of the issue, as is clear in our papers, is what

6   ambiguities and other limitations Google has attempted to read

7   into that notion of a known relationship.  For example, they're

8   quite clear that they read into that limitation that there has

9   to be a predetermined relationship.  There's no requirement for

10   a precise relationship or predetermined relationship.  That

11   again is supported by Figure 11, which we can get into, where

12   cameras can be situated basically in real time.  The creator of

13   the system can decide after cameras are placed whether or not

14   to add more without having it predetermined.

15          THE COURT:  So here's a question for that, and that

16   is, I go back to the idea of just in plain English what's an

17   array?  It's not that common a word, but the way it comes up

18   commonly that I think is similar here is we talk about an array

19   of solar panels.  What we mean when we talk about an array in

20   that sense, I think, just means a collection of things that are

21   organized in some way together.

22          So if your array just means that you have a collection

23   of things, why isn't it so that you need to know where the

24   various things are in order to capture your images in the way

25   that's contemplated by the patents?

L2GHKEWO

1        MR. DiBERNARDO:  First, your Honor, in some claims

2   there is other language that adds context for the array, but as

3   we note from the *Phillips* case, and consistent with what the

4   *Microsoft* Court did, that other language in the claim is not

5   read into the term.  If it exists, it exists.

6        THE COURT:  Right.

7        MR. DiBERNARDO:  So one claim, for example, refers to

8   progressively different locations, but that is separate

9   language, not to be read into the definition of array.

10        THE COURT:  Right.  OK.  I'm sorry.  I understand that

11   is your answer, so you can go ahead.

12        MR. DiBERNARDO:  OK.  Just one more point, your Honor,

13   to emphasize.  Once the images are captured, then the relative

14   relationship between the images is known.  It's a question of

15   not having to have it predetermined or to have a precise

16   location.

17        THE COURT:  But here's a question.  Why do we care

18   about that question?  Because that doesn't seem to me, this

19   idea of predetermined, to be inherent in either your definition

20   or in Google's definition.  So why do we care?

21        MR. DiBERNARDO:  That really is in large part the

22   argument because it's "fixed in relation."  Because it raises

23   ambiguities like "fixed" confusing the jury.  Does it mean the

24   cameras are stationary?  Are the arrays stationary?

25        THE COURT:  It says "fixed in relation to each other,"

L2GHKEWO

1    and that doesn't seem -- and Judge Woods' opinion makes clear

2    that he is rejecting the idea that they are physically fixed in

3    some location, and I think the words that Google's suggesting

4    don't in this case suggest that they're fixed in one location,

5    just that the cameras are fixed in relation to each other and

6    also that, therefore, the images that come from those cameras

7    are fixed in relation to each other.

8              MR. DiBERNARDO:  The issue, your Honor, is highlighted

9    by Google's explicit attempt to read in this notion of

10   predetermined into those words.  That is certainly an issue

11   that we take.  Those words, "fixed in relation," do not require

12   predetermined relationship, yet --

13             THE COURT:  Right.  I mean, in theory I could adopt

14   their definition and reject the idea that it's predetermined.

15             MR. DiBERNARDO:  Yes.  I think there are perhaps

16   better phraseologies that wouldn't raise potential ambiguities

17   like known relationship and the fact that that known

18   relationship between the images occurs after the images are

19   captured, so that's not predetermined.

20             But, yes, as I said at the outset, Kewazinga's

21   proposed construction is not inconsistent; it's absolutely

22   consistent with *Microsoft's* rationale regarding "fixed in

23   relation."  The Court's rationale there was that once an array

24   is formed, the cameras are fixed in relation.  That moving a

25   camera would change the geometric relationship of cameras

L2GHKEWO

1   within that array and form a new array.  In other words --

2          THE COURT:  Let me just interrupt you.  I know that

3   that's what it says, and actually that doesn't make that much

4   sense to me, and maybe Google will want to address that.  But I

5   don't necessarily accept that conclusion.

6          MR. DiBERNARDO:  Perhaps we should take a look at that

7   language in more detail, if I may.  I do have slides on that,

8   your Honor.

9          THE COURT:  Sure.  I guess slides are great until you

10  start having a discussion, but anyway, go ahead.

11         MR. DiBERNARDO:  Actually --

12         THE COURT:  So I understand your position.  Your

13  position is Figure 11, you have these concentric circles.  You

14  call it an array and sub-arrays.  "Sub-arrays" isn't included

15  in the patent.  Judge Woods says anytime you are moving to

16  another circle, it's a different array.  I don't get hung up on

17  whether it's a different array or not.  Perhaps I should since

18  we're defining the term "array," but anyway, go ahead.

19         MR. DiBERNARDO:  So if I could start with Figure 11 to

20  make sure we're on the same page because Figure 11 and

21  Figure 12, that embodiment, provides the context.

22         THE COURT:  So this is not Figure 11?

23         MR. DiBERNARDO:  No, it's not.  Apologize, your Honor.

24         THE COURT:  There it is.

25         MR. DiBERNARDO:  Figure 11.  Figure 11, it refers back

L2GHKEWO

1    to Figure 1 which is in all the patents.  Let's just talk

2    quickly about the components.

3            Again, you have the array of cameras 10, the overall

4    array.  In Figure 1, that comprises multiple rail arrays, each

5    of which carries cameras 14.  In Figure 11 the nomenclature is

6    the same.  Array of cameras 10 is a collection of cylindrical

7    arrays -- again, it's a top-down view here -- a collection of

8    cylindrical arrays 12, 12-1, 12-2, 12-3, and so on, each of

9    which carries cameras.  Here, the array of cameras 10 does

10   include multiple other arrays, rail arrays in Figure 1 and the

11   cylinders 12 in Figure 11.  That's the reference to sub-arrays.

12   It's just a way of explaining it, certainly not a convoluted

13   theory the way Google characterizes it.  It's explicit in each

14   of these embodiments.

15           So Figure 11, what's shown here?  Figure 11 is a

16   time-lapse view.  These different cylinders we're seeing, they

17   don't all exist at the same point in time, and that's made

18   clear in the discussion in patents, including Figure 12.

19           How does it operate?  First, the first cylinder, 12-1,

20   is put into place, images are captured, and then that cylinder

21   is removed and the creator decides, does she want another

22   cylinder?  So 12-1, that cylinder is removed, 12-2 is put in

23   place, images are captured, and then 12-2 can be removed and a

24   new cylinder, 12-3, can be put into place.  These cylinders,

25   the collection, that's array 10.  Notably, by removing cylinder

L2GHKEWO

1   12-1 and cylinder 12-2 and putting in cylinder 12-3, putting in

2   cylinder 12-3 does not change the relationship between the

3   cameras and the output that had already been captured by the

4   earlier cylinders 12-1 and 12-2.  Cameras can move without

5   changing the relationship among the images.  So, again, it's

6   the collection of all of those cylinders, those sub-arrays,

7   12-1 through 12-n, that comprise the array of cameras 10.

8        So what do we know from this?  Cameras can be moved

9   into position to capture the images at different locations in

10  different times.  Cameras in the array don't need to be

11  physically connected.  Each of those cylinders are not

12  physically connected.  They are comprised -- the camera array

13  is comprised by multiple sub-arrays.  Not all of the cameras in

14  the array need to be positioned at the same time.  The

15  locations of cameras in the array do not need to be known prior

16  to capture.  Again, the creator is making that determination as

17  to whether or not to put new cylinders in place and capture

18  additional images at the time, after each cylinder is placed.

19  That's step 1250 in Figure 12 and described in the '325 patent,

20  on 19, line 58, I believe.

21       Again, there is no requirement that there be exact or

22  uniform distances.  Notably, again, the relationships between

23  the cameras in the earlier part of the array are not changed by

24  moving cameras to form the later part array, to capture the

25  images at the later part.

L2GHKEWO

1          The Figure 11 and 12 embodiment clearly show that an

2     array of cameras can be created over time by moving cameras.

3     And I will say Google misrepresents the patents in this regard.

4     They criticize --

5          THE COURT:  Misrepresents what?  I'm sorry.  I missed

6     a word.

7          MR. DiBERNARDO:  The patents, your Honor.

8          THE COURT:  OK.

9          MR. DiBERNARDO:  They criticize Dr. Lubin unfairly,

10    and they mischaracterize the Court's order, all to disparage

11    Figure 11.  Why?  Because Figure 11 is remarkably similar to

12    the accused products here.  In Google Street View, they have

13    multiple cameras mounted atop a car that captures images at

14    discrete locations along a street.  First location images are

15    captured and stored, a second location images are captured and

16    stored, and third location, and so on.  Those different

17    locations are sub-arrays, just as in Figure 11, and the

18    collection is an array of cameras formed over time.  Also, just

19    as in Figure 11, a user can navigate around a given ring and

20    those images can be processed, so too can a user navigate

21    around images at a given location in Street View --

22         THE COURT:  So could I ask a question?  So why is it

23    so important to you to characterize these as all part of the

24    same array?  Why does it matter whether we think of everything

25    in red as a single array or whether we view each circle as an

L2GHKEWO

1    array?

