**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEWAZINGA CORP.,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Civil Action No. 1:20-CV-1106-LGS<br><br>**JURY TRIAL DEMANDED**<br><br>**PUBLIC REDACTED VERSION** |

**GOOGLE LLC'S BRIEF IN SUPPORT OF ITS MOTION TO EXCLUDE CERTAIN PORTIONS OF THE OPINIONS OF MS. MICHELE RILEY**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................................................................................... 1

II. LEGAL STANDARD ................................................................................... 2

III. BACKGROUND ........................................................................................ 2

IV. ARGUMENT ............................................................................................. 5

A. The Court Should Exclude Google Search Ad Revenue From Ms. Riley's Royalty Base (Table 1, Row 3). ............................................................ 5

1. Ms. Riley mistakenly conflates Google Maps users and Google Search users (Fig. 3, Step G). ................................................ 7

2. Ms. Riley did not deduct Google's contributions to Google Search revenue that are unrelated to the patented invention (Fig. 3, Step D). ............................................................................ 9

3. Ms. Riley has no basis for her assumption that Street View users contribute to Google Search ad revenue (Fig. 3, Step A). ..................... 11

B. The Court Should Exclude Ms. Riley's Opinions Regarding Certain Inputs to The Royalty Rate (Table 1, "Royalty Rate" Column). ................................. 14

V. CONCLUSION ........................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)....................2, 9

*ART+COM Innovation Pool GmbH v. Google Inc.*,
1:14-cv-217 (D. Del. April 28, 2016)....................13

*CSIRO v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015)....................12

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014)....................11

*Finjan, Inc. v. Blue Coat Sys. Inc.*,
879 F.3d 1299 (Fed. Cir. 2018)....................10, 11

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)....................2

*Kewazinga Corp. v. Microsoft Corp.*,
2021 WL 4066597 (S.D.N.Y. Sept. 1, 2021)....................8, 9

*Kewazinga Corp. v. Microsoft Corp.*,
No. 1:18-cv-4500 (S.D.N.Y. Jul. 18, 2020)....................8

*LaserDynamics, Inc. v. Quanta, Inc.*,
694 F.3d 51 (Fed. Cir. 2012)....................13

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
2019 WL 8138163 (C.D. Cal. Nov. 20, 2019)....................15

*Price v. L'Oreal United States, Inc.*,
17-cv-614-LGS, 2020 WL 4937464 (Aug. 24, 2020)....................2

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,
22 F. Supp. 3d 585 (E.D.V.A. Dec. 3, 2013)....................11

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*,
30 F.4th 1109 (Fed. Cir. 2022)....................13

*Transcenic, Inc. v. Google Inc.*,
1:11-cv-582 (D. Del. Dec. 23, 2014)....................13

*U.S. v. Williams*,
506 F.3d 151 (2d Cir. 2007)........................................................................................ 2

**RULES**

Fed. R. Evid. 702 ............................................................................................................ 2

## I. INTRODUCTION

Google moves to exclude certain opinions of Kewazinga's damages expert witness, Ms. Michele Riley, because she did not properly tie her analysis to the Accused Products, as required under *Daubert* and Federal Circuit precedent.

Kewazinga accuses Street View, a feature of Google Maps, which does not include advertisements. Yet, the vast majority of Ms. Riley's damages [REDACTED] comes from advertisements on Google Search, an unaccused and different product from Google Maps. Ms. Riley's opinions concerning Google Search should be excluded for three reasons. First, ***Ms. Riley simply uses the wrong data***. To purportedly allocate *Google Search* advertising revenue to Street View, Ms. Riley applies the percentage of people who enter Street View through *Google Maps* not *Google Search*. Ms. Riley confused user data in the *exact same way* in the parallel *Kewazinga v. Microsoft* case pending in this district, which led Judge Woods to exclude her opinions. This error results in an apples-to-oranges calculation that incorrectly inflates Ms. Riley's damages number. Second, ***Ms. Riley miscalculates her royalty base*** by failing to exclude revenue from unaccused features of Google Search that have nothing to do with Street View. Third, even if she had not made those apportionment errors, ***Ms. Riley has no basis to include Google Search advertising revenue in her royalty base*** because she has failed to support her analysis with evidence beyond her own conjecture that Street View contributes to that revenue.