2              MR. DiBERNARDO:  To the extent some claims refer to

3    progressively different locations, these different locations

4    along the street are those progressively different locations

5    through the environment.  So that is one reason.

6              THE COURT:  OK.

7              MR. DiBERNARDO:  Again, this collection of images are

8    all that are provided to the user to be navigated.  And again,

9    users can not only navigate around a cylinder in Figure 11 and

10   around a ring at a given location in Street View, but users can

11   navigate from one ring in Figure 11 to another ring, and that

12   navigation can include processing to smooth the transition.

13   Just as in Google Street View, users can navigate from one

14   location to another and have processing to smooth that.  The

15   two are very, very similar.

16             So what's Google's explanation?  Actually, your Honor,

17   if I may, since you asked the question, I'm going to jump ahead

18   to the Court's discussion on this.

19             So what does it mean to move a camera and change the

20   geometric relationship?  That's what the Court was focused on.

21   The cameras in an array having fixed fields of view, that's

22   what's saved, stored, that's what's navigated.  If you move a

23   camera, for example here, camera X3, it creates a different

24   path.  It changes the geometric relationship between them, and

25   Judge Woods believed that created a new array.  That discussion

L2GHKEWO

1    does not go to whether array of cameras 10 in Figure 11

2    encompasses the multiple cylinders.  It is a very different

3    issue, and Google mischaracterizations that.  So let's look at

4    what the Court said.

5        The *Microsoft* Court says that the cameras are deployed

6    to create the necessary fields of view.  Those fields of view,

7    as we discussed, that's what's navigated.  The images are saved

8    and available for navigation.  It's not about moving cameras to

9    navigate, it's about navigating those stored images.

10   Accordingly, a POSITA would understand that cameras that did

11   not have fixed fields of view relative to the other cameras in

12   the array would be contrary to the teachings.  Again,

13   navigation, your Honor, is not is changing view of camera, like

14   remote control; it's not providing a user remote control of a

15   moving camera.  That's what Judge Woods was referring to here.

16   Cameras within an array have the fixed field of view.  Those

17   are the paths that can be navigated.

18       However, moving cameras -- we'll continue.  Moving

19   cameras within an existing array, and that's the key part,

20   within an existing array like the prior figure, that would

21   change the geometric relationship between cameras in that

22   array, resulting in a new array.  That does not go to the

23   question of whether you can move cameras to form the array.

24   That's clearly supported by Figure 11.  That is not what Judge

25   Woods is talking about here.  And again, in Figure 11 cameras

L2GHKEWO

are moving to create the array, and once the images are
created, the relationship between them is absolutely fixed.
There is a known relative relationship between those images.
Again, creating the navigation path and creating the array is
different from changing the navigation.  That's what Judge
Woods was getting at.

Another section of Judge Woods' decision, and here
he's talking about each array, each cylinder, 12-1, 12-2.
Microsoft is not addressing whether the array of cameras 10 in
Figure 11 can be created over time.  He's looking at individual
cylinder arrays.  Notably, the text highlighted in blue, your
Honor, was admitted by Google in their brief.  They quote the
yellow section but not the blue, and the blue section really
highlights what the Court was getting at.  The issue that the
Court was getting at here was whether, even if the same cameras
were reused from array 12-1 to 12-2, would that be a different
array?  That's what the Court was getting at.  That provides
the context.  And the Court said, well, the geometric
relationship between the cameras in 12-1 and camera 12-2 are
different, so a POSITA would understand them to be different
arrays even if the same cameras were repurchased.  That does
not go to whether or not the collection of cylinder arrays in
Figure 11 comprised the overall array of cameras 10.  If you
look at the footnote that Google omitted in their quotation,
the judge acknowledges this.  The one statement in this

L2GHKEWO

1    section that really goes to Figure 11:  A POSITA would not

2    understand that an array of cameras must comprise a single

3    structure.  Absolutely not, it can comprise multiple

4    structures.  Array of cameras 10 can comprise cylinder arrays

5    12-1 through 12-n.

6          One other point of mischaracterization here.  Again,

7    Google misrepresents the language in the asserted patents

8    regarding moving vehicles.  Google says the patents criticize

9    creating an array over time.  Absolutely not.  The patents

10   criticized giving users remote control over moving vehicles,

11   not creating an array over time, and the PTAB in rejecting a

12   challenge, Microsoft's IPR to the patent, absolutely agreed.

13   The 2006 application, which includes the language quoted here

14   from the '325 patent, criticized moving cameras for requiring

15   viewer control of the camera system's movement for navigation,

16   remote control, that's what was criticized.  There was not a

17   broad exclusion of moving cameras, certainly not creating

18   cameras over time.  Again, we know from the law that

19   construction that reads out an embodiment is rarely, if ever,

20   correct.  The criticism was much more limited, your Honor.

21          With that, your Honor, I think I will reserve time for

22   rebuttal on the array issue.

23          THE COURT:  OK.

24          MR. MODI:  Thank you, your Honor.  First of all, let

25   me thank you, your Honor, for setting the hearing at 10:30.  I

L2GHKEWO

1    am one of those folks that are out in California, so I

2    appreciate the extra half-hour.  So thank you.

3         Your Honor, here's the fundamental dispute.  I'll just

4    tee it up, and then I do have a slide presentation as well that

5    will walk through this.  There is not a single description in

6    these patents about creating an array over time with moving

7    cameras.  That's an additional concept that Kewazinga is trying

8    to get with its construction.  It's not within the ordinary

9    meaning of array.  And as we'll see from the evidence, an

10   array -- what they were really going for is a set of cameras

11   that are situated in an environment, in a precise arrangement,

12   and then which are used to capture images and that can be

13   navigated through.  Figure 11 does not describe a single array

14   that is created over time.  That's what Judge Woods found and

15   that's what the text of the patents say.

16        So I'll go through that in great detail because every

17   one of the arguments that Kewazinga's counsel just raised, they

18   made the exact same arguments to Judge Woods, and I'll walk

19   through every single instance of that.  But that's the bottom

20   line, there is no disclosure, and the claims don't contemplate

21   or cover this concept of an array that is created over time by

22   moving cameras.

23        With that --

24        THE COURT:  So can I just ask this question:  So what

25   you're saying, then, is that the dispute in the construction is

L2GHKEWO

1   whether the array can be created over time, and therefore in

2   construing the term, that disputed meaning has to be addressed?

3   Is that why we're talking about this?  Because it's not --

4   you're right in the sense that there's nothing in the patents

5   that really talk about that.  On the other hand, there's

6   nothing in the patents that necessarily precludes it, I think.

7   But why do we have to resolve that now?  Is that the point of

8   claim construction, because that's the issue you're disputing?

9              MR. MODI:  That is part of it, yes, your Honor.

10             THE COURT:  OK.

11             MR. MODI:  To resolve this notion that Kewazinga

12  argues that it is being consistent with the Microsoft Court's

13  construction.  Well, if it was being consistent with the

14  *Microsoft* Court's construction, of course, it would propose the

15  *Microsoft* Court's construction.  It has completely changed the

16  words of the *Microsoft* Court's construction and, as we'll see,

17  in a way that's meant to capture exactly the concepts and the

18  argument that the *Microsoft* Court rejected.

19             So, Mr. Skrzypek, can we go to slide 2, please.

20             As your Honor is aware, there are two claim terms at

21  issue here, and just on the second slide, for the Court's

22  reference later on, we've indicated which slides are for which

23  terms.

24             Next slide, please.

25             Your Honor touched a little bit on this in some of the

L2GHKEWO

questioning.  There is a little bit of a tension in the federal

circuit case law on what we're supposed to do with claim

construction.  The plaintiffs' counsel recited some cases about

how there's got to be a clear disavowal.  That was the *Thorner*

case in 2012.  The federal circuit's been doing claim

construction for I think almost 25 or 30 years, so you can find

cases that say pretty much anything.  But I think the common

thread between them, the thrust of them, is we look at claim

construction with an eye towards what the patentees actually

invented, and to do that you look at not just the plain

language you look at the specifications, you look at the

disclosure as a whole.  Were that not the case, of course, we

could go to a dictionary on disputed terms and resolve the

dispute there, but that's not how it works.  And in fact, there

are a couple of cases that really hammer this home, cases that

actually were decided after the *Thorner* case that plaintiff

counsel relies on.  The first of which is the *UltimatePointer*

case which we've cited on slide 3.  When a patentee goes out of

its way to actually denigrate or speak negatively of prior art

technologies, that's a pretty strong indication that they were

not intending to capture those criticized technologies within

the scope of the array claims, and we see this with array and

specifically this "moving over time" argument.