In addition to the above errors, which relate to the amount of revenue that Ms. Riley included in her royalty base, her approach to calculating a royalty rate is also flawed. Specifically, ***Ms. Riley improperly uses the profit margin for all of Google's main products to calculate a reasonable royalty***, rather than a profit margin tailored to the accused Street View product.

Together the errors in Ms. Riley's expert report skew her damages calculation by over [REDACTED] and warrant exclusion of the associated portions of her report.

## II. LEGAL STANDARD

Under Federal Rule of Evidence 702, "District Courts play a 'gatekeeping' function," and are "charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Price v. L'Oreal United States, Inc.*, 17-cv-614-LGS, 2020 WL 4937464, at *2 (Aug. 24, 2020) (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Id.* at 267 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)). The "proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *U.S. v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

## III. BACKGROUND

Kewazinga seeks [REDACTED] in past damages for the alleged infringement of U.S. Patent Nos. 6,535,266, 6,522,325, and 9,055,234 (the "Patents-In-Suit") based on the opinions of its economics expert witness, Ms. Michele Riley. *See* Ex. C (Riley Rpt.) ¶ 338.

Kewazinga accuses Street View, a feature within Google Maps. Google Maps is a product that allows users to view a map of a geographic area. The Google Maps product contains numerous features, such as allowing users to locate addresses, get directions, assess traffic, view transit options, and see satellite imagery. *See, e.g.*, Ex. M (Lastra Rebuttal Rpt.) ¶ 760 (showing Google Maps); Ex. A (Riley Rpt.) ¶ 116 (listing features); *see also* Ex. H (Riley Tr.) at 97:11-22. According to Ms. Riley, the specific Accused Products are "Street View and the Dynamic Street View API," which are features that allow users to see street-level imagery of various locations on

Google Maps. Ex. A (Riley Rpt.) ¶¶ 102, 105, 180. And the specific patented technology Ms. Riley attempts to value is a sub-feature of Street View that shows a less-than-one-second transition animation when users move from one Street View location to another. *See id.* at ¶ 151 (discussing the purported value of animated transitions); *see also* Ex. D (Riley Reply.) ¶¶ 20-22; Ex. H (Riley Tr.) at 79:8-16.

To determine a royalty base for the "Street View and the Dynamic Street View API" accused products within Google Maps, Ms. Riley includes (1) revenue associated with Google Maps, [REDACTED] and (2) revenue associated with the Dynamic Street View API, [REDACTED] [REDACTED] Ex. C (Riley Rpt.) Exhibit 1. This totals [REDACTED] of revenue for the Accused Products. But then, Ms. Riley dramatically increases her revenue base by over [REDACTED] by including (3) ad revenue from Google Search—even though Google Search is a ***separate and non-accused product*** (Ex. A (Riley Rpt.) ¶ 119), and despite the fact that the accused Street View product does not show ads (Ex. H (Riley Tr.) at 98:15-99:17). To all three revenue categories, Ms. Riley applies a [REDACTED] royalty rate, which she calculates based, in part, on the profit margin across all of Google's products, not just the Accused Products. **Table 1** summarizes Ms. Riley's opinions.

**Table 1: Ms. Riley's Alleged Royalty Damages**

| | Royalty Base Component | Royalty Base (mm) | Royalty Rate | Total (mm) |
|---|---|---|---|---|
| (1) | Google Maps [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] |
| (2) | Dynamic Street View API [REDACTED] | [REDACTED] | [REDACTED] | [REDACTED] |
| (3) | Google Search | [REDACTED] | [REDACTED] | [REDACTED] |
| | **Total** | [REDACTED] | [REDACTED] | [REDACTED] |

As Table 1 demonstrates, Ms. Riley's damages calculation is based largely on ad revenue from Google Search—***a non-accused product***. Specifically, she focuses on revenue from "local searches"—i.e., searches with "[REDACTED]." Ex. H (Riley Tr.) at 137:6-10. Local searches are a subset of queries in Google Search for information about a specific location—e.g., a "specific

street address," "the White House," or "pizza near me." Exs. H and I (Riley Tr.) at 137:11-138:9; 138:10-14; 139:10-16; 168:20-24; Ex. G (Hylton Tr.) at 60:3-7. **Figures 1 and 2** show examples of local search results.