The second was cited in our papers.  It's the *Eon*

case, 815 F.3d 1314.  And really there -- again, this is a 2016

L2GHKEWO

case, so it's after the *Thorner* case, and what the federal
circuit said in *Eon* is a party's not entitled to claim
construction divorced from the written description in the
prosecution history.  The only meaning that matters in claim
construction is the meaning in the context of the patent.  And
it actually reversed an order where the patentee was trying to
get a definition of a term that maybe in the abstract made
sense but in light of the specification made no sense at all.

So this comes up in a number of the arguments, but to
your Honor's point, there is some tension.  It is a balancing
act, but we've got to look at what the inventors were actually
trying to invent.

So if we go, Mr. Skrzypek, to slide 7, please.

Just as some additional background, Kewazinga in its
patents, before it actually starts to describe the invention,
talks about what was in the prior art, and they do so by --
Mr. DiBernardo -- sorry, actually, Mr. Skrzypek, can we go back
to slide 6, please.

What these patentees were trying to invent was a
telepresence system for music concerts, museums, you know, this
ability to simulate a viewer's actual presence in a venue,
preferably in real time.  So, actually, a preferred version of
this invention, a preferred embodiment, is actually having
these cameras situated around, say, Madison Square Garden and
viewing a concert, for example, in real time.  That's important

L2GHKEWO

1   because one of these concepts that we see Kewazinga trying to

2   bring in is this idea that an array can be formed over time.

3   Well, an array that's formed over time requires moving a camera

4   from here to here to here and necessarily cannot convey or

5   allow somebody to navigate a venue in real time, right?  The

6   camera as it moves time has passed.  The event is no longer the

7   same event it was.

8           THE COURT:  I thought, though, that the real time was

9   something that was preferred and not essential and that Figure

10   11 does contemplate moving cameras, although it calls each

11   concentric circle an array and not a sub-array.

12           MR. MODI:  Yeah, that's right, your Honor.  I'm not

13   suggesting that this invention only covers live events.  I'm

14   laying the context for what the inventors were trying to solve

15   and what did they have in their heads.  Google, of course,

16   disputes that Figure 11 depicts this notion of creating a

17   single array over time, and we'll go into that.  That's partly

18   because the patent itself talks about Figure 11 as describing

19   multiple arrays, and it's the intrinsic evidence that is the

20   most persuasive.  But to your Honor's question, I'm simply

21   setting the context for what the preferred embodiment of this

22   invention is.

23           Let's go to slide 9, please -- excuse me, slide 10,

24   Mr. Skrzypek.

25           So after the patentees go through what the prior art

L2GHKEWO

1    is and what some of the downsides are -- I've got actually in

2    some of the prior slides this notion that there are downsides

3    to these systems with moving cameras or systems with 360

4    cameras -- what these inventors was going for was something

5    better, something improved.  And the solution was to situate an

6    array of cameras, each of which has an associated view of the

7    environment, and in certain embodiments they're on rails.

8    They're locked in fixed relation to each other.  So they're

9    situated around, again, for example, a ring, a bowl around

10   Madison Square Garden, Section 200, and from each angle you get

11   a slightly different perspective of the Knicks game or the

12   concert.  And using that, using the images that are captured

13   from each of those cameras, a user can navigate through those

14   different angles.  It simulates actual in-environment transit

15   as the patents say.

16           And, again, next slide, please.

17           What the patents tell us is that that is different

18   from having to move a camera around.  We're going to use a

19   multiplicity of positioned cameras around the environment and

20   set the stage for the image capture.  In fact, array 10 -- and

21   this is on the bottom of slide 11 -- it has several advantages.

22   Because it uses this series of cameras, no individual camera or

23   the entire array needs to be moved.  It's already there.  It is

24   strategically placed in the environment.  It's something that

25   exists.

L2GHKEWO

1          With that, your Honor, I'll go specifically to the

2     array of cameras.

3          Mr. Skrzypek, let's go to slide 15 and 16, please.

4          And on slide 15 we have the -- how the claim terms

5     were cited.  Array of cameras appears in the '226 patent and

6     the '325 patent.  The '226 -- this will come up a little later,

7     but the '226 was actually the first in these series of patents.

8     The application for it was filed in April of 1999, I believe,

9     and every claim in that patent has this array of cameras.

10    The '325 came six months later.  The application was filed half

11    a year later, and it was there the first time where this Figure

12    11 embodiment was actually included.  So array of cameras is a

13    concept that the patentees had in their minds and actually

14    claimed in every claim of the '226 patent without reference to

15    Figure 11 at all.  This Figure 11 embodiment doesn't even exist

16    in the '226 patent.

17         Next slide, please.

18         Google's proposed construction is the same as the

19    *Microsoft* Court's construction, a set of multiple cameras each

20    fixed in relation to each other.  Kewazinga's construction,

21    while they purport to argue that it is consistent with the

22    *Microsoft* Court's construction is actually quite different from

23    it in the words, as is clear just from the words themselves.

24    But if we look at the next slide, it's worse than that.  It's

25    actually a rehash of the exact construction that Kewazinga

L2GHKEWO

proposed in the *Microsoft* case.

THE COURT:  Just to go back to a question that I asked before, if you look simply at the words of your proposed construction and Judge Woods' construction, it doesn't seem necessarily inconsistent with Kewazinga's proposed construction.

MR. MODI:  I think that's why it's important to understand why Kewazinga is proposing that construction and how it compares to the exact arguments that they made to the *Microsoft* Court because perhaps in the abstract maybe there is no inconsistency, but I think what becomes very clear -- and I'm about to go through this -- is each of these concepts, what they're trying to build into the claim term, are concepts that Judge Woods specifically rejected in coming up with the construction for this term.

So just looking at what Kewazinga proposed in the *Microsoft* case, movable cameras and re-using a camera in multiple locations, that's how -- that is a concept that Kewazinga argued in the *Microsoft* case could be included within an array.  Now, in this case they argue, well, what if we move cameras over time?  We made this point in the papers.  Having a camera and then moving it to reuse it at a slightly different location is the same thing as what they're trying to argue now. What they're saying, the movement from point A to point B, if you look at it as a whole, is creating the array.  It's the

L2GHKEWO

1    same concept.  They're using slightly different words, but it's

2    the exact same concept that they're trying recapture, concepts

3    that Judge Woods rejected in the *Microsoft* case.

4            So what I'd like to do first is go through why Judge

5    Woods got it right, why this construction makes sense.

6            If we could go to slide 18, please, Mr. Skrzypek.

7            There's, I guess, two clauses to the *Microsoft* Court

8    construction.  The first is a set of multiple cameras, and I'll

9    focus on that first, and then I'll talk about "each fixed in

10   relation to each other."  I don't think there's actually much

11   of a dispute as to the first clause, "a set of multiple

12   cameras."

13           Next slide and the next slide after that.

14           When you think about, your Honor brought up this, what

15   is just sort of the ordinary meaning of array, an array is a

16   multiple of something.  It's a grouping, and that's actually

17   from the dictionary definition, a dictionary that Kewazinga

18   cited in its papers.  It's a collection or a grouping of

19   something in some sort of organized way.  And, I mean, if you

20   just think about it, your Honor, I'm holding up a pen.  If I've

21   got a pen on the left side of my screen -- I suppose this might

22   be right to left -- and then I move it five inches and then I

23   move it five more inches, nobody could call that an array of

24   pens.  I've got one pen, right?  So I don't actually think

25   there's any dispute that an array of cameras has to be a set of

L2GHKEWO

1    multiple cameras.

2              Next slide, please.

3              In fact, this is actually perfectly consistent with

4    the claim language which talks about the array including a

5    series of cameras.

6              Next slide, please.

7              This is a point that Judge Woods made in his order.

8    The specification is fully consistent with that.  Every single

9    embodiment of the array of cameras that's disclosed in these

10   patents has an array with a set of multiple cameras.  We're not

11   talking about one camera that goes from point A to point B to

12   point C and thinking of that as the array.  It's a thing.  It's

13   a structure that includes multiple cameras at a given point in

14   time, right?  So that's --

15             THE COURT:  So it seemed to me that what Kewazinga is

16   saying -- and maybe I have it wrong -- but it seemed to me that

17   what they were talking about was a grouping of images, but the

18   patent talks about a grouping or an array of cameras.  So even

19   though what they're saying about images may be true, it's not

20   fully consistent with the patent because we're talking about

21   multiple cameras.