**Fig. 1: "the White House" Search Results Ex. K (Riley Dep. Ex. 8 (annotated))**

**Fig. 2: "pizza near me" Search Results Ex. K (Riley Dep. Ex. 9 (annotated))**

In response to local searches, Google Search shows a results page with a map. *See* **Fig. 1** (orange box and arrow); **Fig. 2** (orange box). Sometimes, the results page will also include a static (*i.e.,* non-interactive), Street View thumbnail image, which a user can click to enter Street View. *See* **Fig. 1** (blue box and arrow); *see also* Ex. G (Hylton Tr.) at 37:10-21; Ex. H (Riley Tr.) at 153:18-23. But even in those cases, the static Street View thumbnail—which itself is not even accused—is only one small part of the results page and importantly, clicking the thumbnail ***does not generate any revenue***. *See* Ex. N (Google's Fourth Supp. Resp. to Kewazinga's Interrogatory No. 4) at 20.

## IV. ARGUMENT

As argued below in Section A, the Court should exclude Google Search ad revenue (**Table 1**, Row 3, in green) from Ms. Riley's royalty base because she (1) uses an apportionment methodology that improperly conflates Google Maps with Google Search users, (2) fails to exclude revenue from unaccused features that have nothing to do with Street View, and (3) does not rely on quantifiable evidence that Street View contributes ad revenue to Google Search. As argued below in Section B, the Court should also exclude certain portions of Ms. Riley's opinions on royalty rate (**Table 1**, Royalty Column, in blue) because she improperly applies the profit margin across all Google products instead of properly isolating the profit margin for the Accused Products.

### A. The Court Should Exclude Google Search Ad Revenue From Ms. Riley's Royalty Base (Table 1, Row 3).

The Accused Product is Street View, a feature within Google Maps. Ex. A (Riley Rpt. ¶¶ 105, 180. The overwhelming majority of Ms. Riley's royalty base, however, comprises advertising revenue from Google Search, a separate product. *See* **Table 1**, above.

To purportedly allocate Google Search ad revenue to Street View, Ms. Riley begins with Google's worldwide advertising revenue (**"Step A"**) and limits it to the United States (**"Step B"**). Ms. Riley then multiplies her calculation by [REDACTED] (**"Step C"**), [REDACTED]

[redacted]

Ex. B (Riley Rpt.) ¶ 195; Ex. H (Riley Tr.) at 137:6-10. But she does not subtract any amount from her royalty base to account for content on the local search results page that is unrelated to maps—*i.e.* Google's non-map contributions (**"Step D"**). Ex. B (Riley .) ¶¶ 195-196; *see also* **Figs. 1 and 2**.

Next, Ms. Riley subtracts Google Maps revenue [redacted] (**"Step E"**), because she already calculated damages for Google Maps as a different royalty base component (*see* **Table 1**, Row 1). She also subtracts Google's costs to acquire Street View images because "imagery acquisition is outside the scope of the Patented Technology" (**"Step F"**). Ex. B (Riley Rpt.) ¶ 196. Finally, she mistakenly allocates [redacted] of the remaining Google Search ad revenue to Street View based on the percentage of Google Maps users who access Street View, rather than the percentage of Google Search users who access Street View (**"Step G"**).[1] Ex. B (Riley Rpt.) ¶ 197; Ex. H (Riley Tr.) at 102:13-17. **Fig. 3** summarizes Ms. Riley's calculations:

**Fig. 3: Ms. Riley's Google Search Calculations**

[redacted]