22             But then the next thing I wondered about is it seems

23   to me they concede we're talking about multiple cameras.  So

24   what if you have two cameras and you just keep using the same

25   two but you move them?  For example, in 2e if you're using --

L2GHKEWO

```
 1    you have two cameras, and so you take your image with the first
 2    one and then the second one and then you move the first one to
 3    the third position and then you move the second one to the
 4    fourth position, why isn't that an array of cameras?
 5              MR. MODI:  I think this actually goes to the next part
 6    of the construction, which is "fixed in relation to each
 7    other."  The short answer is, your Honor, one of the things
 8    that Kewazinga's trying to do here is obviate the need for any
 9    sort of order or arrangement in the cameras, which is of course
10    what is required by an array as we just saw in the dictionary
11    definition.  It's some kind of regular order or arrangement.
12    What they are going to argue, in fact what they're arguing now,
13    is it doesn't matter what the relationship is between the
14    cameras is when you're thinking about the array as long as you
15    can determine that relationship after the fact.  So it
16    doesn't -- and if you just sort of take that argument to its
17    logical conclusion, any two cameras have some physical
18    relationship between them that you can determine after the
19    fact.  I mean, you can always measure the distance of two
20    cameras where they take an image after they've already taken
21    the image.  Abstracting it out even further, two cameras exist
22    on the planet earth, and therefore you can determine *post hoc*,
23    after the fact, the relationship between them.  That's not at
24    all what these patents are about, and that's certainly not what
25    is claimed here.
```

L2GHKEWO

1          What's claimed here is not the idea of a collection of

2     cameras that -- for which you can determine the relationship

3     beforehand.  What's important here and that's claimed here is

4     an arrangement of cameras that is organized and situated in a

5     particular way at a given time where you know the relationship

6     between one another predetermined and then from there you

7     capture the images and navigate to them, and --

8          THE COURT:  Where does it say that?

9          MR. MODI:  I'll go right to that, your Honor.  Let's

10    see.  Let me actually -- if I may, your Honor, actually, the

11    inventor said it is the first thing, and I'll show where the

12    patent says it and I'll show where the *Microsoft* Court has made

13    the same determination.

14         I do want to -- maybe, Mr. Skrzypek, you can go to

15    slide 24, please.

16         So the argument here is Kewazinga's argument is that

17    its construction is perfectly consistent.  We just didn't have

18    an opportunity to explain alleged ambiguities in "fixed in

19    relation to each other."

20         Next slide, please.

21         In fact, Mr. DiBernardo, who argued claim construction

22    in the *Microsoft* case, made the assertion whether the cameras

23    are fixed is immaterial to the invention and not required by

24    the phrase "array of cameras."  So this idea of whether cameras

25    need to have a relationship to one another in the array with

L2GHKEWO

respect to one another was directly in front of the Court, in

front of the *Microsoft* Court.  And this gets to your Honor's

question right here.

           Next slide.

           At the claim construction hearing in attendance was

David Worley.  David Worley is one of the inventors of the

patents-in-suit, and Mr. Worley actually stood up and

confirmed, he said the array itself does not have to be fixed;

the array can be moving.  And that's consistent with the

descriptions in the patents about how an array can be on a

frame with wheels and you can move the frame in place.  But

what Mr. Worley confirmed in court was that what has to be

fixed are the cameras in relation to each other.  So here we

have the inventors of these patents telling us that what you've

got to know, what you've got to at least --

           THE COURT:  That's not really intrinsic evidence,

right?  I mean, that's -- I understand he's the inventor, but

to the extent it doesn't say that in the patent, I'm not sure

what weight to put on that.

           MR. MODI:  I think it's compelling evidence.  It is

not intrinsic evidence, that is true, your Honor, other than it

is the testimony or at least the words in open court of an

inventor of the patent-in-suit who presumably knows what the

invention is about.

           Let me then turn to slide 34, Mr. Skrzypek.

L2GHKEWO

1          To your Honor's question about where does it say this

2     in the patent, there are a couple of places.  The '226 patent

3     at column 4, lines 12 to 18 makes clear that what the system is

4     doing is positioning cameras in place before image capture.

5     Same thing with column 6, lines 26 through 32.  The array

6     doesn't need to move or cameras don't need to move in order to

7     form the array.  The array is a set of cameras which are

8     strategically placed through the environment.  I think this is

9     where Judge Woods, he heard the arguments of both parties, he

10    heard expert testimony from both sides, and his conclusion,

11    which we believe is correct -- if we go to slide 32,

12    Mr. Skrzypek -- if you look at every single embodiment of these

13    patents, every single one of the figures, what Judge Woods

14    concluded correctly is that all the multiple of configurations

15    contemplated in the patents, however, the cameras in each array

16    are always fixed in geometric relation to each other.  Why is

17    that?  The fixed geometric relationship between the cameras

18    within an array is crucial to permitting users to navigate the

19    environment captured by that array.  Indeed, as the

20    specification describes and as Judge Woods explained in his

21    order, the cameras are carefully deployed to create the

22    necessary fields of view.  You can't carefully deploy cameras

23    in an environment if you don't even know the relationship

24    between them in advance, right?  That's the -- sort of doing it

25    ad hoc is the opposite of that.  So the conclusion was,

L2GHKEWO

1    correctly, a POSITA would understand that cameras that did not

2    have fixed fields of view relative to the other cameras in the

3    array would be contrary to the teachings of the '325 and '226

4    patents.

5            THE COURT:  So I alluded to this before.  The thing

6    that gives me pause here is the case law that says that you

7    shouldn't use embodiments to create limitations that aren't

8    otherwise in the patent, and even if there's only one

9    embodiment, to me that suggests even though every single

10   embodiment has fixed cameras, that that doesn't necessarily

11   mean it has to be that way.  So are there cases in the federal

12   circuit, for example, where the court said:  Oh, yes, it has to

13   mean that because every single embodiment in the patent shows

14   that?

15           MR. MODI:  There are cases like that, your Honor.  I

16   believe we've cited them in the papers.  I think the *Eon* case

17   that I mentioned earlier is one of those.  I don't have others

18   directly on hand.  I am certainly -- I believe I can find one

19   in the context of this hearing, but there are absolutely cases

20   that say if you describe your invention consistently with

21   respect to certain features, including an array embodiment, it

22   is proper, indeed, the right approach, to construe the claims

23   that way.  Because, again, we don't construe the claims in a

24   vacuum, right?  The idea here is to capture what the actual

25   invention was.  So if every single embodiment, like in this

L2GHKEWO

case, if every single embodiment that is described has cameras that are fixed in relation to one another in order to permit the navigation that Kewazinga says is the crux of this invention, then, yes, absolutely it is proper to have that be part of the construction.

There's one other point I want to make on this, and it goes to this idea of whether the relationship has to be predetermined. I think, as I was saying before, if that's not the case, if any relationship can be determined after the fact between cameras, then the phrase loses all meaning, right? The order of arrangement doesn't -- you can always sort of find a relationship after the fact between cameras. You've now lost the thrust and the meaning and, frankly, deviated from the ordinary meaning of what it means to be an array. You've got to have a comparison point. There's got to be a regular order arrangement. In fact, I think it was in one of the slides that Mr. DiBernardo showed. I think it was slide 43. It had this notion of if you had a car, I think in the example, go from point A to point B to point C, that's, in their contention, one array. And then on the bottom of the slide, point A, point B, but then the car swerves, and they argue that's not an array for the purposes of this hearing. I think what we're going to see is they're going to argue that, OK, the car turned, but you still know the distances between B and C, so that's also an array. You haven't changed any geometric relationship between

L2GHKEWO

1    the cameras.  You can make that argument for any collection of

2    cameras.

3           Does that make sense, your Honor?  It can't be

4    something that's sort of after the fact.  The whole point of

5    this patent was to come up with an arrangement of cameras

6    before the fact that could effectively allow a user to navigate

7    the environment.

8           THE COURT:  Well, except that it talks -- I don't have

9    the exact words in front of me, but it's something about like

10   "along a line of travel" when they're talking about independent

11   users, and user one can go along this line of travel.  So as

12   long as you're sticking to this path or this line of travel in

13   the environment and you're capturing images along the way,

14   along that path, why do you need to know in advance whether

15   your second image in your second camera is two feet or

16   three feet?