Ms. Riley's opinions concerning Google Search advertising revenue should be excluded because of the errors identified in **red**. Below, Google addresses those problems, starting at the end of Ms. Riley's calculation and working backward. First, at **Step G**, Ms. Riley mistakenly relies on user data for Google Maps, rather than the Google Search product she attempts to analyze. Second, at **Step D**, Ms. Riley captures revenue from unaccused features that have nothing to do

[1] Before multiplying by [redacted] (**Fig. 3, Step G**), Ms. Riley truncates a portion of the local search revenue from 2014 and 2019 to account for the damages period. Ex. C, (Riley Rpt.), Exhibit 4.1 at line 7.

with Google Maps. Third, at **Step A**, Ms. Riley does not rely on quantifiable evidence that Google Street View (which does not show ads) contributes ad revenue to Google Search.

### 1. Ms. Riley mistakenly conflates Google Maps users and Google Search users (Fig. 3, Step G).

Ms. Riley uses the wrong data when she attempts to allocate Google Search revenue to the accused Street View feature. She purports to measure the use of Street View by Google Search users. But instead of using the percentage of ***Google Search*** users who click on Street View from a Google search result page [redacted] Ms. Riley uses the larger percentage of ***Google Maps*** users who click on Street View from within Google Maps [redacted] That error alone inflates her damages calculation by almost [redacted] and warrants exclusion.

Specifically, to allocate Google Search revenue to Street View, Ms. Riley multiplies local search ad revenue by [redacted] (**Fig. 3, Step G**). Exs. B and C (Riley Rpt.) ¶`¶ 195, 197, Exhibit 4.1 at lines 1, 2, 9; Ex. H (Riley Tr.) at 137:6–17 ([redacted] [redacted]). According to Ms. Riley, [redacted] "measures use of Street View by Google users performing local searches." Ex. B (Riley Rpt.) ¶ 197. That is wrong. As Ms. Riley now admits, [redacted] is ***not*** the percentage of local search users that click on Street View; it is the percentage of ***Google Maps*** users that click on Street View. Ex. H (Riley Tr.) at 102:18-22 [redacted] [redacted] [redacted] [redacted] This is a critical mistake because Google Search and Google Maps users are not the same (*see* Ex. H, (Riley Tr.) at 140:18-141:19) and the two products have different [redacted]. That is unsurprising because the two products serve different purposes and have different user interfaces. *Compare* Ex. M (Lastra Rebuttal Rpt.) ¶ 760 (showing Google Maps) *with* **Figs. 1 and 2** (showing

Google Search). In fact, data that Google produced, of which Ms. Riley was aware (Ex. I (Riley Tr.) at 181:16-24 [REDACTED] [REDACTED])), indicates [REDACTED]. For example, in instances where local search results include a Street View thumbnail (**Fig. 1**, blue box), users click on the thumbnail to enter Street View [REDACTED] of the time. Ex. F, (Meyer Rpt.) ¶ 101, Attachment 13. [REDACTED] which means Ms. Riley's unsound analysis inflates damages by almost [REDACTED]. *See id.*

This is not the first time Ms. Riley mixed and matched data points resulting in an inflated damages calculation. In *Kewazinga Corp. v. Microsoft Corp.*, which involved the same patents, Ms. Riley applied the ***same*** flawed methodology and the court excluded her opinion. 2021 WL 4066597, at *21 (S.D.N.Y. Sept. 1, 2021). There, Kewazinga accused Microsoft Streetside (a product similar to Google Street View)[3] and Ms. Riley attempted to calculate damages based on ad revenue from Microsoft's Bing.com search (a product similar to Google search). *Kewazinga Corp. v. Microsoft Corp.*, No. 1:18-cv-4500, Dkt. 205 at 23-24 (S.D.N.Y. Jul. 18, 2020). Just as she does here, Ms. Riley mistakenly multiplied Microsoft's ad revenue from Bing.com ***local search*** by the percentage of Bing.com ***Maps*** users who access Streetside. Microsoft sought to exclude Ms. Riley's opinion because Ms. Riley "erroneously conflate[d] the percentage of Bing.com/*Maps users* who accessed Streetside to estimate the percentage of Bing.com '*local search*' *users* who accessed Streetside" even though the "evidence of record indicate[d] that Bing.com 'local search' users would access Streetside at a much lower rate than Bing.com/Maps