17          MR. MODI:  Well, again, because if the entire point of

18   this invention, as the patents themselves say and as

19   Mr. DiBernardo articulated this morning, is to allow

20   navigation, in fact, seamless navigation in the environment,

21   it's not enough to just after the fact say, well, gosh, these

22   two images are a mile away from each other, as an example,

23   right?  To actually do what the patents are trying to get at

24   here, there's got to be some determination before the fact of

25   what the order of the cameras is going to be.  That's inherent

L2GHKEWO

1   in an array.

2          THE COURT:  OK.

3          MR. MODI:  I do want to -- let me talk a little bit

4   about Figure 11.  I know this is a point of contention in the

5   papers.

6          Mr. Skrzypek, can we go to slide 37, please.

7          Your Honor, there is -- as I said at the outset, there

8   is not a single description or embodiment anywhere in these

9   patents about a single array that is created over time.  It is

10  not what Figure 11 says.  And on slide 37, I have indicated

11  what Google's evidence is on this figure and what Kewazinga's

12  evidence is.  Google's evidence is, in addition to the

13  *Microsoft* Court finding this exact point, the intrinsic

14  evidence.  It's the words of the patents and the claims

15  themselves.  Kewazinga's is almost exclusively based on

16  Dr. Lubin's testimony.  As your Honor pointed out, the whole

17  interpretation of that figure relies on this sub-array point

18  which simply doesn't exist in the patents.  And then I will

19  come back to what Kewazinga has now argued, which is there's

20  this little arrow 10 in the corner that should be the whole

21  basis on which the Court finds that this depicts a single

22  array.

23         So with respect to what the *Microsoft* Court found --

24  next slide, please -- again, I want to emphasize this exact

25  argument was raised by Kewazinga to Judge Woods.  The Court

L2GHKEWO

1    actually asked in the *Microsoft* case:  "Can I ask, is there any

2    one example of moving cameras within an array as opposed to

3    moving an array?"  And the response was:  Sure, Figure 11.  And

4    the description is the same one we've heard today.  How does

5    that happen?  By moving cameras.  The ring is in the center

6    first, images are stored, then it's moved away, then it's moved

7    away.  I actually think it might have been the same slide that

8    we saw this morning.

9              THE COURT:  And I thought I saw somewhere around the

10   description of Figure 11 they talk about moving one of the

11   arrays away so that it doesn't impede the view of another

12   array.

13             MR. MODI:  That's exactly right, your Honor.  You have

14   an array, a cylinder array that you place at a certain distance

15   from the object.  That array has cameras on it at fixed points.

16   You capture the images; you take it away.  You bring in a new,

17   different array, not a sub-array, a different array, 12-1 or

18   12-2.  That one has cameras around it, and you then take the

19   pictures from that separate array and then you remove it, and

20   you can do that a couple of times.  But now what you've got is

21   a plurality of removable arrays and you can navigate between

22   the different arrays.  What the patent does not say is this is

23   all one array.  The patent --

24             THE COURT:  What about that little 10 in the corner?

25             MR. MODI:  OK.  Let's talk about that 10.

L2GHKEWO

1          Mr. Skrzypek, can we go to slide 52, please.

2          So the entirety of the argument is a description of

3   Figure 11 which calls back to Figure 1 and this little initial

4   10.  By the way, actually, I believe all the embodiments do

5   that.  So this isn't like something that they were just making

6   sure to try to reference it.  I believe that's actually just

7   sort of boilerplate language that is included in most if not at

8   all.

9          What does Figure 1 say?  What does the spec say about

10  Figure 1 and what does it say about 10?  What it actually says

11  is the array 10 employs a series of cameras, and so as a

12  result, the entire array does not need to be moved.  So this is

13  talking about the opposite of moving an array; it's talking

14  about not moving an array.  And I think what that shows is, as

15  Google argues, what 11 is showing is you've got, let's say, an

16  inner array that is situated in the environment, takes images,

17  comes out, right?  Doesn't move out and expand or anything like

18  that.  It comes out; you bring in a new array.  And it's these

19  plurality of removable arrays that constitutes this embodiment

20  of multiple arrays.  In other words, these aren't creating an

21  array over time.  These are multiple arrays that are being used

22  one after the other.  Again, that's just clear from the text of

23  how Figure 11 is described in the patents.

24          Mr. Skrzypek, if we could go to slide 42, please.

25          I mean, this is the clearest example, I think, of them

L2GHKEWO

1   all.  Figure 11 shows up in the portion of the specification

2   called "Multiple Arrays."  It would have been very easy -- this

3   is -- I actually think Mr. DiBernardo was the drafting attorney

4   on this patent.  I mean, if they wanted to, they certainly

5   could have written the words along the lines of "Figure 11

6   describes a single array that is created over time."  That's

7   not what the patent says at all.  The patent says it's multiple

8   arrays.  As will be understood by those skilled in the art, the

9   arrays, plural, described with reference to Figure 11 may be

10  used with any server or storage, etc.  These are multiple

11  different arrays, not a single array that is created over time.

12  There isn't a single example of that anywhere in these patents.

13          With that, your Honor, I will reserve any -- I'll

14  reserve some time for any points that Kewazinga has in

15  rebuttal.

16          THE COURT:  OK.  Mr. DiBernardo, are we going to talk

17  about mosaicing, or are you going to do a rebuttal at this

18  point?

19          MR. DiBERNARDO:  I will do a rebuttal on the array

20  point, your Honor.

21          THE COURT:  OK.

22          MR. DiBERNARDO:  OK.  Let me start with the import of

23  that 10.  The term at issue is "array of cameras," and array of

24  cameras is identified by 10.  It's identified that way

25  throughout for consistency.  And array of cameras 10, putting

L2GHKEWO

aside the use of the term "sub-array," it's clear from both

Figure 1 and Figure 11 that the array of cameras, the term at

issue, comprises multiple other arrays.  In Figure 1, array of

cameras 10 comprises multiple rail arrays.  In Figure 11, array

of cameras 10 comprises multiple rings, cylinders, 12-1 through

12-n.

        For Google to say that there's absolutely no

disclosure of a single array created over time completely

mischaracterizes the teaching of Figure 11.  The array 10 of

11, the collection of all of those cylinders, is created over

time with one cylinder being put in place and removed and the

next one being put in place and removed, and so on.  That is

absolutely not the case that there is no disclosure of an array

created over time.  Figure 11 is absolutely that.

        Notably, that important Figure 11 and the label 10,

well, in the brief Google doesn't dispute the explanation of

how Figure 11 operates, and they seem to agree now that rings,

cylinders, are put into place and removed, images are captured,

and that all, the whole collection of imagery, is available to

be navigated.  That whole collection of imagery from the

multiple cylinder arrays, that's array of cameras 10.  Of

course, they don't provide any explanations for that label 10.

        If I could jump ahead, they also -- apologies for the

scrolling, your Honor.

        THE COURT:  That's all right.

L2GHKEWO

1          MR. DiBERNARDO:  Google says that we haven't --

2     basically, they say we said there doesn't have to be any

3     relationship among the images or the cameras.  That's not the

4     case.  The patents describe navigation based on a known

5     relationship and a relative relationship.  For example, in an

6     array as shown, knowing that camera X1 is to the right of X0

7     and X2 is to the right of X1, X3 to the right of X2, and being

8     able to navigate based on user inputs from one camera image to

9     another image to another, the fixed in relationship goes to

10    that type of navigation.  Again, that's also supported by

11    Figure 5 in all of the patents which show a user navigates

12    based on relative position.  If the user wants to move to the

13    right, they don't need to know the precise location of the

14    camera, of the output.  They simply indicate in terms of the

15    input.

16          This is the relationship that the *Microsoft* Court was

17    focused on in "fixed in relation."  It was these known

18    relationships between the cameras.  The fixed geometric

19    relationship is what created the path through which the array

20    of cameras can be defined.  And, again, in the embodiment of

21    Figure 11 with -- once all of the images are captured from

22    those moving arrays, the relationship of the images within the

23    array, the collection of all of the captured imagery, all of

24    the cylinders, the relationship does not change.  Navigation

25    happens as described, by sequencing through the captured

L2GHKEWO

images.  Again, we have not said there doesn't have to be any
relationship in the context of the patents.  It just doesn't
have to be predefined.  And as pointed out earlier, some of the
claims do include other language.  It's not part of the array
limitation, it's other language in the claim, for example, that
recite progressively different perspectives of the environment.
Cameras, the images, can have relative relationship among them,
and that permits navigation as described in the patents,
including at Figure 5.