---

[2] Ms. Riley's [REDACTED] allocation represents the percentage of all U.S. Google.com searches that are local searches. The [REDACTED] represents the percentage of those local searches in which a user clicks into Street View from the search result page. Ex. F (Meyer Rpt.) ¶ 101, Attachment 13.

[3] Like Street View, Streetside is a feature within Microsoft's mapping product Bing Maps (Bing.com/maps). *See id.* at *19 ("The subject of Microsoft's motion is the accused Streetside feature of Bing.com/Maps, which forms the majority of the damages at issue in this case.").

users." *See id.* at 23-24 (emphasis in original). The court granted Microsoft's motion to exclude Ms. Riley's opinion as unreliable; and as to Microsoft's Map users and "local search" users, the court stated:

> The two are distinct groups, one being obviously broader than the other. Ms. Riley has not explained why it is proper to assume that the two behaved in the same manner, nor has she provided any methodology to engage in answering that question. The Court must ensure that Ms. Riley's expert testimony satisfies the requirements of Rule 702. Without an explanation for her conclusion that the two groups are indistinguishable for her damages analysis, the Court cannot conclude that the methodology she used is reliable.

*Microsoft*, 2021 WL 4066597, at *21. For the same reason, Ms. Riley's calculation here is also unreliable and, just as in *Microsoft,* should be excluded. *Amorgianos*, 303 F.3d at 267 ("To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step.").

**2. Ms. Riley did not deduct Google's contributions to Google Search revenue that are unrelated to the patented invention (Fig. 3, Step D).**

In addition to conflating Maps and Search user data, Ms. Riley's methodology is also unreliable because the local search revenue she allocates to Street View is overinclusive. Specifically, she fails to deduct revenue attributable to local search features that have nothing to do with the accused functionality, the accused product (Street View), or Maps. (**Fig. 3, Step D**).

To allocate Google Search ad revenue to Street View, Ms. Riley creates a revenue pool by multiplying Google's U.S. search ad revenue by [REDACTED] (**Fig. 3, Step C**). Ex. B (Riley Rpt.) ¶ 195. According to Ms. Riley, [REDACTED] is the correct allocation because: (1) she estimates [REDACTED] U.S. Google searches are local searches (Ex. H (Riley Tr.) at 142:9-14); (2) local searches produce a search results page with a map (*id.* at 142:15-143:6); and (3) maps relate to the patented invention (*see* Exs. H and I (Riley Tr.) at 159:23-160:18, 166:10-167:3). However, Ms. Riley concedes that "the [local] search results pages include more things than just a map." Ex. I (Riley Tr.) at 179:12-25. Indeed, as illustrated above in **Figs. 1 and 2**—which Ms. Riley agrees are local

search result pages (*see* Exs. H and I (Riley Tr.) at 154:12-25, 168:20-24)—the map (orange box) is only one of several elements displayed on each page. Local search result pages also include, for example, news feeds (**Fig. 1**, grey box), twitter feeds (**Fig. 1**, green box), image carousels (**Fig. 1**, yellow box), and recipe carousels (**Fig. 2**, purple box).