        One other point, your Honor.  I went through the
specific language in the *Microsoft* Court's opinion explaining
why this issue was not being addressed by Judge Woods.
There -- and perhaps take a step back.  There, Microsoft's
proposed construction was a set of multiple cameras each fixed
to capture images at a different location to provide a view
through the environment, and it goes on.  But the important
point is there the issue was not does there need to be a known
relationship between cameras?  There, Microsoft is arguing each
had to be fixed to capture images at a different location.  In
other words, each camera had to be stationary, and so the
quotes that Google has showed you regarding the fixed issue is
a different issue.  The issue was do the cameras have to be
stationary?  Judge Woods, as I went through, did not address
the issue of whether or not the array of cameras 10 in Figure
11 was the collection of all the imagery collected by the

L2GHKEWO

1    multiple cylindrical arrays.  That absolutely was not before

2    him.  He did not address that in the rationale that we went

3    through earlier, your Honor.

4         I guess just one other point since it was raised.

5    They made a point that Figure 11 was not in the '226.  The '226

6    patent and the '325 patent are related.  They are in the same

7    family.  The '325 claims priority to the '226 patent.  The case

8    that Google cites, the *Goldenberg* case, is completely

9    different, and in fact emphatic makes the point that Kewazinga

10   makes.  When two patents like the '226 and '325 are formally

11   related, are in the same family, you can use one to interpret

12   terms in the patents.  That's the *Contech* case that we cite.

13   The later continuation in part, which is the case we have here

14   for the '325, was used to construe terms in the earlier parent

15   application.  In fact, the *Goldenberg* case that Google cites

16   emphatically makes the point that we made.  It says the law

17   makes distinct line between patents that have a familial

18   relationship where you can use continuations in later patents,

19   such as the '226 and '325 Kewazinga patents, and those that do

20   not.  That's exactly the point.

21        Furthermore, in the *Goldenberg* case, the patentees

22   argued that the two patents at issue, unrelated patents, cover

23   different inventions.  Here, that's not the case.  The '325

24   patent is based on and incorporates by reference the '226

25   patent, and the Figure 11 discussion is based on Figure 1.  It

L2GHKEWO

1    carries forward this notion that the array of cameras 10 can

2    comprise multiple smaller arrays and builds on the discussion

3    in the '226 patent that cameras can be secured to movable

4    frames and cameras can indeed move.

5              With that, your Honor, I'll reserve my time for the

6    next issue, unless you have any questions.

7              THE COURT:  I don't at this point.  Thank you.

8              MR. MODI:  Your Honor, may I respond briefly?

9              THE COURT:  Yes.  Yes, of course.

10             MR. MODI:  Thank you.

11             Just a couple of points based on the points that

12   Kewazinga's counsel raised.  From the papers and now in this

13   argument, it is clear that Kewazinga recognizes that, at a

14   minimum, for the array of cameras limitation, there must be

15   some known relationship between the cameras.  What Kewazinga is

16   arguing, though, is that that relationship can be determined

17   after image capture.  And that is the point that, if you just

18   think about it, makes no sense; in fact, completely eliminates

19   any requirement from this claim whatsoever.  You can always

20   determine a relationship between any two things after the fact,

21   right?  It's before the fact that is critical here.  So it is

22   not a concession at all -- I mean, it is not an argument at all

23   to say:  Yeah, there can be a known relationship, but, you

24   know, it doesn't have to be.  It can be after the fact.  That's

25   not imposing any limitation on the claim term whatsoever.

L2GHKEWO

1      That's not what the patents contemplate.

2              Secondly, with respect to this idea that whether the

3      collection of cameras in Figure 11 constitutes a single array,

4      the argument was that that specific issue was not raised before

5      Judge Woods.  I just want to make this very clear.  It was

6      absolutely, positively raised and rejected.

7              Mr. Skrzypek, if we can pull up slide 39, please.

8              The Court in *Microsoft* asks the direct question:  "In

9      each of the cylinders described here, as identified with a

10     separate designator, 12-1 through 12-n, does that say anything

11     about whether or not each of these rings constitutes a separate

12     array of cameras as opposed to the collection constituting an

13     array of cameras?"  And the response was:  "The collection

14     12" -- I think 10 was intended there -- "the collection can

15     mean the array."

16             It's the exact same argument, and so the only twist

17     that I've heard today is reference to the collection of images

18     being the array, the single array.  But as your Honor noted,

19     we're talking about a collection of cameras.  We're not talking

20     about images.  So this precise argument was raised, including

21     with respect to the little numeral.  And if we look at

22     slide 41, I know your Honor is already familiar with Judge

23     Woods' opinion, but the *Microsoft* Court specifically rejected

24     this argument.

25             Unless your Honor has any questions, I'll reserve

L2GHKEWO

1    further time for the next term.

2              THE COURT:  Thank you.  Shall we move to the second

3    issue?

4              MR. DiBERNARDO:  Thank you, your Honor.

5              Just one point on that.  Counsel quoted from the oral

6    argument that one question out of context regarding the

7    collection, and of course that did not, as we saw, did not make

8    it into the *Microsoft* opinion.  It was not addressed by the

9    Court, certainly not discussed in the opinion and the language

10   that we saw in the opinion.

11             With that, I will go to the term "mosaic."  One moment

12   while I scroll ahead.  Thank you, your Honor.  OK.

13             THE COURT:  Can I ask a question about mosaicing.  It

14   looked to me, just by looking at the two constructions, like

15   there were perhaps two issues:  One was the issue of

16   seamlessness, and the other issue was whether the camera has to

17   be the only source of the images that are being fitted

18   together.  But I wasn't entirely clear that those were the two

19   issues and that there were just two.

20             MR. DiBERNARDO:  I think that's fair, your Honor, and

21   this slide highlights the issues.  Essentially, the base of

22   each of the proposed constructions that mosaicing be assembled

23   and include an alignment process and a composition process

24   there's agreement on, and that is consistent with the *Microsoft*

25   Court's ruling.  Google adds two limitations that are not part

L2GHKEWO

1    of the ordinary and understood meaning of the term "mosaicing"

2    and that are actually contradicted by the intrinsic evidence,

3    and that is requiring that it be of camera outputs, as we've

4    highlighted, and this almost statement of purpose that they

5    add, "to achieve a seamless combination of the camera outputs."

6            Specifically to your point of whether or not it needs

7    to be seamless, there's no disagreement that the ordinary

8    meaning and understanding of a mosaic is that it need not be

9    seamless, and they actually can't have seams.  That's

10   consistent with Judge Woods' rationale and holding in *Microsoft*

11   and the intrinsic evidence here.  We'll get into that in a

12   little more detail.

13           So here again there's no dispute that the ordinary

14   meaning of mosaicing is not limited to camera outputs.  Google

15   tries to read in that it's limited to camera outputs.  It's

16   not.  The intrinsic evidence explicitly describes mosaicing,

17   what's referred to as additional source outputs, and those are

18   not camera outputs.  In the '325 patent -- and Google makes an

19   argument that additional source output is not disclosed there,

20   but it absolutely is, including in claims 2 and 3 -- mosaicing,

21   the camera output and the additional source output, and that

22   can include computer graphic imagery, virtual world imagery,

23   and other images.  It's not limited to camera outputs.

24   Mosaicing in the context of these patents is not limited to

25   mosaicing camera outputs.

L2GHKEWO

1          The same with the '234 patent.  Again, Google argues

2     that the '234 should be disregarded, but, again, it does

3     address this issue.  It says:  Additional source output, alone

4     or in combination with camera output, for example, can be

5     represented by mosaicing, mixing, layering, etc.  Mosaicing in

6     the patents includes mosaicing not just camera outputs but

7     other imagery.

8          Some claims do recite mosaicing outputs of cameras.

9     And according to the *Phillips* case, to require that in the

10    definition of mosaicing is improper.  It renders that claim

11    language redundant.  Where the claim says mosaic output of

12    cameras, that's what's been mosaiced, but where it's silent,

13    that's not required by the term "mosaicing."

14         Now, on this issue of seamlessness, again, there's no

15    dispute that the ordinary meaning of mosaicing does not require

16    additional processing to make the mosaic seamless.  The mosaic

17    can have seams.  It exists whether a mosaic is seamless or not

18    and whether or not attempts are made to make the mosaic

19    seamless.  Dr. Lubin explained this and Google offered no

20    counter-testimony, and the intrinsic evidence directly supports

21    this.  The Burt patent, which is incorporated by reference into

22    the '325 and '234 patents, says:  After processing, the

23    individual images are combined to form a mosaic.  The mosaic is

24    formed.  Additional image processing is performed on the mosaic

25    to ensure that the seams between the images are invisible.

L2GHKEWO

1    Removing seams is after a mosaic is formed.  It is not required

2    by mosaic, and the *Microsoft* Court, quoting that language,

3    found just that.  The Burt patent makes clear that a mosaic can

4    be formed even if that mosaic is not perfectly seamless.