Those non-map elements have ***nothing*** to do with Maps, Street View, or the accused functionality. Yet, in **Fig. 3, Step C**, Ms. Riley improperly includes the value of the non-map elements in her royalty base by allocating ***all*** of Google's local search ad revenue to Google Maps (and ultimately Street View). Ex, I (Riley Tr.) at 167:24-168:15. For example, under Ms. Riley's theory, to the extent the map at the top of the results page in **Fig. 2** contributes to revenue generated (*see* Ex, I (Riley Tr.) at 172:11-18 )), so too does the recipe carousel (purple box). Ms. Riley, however, does not deduct the revenue contribution of the recipe carousel, or any other non-map element on the local search results page, from the local search ad revenue in her royalty base calculation. *See* Ex. B (Riley Rpt.) ¶¶ 194-197; *cf.* **Fig. 3**. Accordingly, when Ms. Riley purportedly identifies the portion of local search revenue attributable to Street View— (**Fig. 3, Step G**)—she necessarily captures contributions from non-map elements with no relation to the Patents-in-Suit. Therefore, her analysis is overinclusive and should be excluded. *See Finjan, Inc. v. Blue Coat Sys. Inc.*, 879 F.3d 1299, 1311 (Fed. Cir. 2018) ("[f]urther apportionment [of the royalty base] was required to reflect the value of the patented technology compared to the value of unpatented elements.").

Kewazinga may argue that Ms. Riley somehow accounts for non-map elements with her adjustment (**Fig. 3, Step C**). But Ms. Riley forecloses that argument in her report where she states that the figure was merely an "

[redacted]." Ex. B (Riley Rpt.) ¶ 194; *see also* Ex. I (Riley Tr.) at 165:18-23 ([redacted]).[4] In other words, the [redacted] factor isolates the portion of Google's total U.S. search ad revenue that was generated by local searches—it is not a deduction to distinguish between Google's map and non-map contributions to local search revenue.

To the extent ad revenue generated from local searches is relevant at all (it is not), Ms. Riley needed to subtract the value of non-map components from the local search revenue before allocating that revenue to Street View (**Fig. 3, Step D**). Without any apportionment of Google's non-Map contributions, Ms. Riley will invite the fact finder to award Kewazinga an amount of money not limited to what is attributable to the invention. *Rembrandt Soc. Media, LP v. Facebook, Inc.*, 22 F. Supp. 3d 585, 594 (E.D.V.A. Dec. 3, 2013) ("an apportionment including value attributable to more features than just the improvement overcompensates the patentee"); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("What is taken from the owner of a utility patent (for purposes of assessing damages under § 284) is only the patented technology . . ."); *cf. Finjan*, 879 F.3d at 1311 (rejecting plaintiff's argument that its apportionment was proper because the non-infringing features it failed to account for were unimportant). The Court should reject Ms. Riley's attempt to capture the value of non-patented features and exclude Google "local" Search ad revenue from her royalty base.

### 3. Ms. Riley has no basis for her assumption that Street View users contribute to Google Search ad revenue (Fig. 3, Step A).

Ms. Riley's damages opinion depends on her assumption that Google offers Street View to bring users into its "ecosystem" so that they will generate revenue through ads on Google's

[4] As shown in **Fig. 3, Steps E and F**, Ms. Riley subtracts approximately [redacted] and allocates the remainder ([redacted]) to Street View.

other products, like Search. *See, e.g.*, Ex. A, (Riley Rpt.) ¶¶ 132-137, 138, 182. But Ms. Riley fails to identify any evidence that Street View users actually contribute to Search ad revenue or to quantify any supposed connection between Street View and any ecosystem. Thus, Ms. Riley's Search royalty base, which includes ad revenue that cannot be attributed to Street View, does not "reflect the value attributable to the infringing features of the product, and no more," and should be excluded. *CSIRO v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015).

For example, Ms. Riley did not attempt to determine whether "[redacted]" or if [redacted]." Ex. I (Riley Tr.) at 189:5-23, 190:19-191:6. Ms. Riley also failed to analyze whether Street View users click on any ads in Search to generate revenue. *See id.* at 109:16-25. Indeed, she never even assessed whether any Street View users subsequently use Search. *See id.* at 107:21-108:5, 140:18-141:7. Instead of a reliable analysis that ties Street View to Google's purported ecosystem, Ms. Riley relies on speculation and generalized statements by Google about [redacted] that have no specific relation to Street View, and do not indicate Street View contributes to Google Search ad revenue. *See, e.g.*, Ex. D (Riley Reply) ¶ 37. And when presented with evidence indicating that [redacted], Ms. Riley simply ignores it. Indeed, Jeremy Hylton, a Google engineer who worked on local search for nine years, testified that [redacted] to Ms. Riley's ecosystem theory. Ex. G (Hylton Tr.) at 259:22-260:3 [redacted] *see also* Ex. L (Saidon Tr.) at 234:14–20 [redacted]