5            Now, with that ordinary meaning, the patents do not

6    disavow the full scope.  Here, Google really conflates two

7    issues.  They say, well, the patent describes smooth motion,

8    seamless navigation.  That does not require mosaics to be

9    seamless.  The asserted patents criticized prior art where

10   changing the camera views resulted in a discontinuous image,

11   basically jumping from one image to another image, a jarring

12   view even as Google characterizes it.  That was what was

13   criticized.  That overall navigation of avoiding that

14   discontinous image does not require mosaics to be seamless.  It

15   has nothing specifically to do with mosaicing.  One way we know

16   is that that same language, "avoiding the discontinuous and

17   jarring image," is in the '226 patent, and the '226 patent

18   makes no mention of mosaicing.  It's talking about overall

19   smooth navigation, and Google conflates these two issues, on

20   the one hand, trying to smooth navigation, and on the other

21   hand, requiring a mosaic to be seamless.

22           Seamless navigation in the patents is about providing

23   users with smooth transition during navigation, not whether a

24   mosaic may have a seam in it.  And perhaps to put this in

25   better context for your Honor, what does it mean for a mosaic

L2GHKEWO

1    to have a seam?  A seam could be, for example, different

2    exposures for images.  One image has bright exposure.  Another

3    image being mosaiced may be taken with clouds, so it's darker.

4    Those images can be aligned in the composition process to form

5    a mosaic, but there may be some differences in the exposure

6    where a seam could be visible to a user.  That doesn't go to

7    whether or not there's smooth navigation.  There is still

8    smooth navigation, namely, no jumping or jarring effect from

9    discontinuous images despite that theme being present.

10   Google's conflating --

11             THE COURT:  I'm just going to stop you for a second.

12   Mr. Street tells me you have seven minutes.  I'm not sure

13   whether that's the same time you had, but I wanted to let you

14   know.

15             MR. DiBERNARDO:  Thank you, your Honor.

16             Here I should -- so, your Honor, Google asserts that

17   Kewazinga's proposed construction would lead to a nonsensical

18   result because it would permit anything to be a mosaic.  And in

19   support Google contends that Dr. Lubin testified that images

20   can be mosaiced even if they have no relationship.  That is

21   absolutely a mischaracterization of Dr. Lubin's testimony.  He

22   never said it didn't have to be any relationship between images

23   between mosaiced.

24             First, it's not a nonsensical result because even the

25   agreed portions of the construction require there to be an

L2GHKEWO

alignment process and a composition process.  Moreover, other claim language, as we talked earlier about, requires that there be progressively different perspectives of the environment. Again, describing the images that are being mosaiced or that may be mosaiced.  And then in terms of Dr. Lubin's explanation, it's clear he says there is no requirement that there be any particular relationship.  As long as you have a known relationship between those views, the views can be mosaiced. So there has to be a relationship, there has to be an alignment process, and a composition process.  There's no nonsensical result.

          Just, your Honor, I guess to take a step back regarding Google's attempt to add in this notion of to achieve seamless combination, it really seems that this is absolutely unhelpful to a jury.  It raises issues of intent and whether or not the creator of the system was intending to achieve a seamless combination.  It also raises issues that are inconsistent with the accepted ordinary meaning that a mosaic does not have to be seamless.  There is an alignment process and a composition process.  That's when a mosaic is formed. That's the basis on which infringement should be found.  That a mosaic may have seams, like differences in exposure, does not -- it still fulfills the purpose of the invention of smoothing navigation.  Requiring a seamless mosaic has nothing to do with smooth navigation.

L2GHKEWO

1          Highlighting the ambiguity of this term and this

2     phrase that they seek to add, at page 22 of Google's brief,

3     they mention that the best process for achieving a mosaic

4     should be employed.  Does that mean that to achieve a seamless

5     combination, the best process has to be employed?  That could

6     differ with different applications.  The patents talk about

7     different techniques for doing a mosaic: merging, fusing,

8     filtering.  Does that mean one of those processes could be

9     enough, as is thought and understood in the art, or this notion

10    of using a best process, do all of those have to be used?  This

11    phrase is really unhelpful to a jury, it's ambiguous, and it

12    brings in this notion of intent.  It also begs the question of

13    whether or not the additional processing that Judge Woods

14    focused on, whether that, which is agreed not part of

15    mosaicing, whether such additional processing is now somehow

16    required to achieve this best process for obtaining a mosaic.

17          With that, your Honor, I'll save any remaining time.

18          THE COURT:  OK.

19          MR. MODI:  Mr. Skrzypek, can we go to slide 55 of the

20    Google presentation, please.

21          Your Honor, there's really one principal dispute here,

22    which is the last phrase "to achieve a seamless combination of

23    the camera outputs," and the second one sort of flows from the

24    first.  So I'll take it in that order, and I'll show you what I

25    mean.  But what we're trying to do here with this construction

L2GHKEWO

is provide some additional clarity on what a composition

process is.  A composition process doesn't really have a clear

meaning or any meaning, and we respectfully submit that

additional clarity about what that process is will actually be

helpful to the jury and enable the jury to perform its duty of

deciding whether there is infringement or not infringement.

Where does the language come from?  The language is a

direct -- it comes directly from the specification and

specifically the patent that Kewazinga incorporated by

reference for this concept of mosaicing.  And I'll go through

that in a second, too.  But for context, one additional point I

want to make here is a lot of the presentation that Kewazinga

just delivered was focused on the noun "mosaic" and whether the

noun "mosaic" had to be perfectly seamless.  That's not the

issue here.  The issue here is the verb "mosaicing."  This

verb, this action, is something that's recited in a number of

the claims.  And in the *Microsoft* opinion, the Court actually

had a very apt analogy to the concept of proofreading.  The act

of proofreading is looking through something and trying to pick

out and correct any typos, for example, in a brief.  Now, is

something that has been proofread fully perfect and absent of

typos?  Well, hopefully.  That would be a good proofreading

process, but that doesn't always happen.  I've certainly

written briefs that I thought I've proofread and later found a

typo or two, but the verb, the act of proofreading, requires

L2GHKEWO

1    some effort to remove errors, and it's sort of a similar thing

2    here.  The act of mosaicing, as described in these patents,

3    includes, requires, some effort to achieve a seamless

4    combination of the outputs.

5           Next slide, please.

6           And just building on the point of why this is going to

7    be helpful, the *Microsoft* Court actually left open the

8    possibility of construing or deciding this very issue.  What

9    the *Microsoft* Court concluded was if there was a dispute about

10   whether there needs to be some image processing aimed at

11   reducing seams in mosaiced images, in other words, mosaicing,

12   the Court will consider supplemental briefing as to the meaning

13   of the term "composition process."  So all Google's proposal is

14   is an additional clarification on composition process.

15          Now, where does this construction come from?

16          Slide 58, please.

17          The '325 patent describes mosaicing, the term at issue

18   here, by incorporating by reference the '032 patent to Peter

19   Burt.  The mosaicing is something that comes from the Burt

20   patent.

21          Next slide, please.

22          What the Burt patent describes, as shown on slide 59,

23   is that mosaicing is a two-part process, the second part having

24   a couple of subparts.  So there is an alignment process that's

25   indicated in blue with 300 and a composition process, 303.

L2GHKEWO

1   This the parties are in agreement on.  There is an alignment

2   process there's a composition process.  That was the *Microsoft*

3   Court's construction, and there's no dispute there.  But what

4   does the Burt patent say about what the composition process is?

5           Next slide, please.

6           So according to the Burt patent, once that top

7   alignment process is complete, the invention utilizes a mosaic

8   composition process to construct or update a mosaic.  That

9   composition process within itself contains two processes: a

10  selection process and a combination process.  Now --

11          THE COURT:  Can I just ask, what's an alignment

12  process?

13          MR. MODI:  An alignment process is aligning two of the

14  constituent inputs with one another.  And I think the patents

15  describe it, and I don't actually have the precise description

16  either in my slides or on the top of my head, but I think it is

17  largely in line with what an ordinary meaning of alignment is

18  to mean, to try to line up certain things in a certain way.

19          THE COURT:  Then how is that different from the

20  mosaicing composition process?

21          MR. MODI:  Well, the mosaic composition process is --

22  the alignment process is part of the mosaic composition

23  process.  So mosaic composition process, or mosaicing, includes

24  both alignment and then this composition process.  I'm sorry.

25  I think I misunderstood your question.

L2GHKEWO

1          Composition is something different than alignment, and

2     actually this is -- your Honor's question is exactly right.

3     Why is that different?  How is that different?  What even is a

4     composition process?  That's exactly why additional

5     clarification around that makes sense.  What the composition

6     process is, according to the Burt patent, is a selection and a

7     combination.  The selection process -- this is on slide 60 --

8     automatically selects images for incorporation into the mosaic

9     and may include masking and cropping functions.  OK.  So

10    there's some selection of whatever the inputs are into this

11    composition process.