[redacted]

As Ms. Riley previews in her expert report, Kewazinga may cite *Transcenic, Inc. v. Google Inc.*, 1:11-cv-582, D.I. 591 (D. Del. Dec. 23, 2014) and *ART+COM Innovation Pool GmbH v. Google Inc.*, 1:14-cv-217, D.I. 353 (D. Del. April 28, 2016) in support of Ms. Riley's ecosystem theory. Those decisions have no relevance here. In both cases, the issue before the court was whether the expert had violated the entire-market-value-rule ("EMVR") in calculating their royalty bases. *ART+COM Innovationpool GmbH*, D.I. 353 at 31-32; *Transcenic*, D.I. 591 at 110-111.

In contrast, Ms. Riley's ecosystem theory is defective for two ***different*** reasons. First, she has no evidence that Street View users generate advertising revenue on Google Search. Second, she has not attempted to reliably quantify how much advertising revenue Street View users supposedly generate. Indeed, both *Transcenic* and *ART+COM* caution that if a damages expert uses an "ecosystem" as a starting point, that expert must "carefully analyz[e]" and "carefully apportion[]" that ecosystem to arrive at a royalty base and rate "***directed specifically to the use of the infringing technology***." *Transcenic* at 110–111 (emphasis added); *see also ART+COM* at 32.

Here, Ms. Riley goes far beyond what is "directed specifically to the use of the infringing technology" (*id.*) by incorporating revenue from the separate Google Search product. (**Table 1, Row 3)**. Her intentional and explicit departure from revenue associated with the Accused Products to the entire Google ecosystem—without evidence of a link between the two—distinguishes Kewazinga's cases. It also mandates exclusion. *LaserDynamics, Inc. v. Quanta, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("A damages theory must be based on sound economic and factual predicates.") (internal citation omitted). *See also, e.g.*, *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1123 (Fed. Cir. 2022) (cautioning that "a patentee must take care to seek only those damages attributable to the infringing features") (internal citations omitted).

**B. The Court Should Exclude Ms. Riley's Opinions Regarding Certain Inputs to The Royalty Rate (Table 1, "Royalty Rate" Column).**

According to Ms. Riley, the parties to the hypothetical negotiation would consider a royalty rate between [REDACTED] and [REDACTED] Ex. C (Riley Rpt.) ¶¶ 296, 334. Ms. Riley calculates the bottom of that range—[REDACTED]—using an unreliable income approach. Ex. C (Riley Rpt.) ¶¶ 203-215. To arrive at [REDACTED], she [REDACTED] splits a [REDACTED] profit margin between Google and Kewazinga. Exs. B and C (Riley Rpt.) ¶ 215, Exhibit 6.2. A critical problem with that profit split, however, is that 28.2% is the operating profit margin ***for the entire Google segment***[5] as reported in the 10-K for its parent company, Alphabet Inc. In other words, 28.2% accounts for the ***combined*** profitability of ***all of Google's main products***, including ads, Android, Chrome, hardware, Google Cloud, Google Maps, Google Play, Search, and YouTube. Ex. C (Riley Rpt.) Ex. 6.2.