12         Then there is a separate combination process.  The

13    combination process applies various imaging processing

14    techniques, such as merging, fusing, filtering, image

15    enhancement, and the like, to achieve a seamless combination of

16    the images.  That is the point and the results of the

17    combination process, to achieve a seamless combination of the

18    images.  Does it have to be done in any particular way?  No.

19    As the patent says, it can be merging, fusing, filtering, and

20    we are not proposing in the construction that it has to be done

21    in any one of those ways.  But what is clear from the Burt

22    patent is that the combination process achieves a seamless

23    combination of the images.  That's what it is, and it would be

24    helpful for the jury to understand that's what it is.  Without

25    that context, it's really unclear how a jury is supposed to

L2GHKEWO

evaluate whether or not the combination process has been met or
not.  The combination process could mean anything.  The patents
tell us what it means.

Next slide, please.

Then now coming back to the Kewazinga patents,
the '325 patent includes exactly this same disclosure.  The
combination process applies these different techniques, or one
of these different techniques, to achieve a seamless
combination of the outputs.  So the patent tells us what it
does, and it is that description, and just that description,
which will be helpful for a jury and we believe should
therefore be in the construction.

Then with respect to the sort of secondary point, your
Honor -- I'm sorry, Mr. Skrzypek, can we go to slide 64,
please.

There is the argument in the papers and Kewazinga's
presentation just now that what the Burt patent says is that
any attempts to achieve seamlessness is some separate step from
the mosaicing.  That's the argument that's be presented.  The
problem is the portion of the Burt patent specification that
Kewazinga relies on is talking about the prior art.  That's
talking about how mosaicing was done before the Burt patent.
What the Burt patent describes and what is incorporated into
the Kewazinga patents is a mosaicing that involves this
combination process to achieve a seamless output of the images.

L2GHKEWO

1          Then slide 65, Mr. Skrzypek.

2          Because we believe it would be helpful to the jury and

3     clearer to articulate what is meant by the composition process,

4     we would propose adding that last portion of the construction

5     in.  And as a grammatical matter, this is why we had proposed

6     that the second line in Google's construction there on slide 65

7     include camera outputs because what's clear is what's being

8     combined, as described in the Burt patents, is the camera

9     outputs.  And if you just think grammatically about how this

10    construction works, it would be confusing to have images in the

11    first part and then a combination of the camera outputs in the

12    second.

13         So that's the basis of that change.  It flows from the

14    much more principal dispute, which is what is a composition

15    process, and it is consistent with how the claims are recited.

16    We have on the bottom of slide 65 this claim 1 of the '325

17    patent which makes clear that what is -- the sequentially

18    mosaicing is performed on the selected outputs of cameras.  So,

19    yes, it's in the claim.  I agree with that.  It is really more

20    of an ensuring grammatic consistency within the construction

21    type of issue.

22         Unless your Honor has any questions, I will reserve

23    the remainder of my time for any rebuttal.

24         THE COURT:  OK.  Mr. Street, how much time does the

25    plaintiff have left, if any?

L2GHKEWO

1          THE DEPUTY CLERK:  Kewazinga has two minutes left.

2          THE COURT:  OK.

3          MR. DiBERNARDO:  Thank you, your Honor.

4          Real quickly, then, to say that this added language

5     "to achieve seamless combination" is to explain the composition

6     process is disingenuous.  If that were the case, there would

7     be experts explaining what that meant.  A composition is to

8     form a single image with at least part of the two images.  It's

9     that process that helps smooth navigation.  That's the process

10    that's understood by the alignment and composition process.

11         Mosaicing, your Honor, predated the Burt patent.  What

12    Google is trying to do is to limit mosaicing to just what's a

13    preferred embodiment in Burt, and that is not the case.  That

14    is not the ordinary meaning.  That is not the process of claim

15    construction.  There is no basis to limit mosaicing to a

16    preferred embodiment in Burt, which is also just one embodiment

17    in the Kewazinga patent.  The description in Burt is an example

18    of an example.  It's not limited to the mosaicing in the Burt

19    patent.  It's just one example.

20         Taking a step back, it seems by focusing on this

21    combination process, Google is in essence going back to what

22    the *Microsoft* Court rejected.  They're saying that the

23    combination process has to achieve a seamless image.  That was

24    rejected by the *Microsoft* Court.  That is not part of the

25    understood meaning of what a mosaic is.  A mosaic can have

L2GHKEWO

seams.  The intrinsic evidence says that, and *Microsoft*

rejected that very argument by Microsoft.  They've come full

circle, and this extra language, "to achieve seamless

combination," should be rejected as inconsistent with that

ordinary meaning, your Honor.

THE COURT:  OK.  Give me just a minute.

MR. MODI:  I'm sorry, your Honor.  May I add?

THE COURT:  Yes.  Mr. Modi, I guess I'm still not --

you said it was just a matter of grammar, but it still sounds

like in your proposed construction you're including only camera

outputs and you're not including other sources of imagery, and

in fact you seem to be excluding it.  Is that the case, and if

so, why should we do that?

MR. MODI:  That's not the intent, your Honor, and if

it's more palatable to the Court, we could keep that plurality

of images portion of the *Microsoft* construction intact.  It is

Google's position that additional clarification on what the

composition process entails or even means, for that matter, is

important, and so we would respectfully suggest that that be

incorporated into the construction because that's exactly how

the patents describe what that is.  And to the extent it

creates any sort of grammatical inconsistency within the

construction, I'm sure, to the extent there's a dispute about

that later in the case, maybe that could be resolved at that

time.

L2GHKEWO

1       THE COURT:  OK.  I didn't mean to interrupt you.  Was

2   there anything else you wanted to address?

3       MR. MODI:  Oh.  So, no, I appreciate that, your Honor.

4   Thank you.

5       Again, we're not talking about mosaic.  The *Microsoft*

6   opinion had a very long description of the notion that a mosaic

7   does not need to be perfectly seamless because it's not

8   something you can sort of determine before the fact or after

9   the fact.  We're talking about the verb, and the verb is

10  defined in the Burt patent.  The notion that Kewazinga was just

11  merely -- first of all, the notion that there's an ordinary

12  meaning to mosaicing I would dispute.  It's not certainly a

13  phrase that I don't think is used in any regularity in these

14  patents.  In fact, Kewazinga had to go to another patent to

15  really describe what the concept is.  And what that patent says

16  is, OK, there's mosaicing as was done in the prior art, but

17  here's what mosaicing means here.  So I think the disclosure

18  that is actually in these patents is the mosaicing that is

19  described in the Burt patent.  It has that flowchart.  The

20  parties don't dispute that, and it's really just about what do

21  we do with this composition process?

22      Unless your Honor has any questions on mosaicing, I

23  just didn't want -- your Honor had asked for a couple of cases

24  on whether it's appropriate to construe a claim when the

25  specification consistently describes the invention in a certain

L2GHKEWO

1    way.  There are a couple of cases.  One is *Medicines*

2    *Co. v. Mylan*, 853 F.3d 1296.  Another is *Scimed v. Advanced*

3    *Cardiovascular*, 242 F.3d 1337.  And of course, *Phillips* and

4    then the number of cases that we cited in our papers as well

5    stand for this position that you don't look at claims in a

6    vacuum.  The *Eon* case is another.  This is meant to be an

7    exercise in trying to figure out what the inventors actually

8    invented.

9            So unless your Honor has any further questions, that's

10   all I have.

11           THE COURT:  OK.  Thank you very much.

12           Thank you to both of you, and you're sending copies of

13   your PowerPoints to the chambers email address, right, both?

14           MR. DiBERNARDO:  Yes, your Honor.

15           MR. MODI:  Yes, your Honor.

16           THE COURT:  That would be much appreciated.  Thanks.

17           OK.  Unless there's anything else, is there anything

18   else we need to discuss?  Sounds like no.  We are --

19           MR. DiBERNARDO:  One quick question, your Honor.

20           THE COURT:  Yes.

21           MR. DiBERNARDO:  Just housekeeping.  Do you have a

22   preferred form for the slides?  In native PowerPoint or just a

23   PDF?  Both?

24           THE COURT:  Why not both, because sometimes it's

25   faster to read or faster to send if it's in one form versus

L2GHKEWO

1    another.

2              MR. DiBERNARDO:  Will do.

3              THE COURT:  Thank you.

4              Thanks very much.  We're adjourned.

5              MR. MODI:  Thank you, your Honor.

6              MR. DiBERNARDO:  Thank you.

7              (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25