Ms. Riley ***claims*** Google's segment-wide profit margin is one of the "[REDACTED]" (Ex. C (Riley Rpt.) ¶ 213)—but she fails to credibly back that claim. First, she states that Google's segment-wide margin is applicable because "[REDACTED]." (Ex. C (Riley Rpt.) ¶ 213). As a threshold matter, Ms. Riley cites no evidence in support of that statement and cites no evidence that each of the above Google products uses Street View panoramas. Moreover, as Ms. Riley acknowledges, Street View "imagery acquisition is outside the scope of the Patented Technology" (Ex. B (Riley Rpt.) ¶ 196), and Google could continue to benefit from Street View imagery in the absence of the Patented Technology (Ex. H (Riley Tr.) at 90:16-91:6). Thus, by Ms. Riley's own admission, use of panorama images does not implicate the Patented Technology, and therefore,

[5] Alphabet Inc., Google's parent company, reports financial information in two segments–"Google" and "Other Bets." The "Google segment" includes Google's main products such as ads, Android, Chrome, hardware, Google Cloud, Google Maps, Google Play, Search, and YouTube. Ex. J (2018 Alphabet Inc. 10-K) at 26; Ex. C (Riley Rpt.) ¶ 215, Exhibit 6.2.

does not justify her application of the segment-wide margin. Second, Ms. Riley asserts that her use of the segment-wide profit margin is justified because "[REDACTED]" Ex. C (Riley Rpt.) ¶ 213. To begin, Ms. Riley again fails to cite any support for her assertion. Also, even if Ms. Riley were correct, it strains credulity for her to suggest that Street View drives the profits for ***all of Google's main products***.

Indeed, other parts of Ms. Riley's analysis foreclose the use of the "Google segment" profit margin as a proxy for the profitability of the Accused Products. For example, to calculate her damages base, Ms. Riley excludes revenues from YouTube—another Google-segment product—because that revenue is not attributable to the Accused Products. Ex. B (Riley Rpt.) ¶ 195, n.526. For that same reason, her use of the segment-wide profit margin (including YouTube) is inappropriate—it accounts for revenue, and therefore ***profitability***, that is not attributable to the Accused Products.

In short, because Ms. Riley fails to provide a reliable justification for her use of the Google segment-wide profit margin to calculate the [REDACTED]ty rate, the associated methodology is unreliable, speculative, and should be excluded. *See Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 2019 WL 8138163, at *16 (C.D. Cal. Nov. 20, 2019) ("The dispositive flaw in [the plaintiff's] argument is the underlying assumption that company-wide financials could provide any relevant information on the profitability of the accused product . . . . Mathematically, this cannot be so.").

## V. CONCLUSION

For the foregoing reasons, Google's motion should be granted, excluding (1) Google Search revenue from Ms. Riley's royalty base (Exs. A and B (Riley Rpt.) ¶¶ 184-197, and exhibits containing same; Exs. D and E (Riley Reply) ¶¶ 45-60) and (2) Ms. Riley's [REDACTED] royalty rate, and calculation thereof (Ex. C (Riley Rpt.) ¶¶ 205-215, 295, 296, 331, and 332, and exhibits containing same; Ex. E (Riley Reply) ¶¶ 63-71, 83).

Dated: February 9, 2023          By:    *Karim Z. Oussayef*
                                        John M. Desmarais
                                        jdesmarais@desmaraisllp.com
                                        Karim Z. Oussayef
                                        koussayef@desmaraisllp.com
                                        Steven M. Balcof
                                        sbalcof@desmaraisllp.com
                                        Ryan Dowell
                                        rdowell@desmaraisllp.com
                                        Lee Matalon
                                        lmatalon@desmaraisllp.com
                                        **DESMARAIS LLP**
                                        230 Park Avenue
                                        New York, New York 10169
                                        Tel: (212) 351-3400
                                        Fax: (212) 351-3401

                                        Yong Wang (*pro hac vice*)
                                        lwang@desmaraisllp.com
                                        **DESMARAIS LLP**
                                        101 California Street
                                        San Francisco, California 94111
                                        Tel: (415) 573-1900
                                        Fax: (415) 573-1901

                                        Tuhin Ganguly (*pro hac vice*)
                                        tganguly@desmaraisllp.com
                                        **DESMARAIS LLP**
                                        1701 Pennsylvania Avenue NW, Suite 200
                                        Washington, D.C. 20006
                                        Tel: (202) 451-4900
                                        Fax: (202) 451-4901

                                        *Counsel for Defendant Google LLC*